**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**CASE NO. 9:17-cv-81178-DMM**

NATIONAL LABORATORIES, LLC, THE LUKENS
INSTITUTE, LLC, TREASURE COAST
RECOVERY, LLC,

       Plaintiffs and Counter-Defendants,

v.

UNITEDHEALTH GROUP, INC., UNITED
HEALTHCARE SERVICES, INC.,
UNITEDHEALTHCARE INSURANCE COMPANY,
UNITED HEALTHCARE SERVICES LLC,
OPTUM, INC. and GOLDEN RULE INSURANCE
COMPANY,

       Defendants and Counter-Plaintiffs,
v.

NATIONAL LABORATORIES, LLC, THE LUKENS
INSTITUTE, LLC, TREASURE COAST
RECOVERY, LLC, TREATMENT MANAGEMENT
COMPANY, LLC, WELLNESS COUNSELING AND
RESIDENTIAL DETOXIFICATION, LLC, SUNSHINE
DOCTORS GROUP, LLC, and AID IN RECOVERY, LLC

       Counter-Defendants.

_____/

**<u>DEFENDANTS' ANSWER, DEFENSES, AND ORIGINAL COUNTERCLAIM</u>**

     Defendants, UnitedHealth Group, Inc. ("UnitedHealth Group"); United HealthCare

Services, Inc. ("United HealthCare Services"); UnitedHealthcare Insurance Company

("UnitedHealthcare Insurance"); United HealthCare Services, LLC; Optum, Inc. ("Optum"); and

Golden Rule Insurance Company ("Golden Rule") (collectively, "Defendants" or "United"),

hereby file their Answer, Defenses, and Original Counterclaim, in response to the Amended

45098513;1

Complaint of Plaintiffs, National Laboratories, LLC ("National Labs"), the Lukens Institute d/b/a Executive Recovery Center ("Lukens"), and Treasure Coast Recovery ("Treasure Coast") on a paragraph by paragraph basis.

## I.    INTRODUCTION

1.    UnitedHealth Group admits that United HealthCare Services; UnitedHealthcare Insurance; United HealthCare Services, LLC; Optum; and Golden Rule are wholly owned subsidiaries of UnitedHealth Group. UnitedHeath Group admits that a portion of its business involves "insuring and administering health insurance plans." United denies the remaining allegations of this Paragraph as setting forth legal conclusions to which no Response is required.

2.    United admits that certain health insurance plans for which it acts as insurer and/or claims administrator are governed by the Employee Retirement Income Security Act of 1974 ("ERISA"). United admits that for some ERISA-governed plans, United serves as the claims administrator responsible for determining whether any given benefit claim is covered by the plan and issuing or authorizing any benefit payments. The statement that "United is an ERISA fiduciary for the self-insured United Plans to the extent it exercises these functions" calls for a legal conclusion and requires no response.

3.    United denies the allegations of this Paragraph.

4.    United lacks information and knowledge necessary to form a belief as to the allegations in this Paragraph, and therefore denies those allegations.

5.    United lacks information and knowledge necessary to form a belief as to the allegations in this Paragraph, and therefore denies those allegations.

6.    United admits that Lukens and Treasure Coast do not have a direct in-network written contractual relationship with United. United lacks information and knowledge necessary

45098513;1

to form a belief as to the remaining allegations in this Paragraph regarding the services Lukens and Treasure Coast provided to United members, and therefore denies those allegations.

7.     United admits only that Plaintiffs have submitted benefit claims for benefit to United for payment. United further admits only that it has paid some benefit claims or caused some benefit claims to be paid to Plaintiffs. United denies the remaining allegations of this Paragraph.

8.     United denies the allegations of this Paragraph.

9.     United admits that National Labs contacted United regarding benefit claims, but denies Plaintiffs' characterizations of any contacts, and denies the remaining allegations of this Paragraph.

10.     United lacks information or knowledge necessary to form a belief as to when Lukens and Treasure Coast learned of any purported facts they are alleging, and, therefore, denies those allegations. United denies the remaining allegations of this Paragraph.

11.     United admits only that Plaintiffs have submitted thousands of benefit claims since August 2015 to United, and denies Plaintiffs' characterization of those claims. United denies the remaining allegations of this Paragraph.

## II.     PARTIES

12.     United lacks information and knowledge necessary to form a belief as to the allegations in this Paragraph, and therefore denies those allegations.

13.     United lacks information and knowledge necessary to form a belief as to the allegations in this Paragraph, and therefore denies those allegations.

14.     United lacks information and knowledge necessary to form a belief as to the allegations in this Paragraph, and therefore denies those allegations.

15.     United admits that UnitedHealth Group is a publicly traded Delaware corporation with its principal place of business in Minnesota and that various subsidiaries and affiliates issue health insurance and administer health insurance plans. United denies the remaining allegations of this Paragraph on the basis that the allegations are incomplete regarding the summary of description of totality of United's business.

16.     United admits that United HealthCare Services is a Minnesota corporation which conducts insurance operations in the State of Florida. United is unable to formulate a response relating to allegations implicated by the phrase, "operating division" as it is vague and ambiguous, and therefore, United denies the remaining allegations of this Paragraph.

17.     United admits that UnitedHealthcare Insurance Company is a Connecticut corporation with its principal place of business in Connecticut, that it conducts business as an insurance company in the State of Florida, that it underwrites insurance, and that it participates in the claims administration process related to certain United plans.  United denies the remaining allegations in this Paragraph.

18.     United admits the allegations of this Paragraph.

19.     United admits that Golden Rule Insurance Company is an Indiana corporation with a principal place of business in Indiana.  United denies the remaining allegations in this Paragraph.

20.     United admits that the named Defendants either issue health insurance and/or provide administrative services for health insurance plans or policies or other health care related services.  United denies the Plaintiffs' characterizations of the purpose, goals and policies of the Defendants as incomplete.  United also specifically denies that the distinctions between the

named Defendants should be disregarded.  The remaining allegations of this Paragraph are also denied.

21.     United admits that it is a claims administrator of certain health benefits plans or policies that allegedly cover certain benefit claims at issue.  However, the administrative services agreements speak for themselves and the applicable employee health plans or policies set forth United's and/or the benefit plan's duties and responsibilities specific to that plan or policy. United also admits that Plaintiffs communicated directly with United on behalf of patients. United however denies that it is generally vested with authority to provide plan documents to plan participants. The remaining allegations of this Paragraph are also denied.

22.     United denies the allegations of this Paragraph.

23.     United states that to the extent Plaintiffs attempt to characterize or restate portions of statutory and/or regulatory provisions, such provisions speak for themselves and require no response. United also states that applicable administrative services agreements speak for themselves and the applicable employee health plans or policies set forth United's and/or the benefit plan's duties and responsibilities specific to that plan or policy. To the extent a response is required, United denies the allegations in Paragraph 23, including subparts a–h thereto.

### III.     JURISDICTION AND VENUE

24.     United admits the allegations of this Paragraph for jurisdictional purposes only, but denies the allegations of this Paragraph for any other purpose.

25.     United admits the allegations of this Paragraph for supplemental jurisdiction purposes only pursuant to 28 U.S.C. § 1367 over the state law claims, but denies the allegations of this Paragraph for any other purpose.

26.     United denies the allegations in paragraph 26.

27.     United admits that this Court has personal jurisdiction over United, but denies the remaining allegations in this Paragraph, express or implied.

28.     United admits that venue is proper in this Court, but denies that any "breach took place" as alleged in this Paragraph.  Any allegation not specifically admitted is hereby denied.

## IV.     FACTUAL ALLEGATIONS

29.     United lacks information and knowledge necessary to form a belief as to the allegations in this Paragraph, and therefore denies those allegations.

30.     United lacks information and knowledge necessary to form a belief as to the allegations in this Paragraph, and therefore denies those allegations.

31.     United lacks information and knowledge necessary to form a belief as to the allegations in this Paragraph, and therefore denies those allegations.

32.     United lacks information and knowledge necessary to form a belief as to the allegations in this Paragraph, and therefore denies those allegations. United also states that the allegation regarding, "The Assignment of Benefits also authorizes the Plaintiffs, its agents, contractors and/or billing representatives, to act as the patient's agent for purposes of obtaining direct payment for the services provided" is a legal conclusion to which no response is required, and, therefore, denies this allegation.

33.     United also states that the allegation, "Plaintiffs followed industry standard processes with United for verifying coverage, and where necessary obtaining authorization or other approval from United, for the medically necessary services rendered that are at issue in this lawsuit" contains legal conclusions to which a response is not required and, therefore, denies this allegation. United admits that Plaintiffs or their agents have contacted United regarding such matters as coverage, eligibility, authorization or approval from time to time, but lack sufficient

information and knowledge to form a belief as to the frequency, nature, or purpose of these contacts. United denies the remaining allegations in this Paragraph.

34.     United admits that it does, under certain circumstances, verify whether a particular member has coverage, benefits, or eligibility for certain substance use disorder services, but lacks sufficient information and knowledge as to whether it "routinely verified" for all United Members treated by Plaintiffs that "had coverage, benefits and eligibility for substance abuse treatment." United admits that, generally, depending on the terms of the applicable plans and the details of the treatment or services involved, among other potential factors, it would determine whether certain services were covered and/or authorized and relay such information to a provider. The allegations that "[t]his verification process is industry standard" and "[t]his process also was the established custom, usage and practice by United for informing the Plaintiffs that United (a) approved the providers rendering the services, (b) expected the Plaintiffs to bill for the services, (c) would process the bills, and (d) would pay or cause payment to be made for the medically necessary services," are legal conclusions that require no response and, therefore, are denied. United denies any remaining allegations of this paragraph.

### *Claims Submitted by National Labs to United for Benefit Determination and Payment on behalf of United Plans*

35.     United admits only that it has paid or authorized payment of benefit claims submitted by patients in some instances, and denies Plaintiffs' characterizations of those payments. United further states that the allegations relating to "industry standard" and "custom, usage and practice" are legal conclusions and require no responses, and, therefore, United denies those allegations. Regarding the allegation that "[o]n or around November 15, 2015, however, United began to request unnecessary and excessive medical records and other documentation on individual claims submitted by National Labs to United prior to making benefit determinations

on behalf of United Plans," United responds only that on or around November 25, 2015, it began properly requesting that Plaintiffs submit documentation to support their claims, and United denies the remaining allegations. Regarding the allegation that "[o]ver the next several months, National Labs provided United with thousands of pages of medical records, physician orders, lab test results, as well as descriptions of testing methodologies used and specimen type," United admits only that Plaintiffs submitted some incomplete documentation relating to their services. United admits that it appears that on or around January 25, 2016, Plaintiffs provided to United via email a CLIA certificate and document referenced as a chargemaster. United denies any remaining allegations in this Paragraph.

36.     United lacks information and knowledge necessary to form a belief as to the allegations in this Paragraph, and therefore denies those allegations.

37.     United notified National Labs by letter dated November 25, 2015, that National Labs was required to submit medical records for all future benefit claim submissions.  United otherwise lacks information and knowledge necessary to form a belief as to the remaining allegations of this Paragraph, and therefore denies those allegations.

38.     United lacks sufficient knowledge or information to form a belief as to the allegations in this Paragraph and, therefore, denies the allegations in this Paragraph.

39.     United admits that United and National Labs participated in a Webex, but denies Plaintiffs' characterization of the Webex, and, therefore, denies the remaining allegations relating to the Webex. United admits that it received a fax dated May 19, 2016, from National Labs, purporting to send documents relating to "National Labs Record Request," but is without information or knowledge at this time to form a belief as to whether these documents were "requested by United during the Webex conference" or that National Labs "contacted United on

45098513;1

the next steps," and, therefore, denies those allegations. United is without sufficient information or knowledge to form a belief as to when and in what manner Carolyn Ham informed National Labs she was leaving United, and, therefore, denies those allegations. United denies all remaining allegations in this Paragraph.

40.    United admits that Adam Easterday communicated with Plaintiffs, but is without sufficient information or knowledge to form a belief as to when and in what manner such communications commenced, and, therefore, denies the allegation that such a connection occurred on or around June 9, 2016.  Regarding Plaintiffs' allegation that "[o]n or around June 14, 2016, National Labs provided Mr. Easterday with the Parties' prior communications regarding the claims sampling process that was developed by United," United admits only that, on June 14, 2016, Mr. Easterday appears to have received an e-mail from Plaintiffs' counsel, Eileen Parsons, providing Ms. Parsons' representations regarding previous communications. United denies any remaining allegations in this Paragraph.

41.    United admits only that it appears that an e-mail to Ms. Parsons was sent on June 22, 2016, relating to Plaintiffs, and denies Plaintiffs' characterizations of any alleged communication(s). United denies that it received a related communication the following day, and denies any remaining allegations in this Paragraph.

42.    United is without sufficient information or knowledge to form a belief as to whether a letter dated July 1, 2016, as described in this Paragraph was sent to Plaintiffs, and, therefore, denies the allegations in this Paragraph. In addition, the allegation stating that "[t]his was a change from the prior practices and the industry standard for coverage for the services at issue here" represents a legal conclusion and does not require a response, and is, therefore, denied.  United denies any remaining allegations this Paragraph.

45098513;1

43.     United is without sufficient information or knowledge to form a belief as to whether a "conference call" occurred between United and National Labs on July 27, 2016, and, therefore, denies this allegation. United denies that it "still had not communicated to National Labs any information regarding the prior agreement to audit a sampling of claims so that the sampling could proceed."  United denies any remaining allegation of this Paragraph.

44.     United denies the allegations in this Paragraph.

45.     United admits only that communications were exchanged between United and counsel for National Labs around October 14, 2016, but denies Plaintiffs' characterization of any communications and, therefore, denies the remaining allegations in this Paragraph.   United denies any remaining allegations of this Paragraph.

46.      United admits only that communications were exchanged between United and counsel for National Labs around December 14, 2016, but denies Plaintiffs' characterization of any communications or actions and, therefore, denies the remaining allegations in this Paragraph. United denies any remaining allegation of this Paragraph.

47.     United admits only that communications were exchanged between United and counsel for National Labs during December 2016 and January 2017, but denies Plaintiffs' characterization of any communications or actions and, therefore, denies the remaining allegations in this Paragraph.

48.     United lacks information and knowledge necessary to form a belief as to the allegations in this Paragraph, and therefore denies those allegations.

49.     United admits only that representatives from United and National Labs participated in a WebEx conference on or around April 10, 2017, and that Dr. Barthwell participated, but disputes the remaining allegations and, therefore, denies same.

50.     United admits that there appear to have been communications between United and National Labs around April 21, 2017, but denies Plaintiffs' characterization of those communications and, therefore, denies the remaining allegations of this Paragraph.

51.     United admits that it received a 5-page letter dated May 15, 2017, from Plaintiffs' counsel, but disputes Plaintiffs' characterization of the contents, and, therefore, denies the remaining allegations of this Paragraph.

52.     United admits that it provided certain information including a spreadsheet to counsel for Plaintiffs regarding United's review of Plaintiffs' submissions on May 26, 2017, but is without sufficient information and knowledge at this time to form a belief as to when any review was "completed," and, therefore, denies that allegation. United denies the remaining allegations in this Paragraph.

53.     United admits only that it sent a letter dated June 26, 2017, to counsel for Plaintiffs. United disputes Plaintiffs' characterization of the letter and states that the letter speaks for itself, and, therefore, denies the remaining allegations in this Paragraph.

54.     United denies the allegations in this Paragraph.

55.     United states that to the extent Plaintiffs attempt to characterize or restate portions of statutory and/or regulatory provisions, such provisions speak for themselves and require no response. To the extent a response is required, United denies the allegations in this Paragraph.

### *Claims Submitted by Plaintiffs Lukens Institute and Treasure Coast Recovery for Benefit Determination and Payment by United on behalf of United Plans*

56.     United admits only that it investigated Lukens and Treasure Coast during 2015 and 2016, and as part of that investigation, United appropriately requested records from Lukens and Treasure Coast. United specifically denies that it "requested a multitude of information that is not typically requested of similarly situated providers for processing these types of claims,

including progress notes, medication lists, testing results, specialist referrals, superbills, manufacturer and model information for testing equipment, and other information," and denies all remaining allegations in this Paragraph.

57.     United denies the allegations in this Paragraph.

58.     United admits only that Lukens and Treasure Coast submitted a small number of documents that were often insufficient to comply with United's requests. United denies the remaining allegations in this Paragraph.

59.     United admits that it received a 5-page letter dated May 15, 2017, from Plaintiffs' counsel, but disputes Plaintiffs' characterization of the contents, and, therefore, denies the remaining allegations of this Paragraph.

60.     United admits only that it sent a letter dated June 26, 2017, to counsel for Plaintiffs. To the extent that Plaintiff intends to characterize or restate the contents of the letter, United states that the letter speaks for itself and that a response is not required. To the extent a response is required, United denies these allegations, and denies the remaining allegations of this Paragraph.

61.     United denies the allegations in this Paragraph.

***Identification of Patient Bills at Issue***

62.     United denies the allegation that it "is in possession of the information needed to identify the claims at issue in this lawsuit and that it has refused to pay." The remaining allegations in Paragraph 62 contain legal arguments that do not require a response. To the extent a response is required, United denies the allegations in this Paragraph.

45098513;1

## V. CAUSES OF ACTION

### COUNT I
### FAILURE TO PROVIDE BENEFITS UNDER ERISA PLANS
### (ERISA Section 1132(a)(1)(B))

63.     United incorporates its responses to Paragraphs 1-62 as if fully set forth herein.

64.     United admits that the Amended Complaint purports to seek relief under ERISA, but denies that Plaintiffs are entitled to any relief under ERISA. United denies any remaining allegations in this Paragraph.

65.     United states that to the extent Plaintiffs attempt to characterize or restate portions of statutory and/or regulatory provisions, such provisions speak for themselves and require no response. To the extent a response is required, United denies the allegations in this Paragraph.

66.     United denies that Plaintiffs "are the assignees of health care benefits provided to United for Members enrolled in ERISA plans and are therefore entitled to recover benefits due under the terms of United Member plans in their capacity as assignees of the United Members." United states that the remaining allegations of this Paragraph constitute a legal conclusion to which a response is not required. To the extent a response is required, United denies the allegations of this Paragraph.

67.     United states that the allegations that "ERISA authorizes actions under 29 U.S.C. § 1132(a)(1)(B) to be brought against the ERISA plans' administrators" and that "United functions as a *de facto* plan administrator" constitute legal conclusions to which a response is not required. To the extent a response to this allegation is required, United denies these allegations. United denies the remaining allegations in Paragraph 67.  Regarding the allegations that "United has provided plan documents to participants, received benefit claims, and whether or not Plaintiffs have fulfilled their required duties as to the claims at issue in this action, have

13

evaluated and processed other claims for those participants, reviewed the terms of the plans, made initial benefit determinations, made and administered benefit payments, and handled appeals of benefit determinations," United admits that it generally performs such functions. United denies any remaining allegations in this Paragraph.

68.     United admits that each individual plan, in conjunction with applicable policies and procedures, governs the terms under which expenses incurred by a plan Member are reimbursable. United denies any remaining allegations in this Paragraph.

69.     United states that to the extent Plaintiffs attempt to characterize or restate portions of statutory and/or regulatory provisions, such provisions speak for themselves and require no response. To the extent a response is required, United denies the allegations in Paragraph 69, including subparts thereto.

70.     United states that to the extent Plaintiffs attempt to characterize or restate portions of statutory and/or regulatory provisions, such provisions speak for themselves and require no response. To the extent a response is required, United denies the allegations in Paragraph 70, and footnote 1 thereto.

71.     United denies the allegations of this Paragraph.

72.     United denies the allegations of this Paragraph.

73.     United denies the allegations of this Paragraph.

74.     United states that to the extent Plaintiffs attempt to characterize or restate portions of statutory and/or regulatory provisions, such provisions speak for themselves and require no response. To the extent a response is required, United denies "Plaintiffs have exhausted or by law are deemed to have exhausted their administrative remedies under the ERISA plans at issue."   United further denies that it, "held Plaintiffs' claims submissions in limbo without

processing those claims under the pretense that 'additional information was required,' whether or not such additional information was previously or subsequently provided to United." United also denies that it "insisted on a review of 'Sample Claims' in lieu of Plaintiffs' further submission of documents, and summarily denied coverage without consideration of Plaintiffs' submitted documentation for those Sample Claims." Moreover, United denies that it "has not established and/or maintained reasonable claims procedures for these unprocessed and unpaid claims." United admits only that it sent a letter dated June 26, 2017, to counsel for Plaintiffs. United disputes Plaintiffs' characterization of the letter and states that the letter speaks for itself. United denies any allegation in this Paragraph not specifically admitted.

75.    United admits that Plaintiffs have, at various times, provided United with medical records, but denies the allegation that, "none of which United will even consider for determining coverage." United denies that "Plaintiffs have made all reasonable efforts to have United adjudicate its claims." The allegation that "United's refusal to determine benefits on these claims has left Plaintiffs with no reasonable administrative options" is a legal conclusion to which a response is not required. To the extent a response is required, United denies that allegation. United denies any allegation in this Paragraph not specifically admitted.

76.    United states that to the extent Plaintiffs attempt to characterize or restate portions of statutory and/or regulatory provisions, such provisions speak for themselves and require no response. To the extent a response is required, United denies the allegations of this Paragraph.

77.    United denies the allegations of this Paragraph.

78.    United admits that each plan insured and/or administered by United has separate terms governing benefit coverage and that members and/or the plan employers or sponsors generally either pay premiums for the issuance of insurance policies that fund plan or pay for

benefits covered under such plans to the extent the plans are self-insured.  United denies the remaining allegations in Paragraph 78.

79.    United states that the allegations of this Paragraph constitute a legal conclusion to which a response is not required. To the extent a response is required, United denies the allegations of this Paragraph.

80.    United states that the allegations of this Paragraph constitute a legal conclusion to which a response is not required. To the extent a response is required, United denies the allegations of this Paragraph.

**COUNT II**
**FAILURE TO MAINTAIN REASONABLE CLAIMS PROCEDURES FOR ERISA PLANS**
**(ERISA § 1132(a)(3))**

81.    81-90.  United does not respond to the allegations contained in paragraphs 81-90 of the Plaintiffs' Amended Complaint since Count II has been dismissed pursuant to the Court's Order, D.E. 90.   To the extent that a response is nonetheless required, United denies the allegations in Paragraphs 81-90.

**COUNT III**
**BREACH OF IMPLIED-IN-FACT CONTRACT**

92.    United incorporates its responses to Paragraphs 1-62, to the extent applicable, as if fully set forth herein.

93.    United states that the allegations of this Paragraph constitute a legal conclusion to which a response is not required. To the extent a response is required, United denies the allegations of Paragraph 92. United denies any remaining allegation of this Paragraph.

94.    United admits only that it communicated with Plaintiffs generally, and denies Plaintiffs' characterization of any communications. United further states that the allegations of

16

this Paragraph constitute a legal conclusion to which a response is not required. To the extent a response is required, United denies the allegations of this Paragraph.

95.    United admits generally that it may have communicated with various representatives of the Plaintiffs prior to the instant lawsuit, but denies Plaintiffs' characterization of any communications.  United denies the remaining allegations of this Paragraph.

96.    United states that the allegations of this Paragraph constitute a legal conclusion to which a response is not required. To the extent a response is required, United denies the allegations of this Paragraph.

97.    United denies the allegations of this Paragraph.

98.    United denies the allegations of this Paragraph.

99.    United denies the allegations of this Paragraph.

100.    United denies the allegations of this Paragraph.

101.    United denies the allegations of this Paragraph.

102.    United states that the allegations of this Paragraph constitute a legal conclusion to which a response is not required. To the extent a response is required, United denies the allegations of this Paragraph.

**COUNT IV**
**BREACH OF IMPLIED-IN-LAW CONTRACT**
**(UNJUST ENRICHMENT)**

103.    United incorporates its responses to Paragraphs 1-62, to the extent applicable, as if fully set forth herein.

104.    United states that the allegations of this Paragraph constitute a legal conclusion to which a response is not required. To the extent a response is required, United denies the allegations of Paragraph 104.

105.    United denies the allegations of this Paragraph.

45098513;1

106.    United denies the allegations of this Paragraph.

107.    United denies the allegations of this Paragraph.

108.    United denies the allegations of this Paragraph.

109.    United denies the allegations of this Paragraph.

110.    United denies the allegations of this Paragraph.

111.    United denies the allegations of this Paragraph.

112.    United denies the allegations of this Paragraph.

**COUNT V**
**BREACH OF CONTRACT AS THIRD-PARTY BENEFICIARIES**

113.    United incorporates its responses to Paragraphs 1-62, to the extent applicable, as if fully set forth herein.

114.    United states that the allegations of this Paragraph constitute legal conclusions to which a response is not required. To the extent a response is required, United denies the allegations of this Paragraph.

115.    United admits that written plan agreements may exist, the contents of which speak for themselves.  United denies the remaining allegations of this Paragraph.

116.    United denies the allegations of this Paragraph.

117.    United denies the allegations of this Paragraph.

118.    United states that the allegations of this Paragraph constitute a legal conclusion to which a response is not required. To the extent a response is required, United denies the allegations of this Paragraph.

**COUNT VI**
**DECLARATORY RELIEF**

119.    United incorporates its responses to Paragraphs 1-62, to the extent applicable, as if fully set forth herein.

45098513;1

120.     United is without information or knowledge at this time to form a belief as to what actual services Plaintiffs provide, and, therefore deny those allegations. United denies the remaining allegations of this Paragraph.

121.     United denies the allegations of this Paragraph.

122.     United states that the allegations of this Paragraph constitute a legal conclusion to which a response is not required. To the extent a response is required, United denies the allegations of this Paragraph.

123.     United denies the allegations of this Paragraph.

124.     United denies the allegations of this Paragraph.

125.     United states that the allegations of this Paragraph constitute a legal conclusion to which a response is not required. To the extent a response is required, United denies the allegations of this Paragraph.

## VI. RELIEF REQUESTED

United denies that Plaintiffs are entitled to any of the relief sought in paragraph A-I of the "Relief Requested" section of their Amended Complaint.

## GENERAL DENIALS

United generally denies all allegations of the Amended Complaint except for such allegations as are explicitly and specifically admitted above.

## DEFENSES

In further response to the Amended Complaint, United asserts the following defenses. The denomination of any matter below as a defense is not an admission that United bears the burden of persuasion, burden of proof, or burden of producing evidence with respect to any such matter.

45098513;1

1.      Plaintiffs purport to state a cause of action relating to a claim for ERISA benefits under the ERISA plan.  Thus, to the extent that ERISA governs any benefit claims brought by Plaintiffs, Plaintiffs' claims under state law are preempted and otherwise barred by the applicable provisions of ERISA and binding precedent. Under ERISA, Plaintiff is not entitled to seek compensatory, punitive, or other extra-contractual damages.

2.      With regard to any benefit claims governed by ERISA, Plaintiffs' remedies for any alleged act or omission under the applicable ERISA plans are limited solely to those offered by ERISA.

3.      United has discharged its duties with respect to the applicable plans or policies that apply to the benefit claims at issue, in the interest of the participants and their beneficiaries and, in doing so, United acted in accordance with the documents and instruments governing the applicable plans or policies.

4.      With regard to the benefit claims at issue governed by ERISA, the applicable plans specify whether the claims administrator has discretion to make factual determinations and interpret the plan.  For the plans that vest that discretion in United, the applicable standard of review of United's determination is arbitrary and capricious.

5.      United affirmatively alleges that any liability of United, which is denied, is subject to the terms, conditions, limitations, endorsements, exclusions, and effective dates of the applicable plan or policy documents and related United policies and procedures.

6.      With regard to the benefit claims at issue governed by ERISA which were denied for the failure to submit medical records, United acted in accordance with the terms of the applicable plans.  Plaintiffs failed to satisfy all conditions precedent to any claim for benefits in that they failed to present sufficient medical evidence demonstrating entitlement to benefits.

45098513;1

7.      With regard to the benefit claims at issue governed by ERISA, should there be a determination that Plaintiffs are entitled to benefits, which is denied, such entitlement does not mean that Plaintiffs have entitlement to unlimited future benefits after that date given.

8.      Should there be a determination that Plaintiffs are entitled to benefits at issue, which is denied, United is entitled to reduce the benefit claims to the allowable amounts as defined by the terms of the applicable plans or policies, and, in accordance with the terms of the applicable policies or plans, to account for amounts to be paid by the participants or due from the participants such as co-pays, deductibles and co-insurance.

9.      If the Court determines that United materially erred in administering Plaintiffs' claims for benefits under the terms of the Plan or applicable law, which is denied, the Court should remand the benefit claims to United for further administrative processing in accordance with such determination before reaching any judicial decision as to Plaintiffs' entitlement to benefits.

10.      Plaintiffs are not entitled to any interest because the Plans do not explicitly provide for interest and such relief is not otherwise available under ERISA.  *Flint v. ABB, Inc.*, 337 F.3d 1326 (11th Cir. 2003).

11.      Plaintiffs have a duty to attempt to mitigate their damages associated with the claims that they suffered.  To the extent that Plaintiffs have not done so, Plaintiffs are not entitled to all or some of the damages to which he may otherwise be entitled.

12.      The applicable plans or policies that apply to the benefit claims at issue contain mandatory administrative remedies that are required to be exhausted before plan participants or insured, or Plaintiffs acting on their behave, may prosecute a claim in this Court.  With regard to

the benefit claims at issue, Plaintiffs failed to exhaust their administrative remedies under the applicable plans or policies and under ERISA, and therefore, are not entitled to the relief sought.

13.    Plaintiffs are not entitled to payment of claims and/or United is entitled to a set-off for any Urine Drug Testing that was ordered regardless of the patient's individual needs, risk factors, treatment progress, or health concerns, authorized, medically necessary, lawfully rendered, and compensable, when in fact these tests were ordered and performed as the result of a predetermined protocol for testing and was medically unnecessary.

14.    Plaintiffs' claims are non-compensable and/or subject to a setoff to the extent Plaintiffs ordered expensive presumptive and definitive Urine Drug Testing without first performing effective, inexpensive in-house point-of-care ("POC") tests to determine whether any laboratory tests were necessary;

15.    Plaintiffs' claims are non-compensable and/or subject to a setoff to the extent Plaintiffs failed to engage in a good faith attempt to collect a copayment and/or deductible from the patient, a practice that constitutes insurance fraud under Florida law. *See* Fla. Stat. § 817.234 (7)(a).

16.    Plaintiffs' claims are non-compensable and/or subject to a setoff to the extent they violated United's policies governing reimbursement or the compensability of a claim, including but not limited to the Laboratory Services Policy.

17.    Plaintiffs' claims are non-compensable and/or subject to a setoff to the extent they violated Fla. Stat. § 501.203(7) by, among other things, subjecting substance abuse patients to excessive, medically unnecessary, and unauthorized urinalysis testing; forging physician signatures on laboratory orders and other documents to give the appearance of medical necessity;

22

and billing United for that urinalysis testing that was the result of an intentionally fraudulent testing scheme.

18.     Plaintiffs' claims are non-compensable and/or subject to a setoff to the extent a patient or referral was procured in violation of Fla. Stat. § 817.505 *et. seq.* and/or Fla. Sat. § 456.054 *et. seq.*

19.     Plaintiffs do not have standing to pursue claims on behalf of any patients.

20.     To the extent that the applicable plans or policies contain anti-assignment provisions, Plaintiffs do not have standing to pursue claims on behalf of any plan or policy participants or insureds.

## CLAIM FOR ATTORNEY'S FEES AND COSTS

Pursuant to 29 U.S.C. § 1132(g), United hereby demands an award of its reasonable attorney's fees and costs incurred in this litigation.

## JURY DEMAND

United objects and moves to strike Plaintiffs' jury demand on the basis that there is no right to a jury trial in ERISA benefits cases.  *See Shaw v. Conn. Gen. Life Ins. Co.,* 353 F.3d 1276 (11th Cir. 2003).

**WHEREFORE**, The United demands the following: (a) that judgment be entered in its favor and against the Plaintiffs and the case dismissed with prejudice; (b) that the Court award United its attorneys' fees and costs incurred in defense of this matter; and (c) that the Court grant United such other and additional relief as is just and equitable.

45098513;1

<u>**ORIGINAL COUNTERCLAIM**</u>

Defendants UnitedHealth Group, Inc., United HealthCare Services, Inc., Unitedhealthcare Services Insurance Company, United Healthcare Services, LLC, Optum, INc., and Golden Rule Insurance Company, (collectively, "Counter-Plaintiffs" or "United"), bring this Counterclaim against National Laboratories, LLC, The Lukens Institute, LLC, Treasure Coast Recovery, LLC, Wellness Counseling and Residential Detoxification Services, LLC, Treatment Management Company, LLC, Sunshine Doctors, LLC, and Aid in Recovery, LLC (collectively, "Counter-Defendants"), and allege the following in support:

## I.   NATURE OF THE ACTION

1.     This case involves a fraudulent, unfair, deceptive and unconscionable scheme orchestrated and jointly perpetrated by a group of entities that share common ownership, through a structure of sham "holding" companies.  These entities comprise a web of entities designed to target, recruit, and import patients from all over the country into their web of "substance use disorder" treatment facilities. This web of entities (the "Web") includes a marketing arm, a "detox" facility, outpatient treatment facilities, a physicians group, a testing laboratory, and various iterations of holding companies through which the Web is organized.

2.     The goal of the Web is to maximize billing by moving the patients through various levels of care, from the most intense to the least, all the while collecting specimens for urine drug testing ("UDT").  UDT, performed by Web entity National Laboratories, LLC ("National Labs"), provides the greatest opportunity for Web billing.  All of the 30 plus treatment facilities throughout the Web, from as far away as California and Arizona, send urine specimens to Florida so that National Labs can test (and re-test) specimens, to the tune of

24

$11,000 or more per specimen. This intentional pattern of UDT is performed in a rote and pre-determined manner on substance use disorder ("SUD") patients.

3.      The Web of facilities is comprised of a marketing arm designed to identify and recruit the patients, treatment facilities offering various "levels of care" for patients and a UDT "laboratory" to which all specimens are shipped from across the country. The Web also includes a group of doctors intended to render the "treatment" and, important to the business model, order the UDT.  The Web is overseen by parent company Treatment Management Company ("TMC") which provides all of the "business" support for the entities.

4.      The Web, whose facilities are all out-of-network, charge exorbitant prices and exploits those patients who are suffering from SUD.

5.      The Web begins with its marketing partner, Aid in Recovery, which is designed, through heavy investments in search engines, to locate patients and capitalize on them as they search for help on the internet.  Aid in Recovery's online presence allows it to find potential patients to draw into the Web.  In fact, Aid in Recovery will often send plane tickets, at no charge to patients, to immediately transport them to a Web facility.

6.      These treatment facilities (more than 30 in total) are all owned and/or managed by Treatment Management Company ("TMC"). They are located in California, Arizona, and Florida.  These treatment facilities, based upon "Standing Orders" provided by TMC, direct the collection and testing of UDT specimens throughout each level of care, regardless of individual patient needs.

7.      Many of the patients referred into the Web through Aid In Recovery begin at the detoxification level of care ("detox"). Detox is the highest level of care for SUD patients and is appropriate only for those patients suffering from acute and serious addiction to assist patients in

managing the symptoms of withdrawal. The Web detox facility located in Palm Beach County is Wellness Counseling and Residential Detoxification Services, LLC, ("Wellness").

8.     Florida Web facilities The Lukens Institute, LLC, ("Lukens") and Treasure Coast Recovery, LLC ("Treasure Coast") are located in Martin County, Florida, which borders Palm Beach County. National Labs is also located in Martin County, Florida.  These treatment facilities would treat the Web patients after "discharge" from Wellness through less intensive levels of care including Partial Hospitalization ("PHP") and Intensive Outpatient Program ("IOP"). Both of these subsequent levels of care include residential treatment options for patients via the Web.

9.     Beginning with detox and throughout the various levels of care, Web patients were subjected to excessive and medically unnecessary UDT under the guise of monitoring and treating these patients. Web providers, including Wellness, Lukens and Treasure Coast, with the participation of Sunshine Doctors and at the direction of TMC, ordered excessive, expensive and unnecessary urinalysis testing from the Web's companion laboratory business, National Labs, based on a rote and predetermined protocol for UDT.  Florida Web members Wellness, Treasure Coast, Lukens and Treatment Management Company worked in concert to perpetrate this scheme, take advantage of patients, and defraud United out of approximately $16.5 million. The Web intentionally engaged in a predetermined "protocol" pattern of UDT irrespective of a patient's individual needs, under the guise of "blanket orders" and "standing orders" for excessive UDT testing.

10.     Between February 2013 and June 2017, Web entities Wellness, Lukens, Treasure Coast and National Labs billed United more than $200 Million for UDT alone. *See **Exhibit A***. The many facets of this scheme included the following:

- Wellness, Treasure Coast and Lukens, at the direction of TMC, ordered UDT from National Labs for every single patient, multiple times per week, often for weeks on end, throughout the various levels of care regardless of the patient's individual needs, risk factors, treatment progress, or health concerns;

- National Labs knowingly received and accepted the above-mentioned urine samples of each patient, multiple times per week, often for weeks on end, pursuant to a protocol by which TMC ensured that Wellness, Lukens and Treasure Coast staff were directed to send countless UDTs to National Labs for testing;

- TMC, as part of its business model to maximize profits from UDT, made no effort to send patients' specimens to a lab that was within network for these patients, but rather, sent all specimens to the Web lab, who could bill exorbitantly to enrich the owners of the Web;

- Wellness, Treasure Coast and Lukens would, as part of the TMC business model, order UDT for a presumptive or "screening" test to test for the presence of drugs. Even in those instances in which the results were negative, or "as expected," Wellness, Treasure Coast and Lukens would order a definitive or "confirming" test. This aspect of the business model allowed the Web to bill over $11,000.00 for UDT of a single specimen. This testing and billing protocol would oftentimes be repeated multiple times per week.

- TMC directed that its member facilities implement this predetermined protocol for testing, that required UDT testing for patients of at least 3 presumptive and 2 definitives UDTs each week ("3/2 Protocol"), irrespective of the patients' severity

27

of addiction, the nature and extent of the addiction, the patients' physical condition, the patients' compliance with the program or the patients' lucidity and sobriety during treatment.  If a patient was in the Web, then TMC directed that they be tested according to the 3/2 Protocol.

- As part of the 3/2 Protocol, Wellness, Lukens and Treasure Coast would typically order both a presumptive and definitive test from National Labs at the time the specimen was sent, meaning it did not wait for the results of the presumptive before ordering the definitive test from National Labs;

- TMC directed Treasure Coast and Lukens to order from National Labs identical, expansive, predetermined "laundry lists" of dozens of substances to test for across patients and levels of care, irrespective of patient specific factors, such as the nature of the addiction treated for;

- TMC spent hundreds of thousands of dollars on an "expert" to defend its use of the 3/2 Protocol and champion its position to insurance companies and the industry and to ensure its revenue stream continued;

- Wellness, Treasure Coast and Lukens would routinely order more testing from National Laboratories on additional samples from the same patient prior to having received the results of the UDTs collected only a few days before;

- National Labs, despite knowing that it had not finished testing the previous specimen and thus did not have the results, accepted the new specimen and performed additional unnecessary tests before reporting the results of the previous tests;

- TMC directed Wellness to order from National Labs expensive and unnecessary UDT testing for all patients upon discharge from detox (despite the fact that patients had been in a controlled residential facility under monitoring); the results of which would not be received until after the patient was gone from the facility;

- TMC directed Wellness to order from National Labs expensive machine-analyzed presumptive and definitive UDT for all patients based upon determinations of "high risk" which were inapplicable and/or not patient specific;

- TMC directed Treasure Coast and Lukens to order from National Labs expensive presumptive and definitive UDT upon "admission" into the program in instances in which patients had just been "discharged" from detox at Wellness, had remained in the care of TMC while transported to Treasure Coast or Lukens, and before the results of the prior "discharge" UDT that had just been ordered by Wellness;

- TMC directed Treasure Coast and Lukens to order from National Labs expensive presumptive and definitive UDT for all patients upon "discharge" from PHP level to the lower IOP level of care, despite not receiving the results until the patient had commenced the next level of treatment in the same facility;

- TMC directed Treasure Cost and Lukens to order from National Labs expensive and definitive UDT for all patients upon "admission" in the IOP lower level of care, despite the fact that a "discharge" UDT had just been ordered in the same facility;

- In those instances in which Treasure Coast and Lukens performed what should have been an inexpensive in house point-of-care test ("POC"), they would charge

$1,500 for this simple "dip stick" test that could be purchased in a drug store for roughly $15;

- Both Lukens and Treasure Coast purchased equipment that permitted it to perform presumptive tests on site at the facilities.  Lukens and Treasure Coast would, on occasion, bill for a presumptive test performed at their respective facilities and then order the same presumptive test from National Labs. This allowed the Web to "double dip" by billing for multiple presumptive tests from the same sample for the same patient;

- National Labs, at the direction of TMC, between September of 2014 and June of 2017, billed United an average close to $100,000.00 *per patient* for this testing, typically over the course of only a few months;

- Lukens, between July 2013 and June 2017, in addition to the robust billing by National Labs,  billed United on average tens of thousands of dollars for its patients for UDT alone;

- Treasure Coast, between January 2014 and June 2017, in addition to the robust billing by National Labs,  billed United on average tens of thousands of dollars for its patients for UDT alone;

- Wellness, between April 2015 and March 2018, in addition to  the robust billing by National Labs, billed United on average tens of thousands of dollars for its patients for UDT alone; and

- For those patients at issue in this action, they were billed an average of more than $133,000.00 in UDT from Web providers including Wellness, Lukens, Treasure Coast and National Labs.

- The Web, as owners of Aid in Recovery, Sunshine Doctors, TMC, Wellness, Treasure Coast, Lukens and National Labs, used UDT to generate and inflate profits and to enrich member entities and their owners at the expense of patients, members, benefit plan sponsors and United.

11.     These "orders" for UDT, purportedly authorized by Web physicians, many of whom were associated with Web entity Sunshine Doctors, were largely template-driven, "cut and pasted" documents with pre-formatted justifications of "medical necessity."

12.     These orders typically requested two types of expensive and unnecessary tests. First, the treatment facilities ordered (and/or performed themselves) an enzyme immunoassay or other machine-analyzed "qualitative" or "presumptive" test ("machine-analyzed presumptive"), which measured whether drugs or certain classes of drugs were in the patient's system.  Then, even if the machine-analyzed presumptive test indicated that no drugs were present, National Labs performed a gas chromatography-tandem mass spectrometry or similarly sophisticated "quantitative" or "definitive" ("definitive") UDT, which measures specific levels of particular drugs in an individual's system.

13.     As described in detail below, Aid in Recovery, TMC, Sunshine Doctors, Wellness, Lukens, Treasure Coast and National Labs worked in concert to submit bills to United for these laboratory tests for virtually all patients, multiple times per week, based upon the profit driven predetermined 3/2 Protocol for testing without any regard to medical necessity or individualized patient needs.

14.     In fact, this "scheme" was largely invisible to United in the context of an individual claim, and only began to emerge when patterns between large numbers of claims were analyzed.  Even after placing a prospective review on National Labs in 2015 and Lukens and

Treasure Coast in early 2016 (due to observations regarding common ownership and excessive amounts billed), these Web providers refused, virtually across the board, to submit supporting documentation with its claims submissions, making it exceedingly difficult to for United to identify the patterns described herein. They also submitted "medical necessity" statements and retained a "subject matter" expert to lobby for the propriety of its practices to hide these patterns. As United undertook to defend itself from litigation involving massive numbers of claims brought by National Labs, Treasure Coast and Lukens the pervasiveness of these patterns became apparent. United did not discover (and could not have discovered) the Web's scheme until shortly before filing this counterclaim. It was only after the United reviewed claim files collectively and considered them holistically, that it became apparent that individualized patient care was not occurring.

15. As a result of this scheme, Lukens, Wellness, Treasure Coast and National Labs submitted bills to United for multiple POC, machine-analyzed presumptive, and definitive tests each week, billing many thousands of dollars per patient each week for months at a time. For example:

- National Labs billed United $401,165 for UDT of *one patient*, Patient 1, over the course of approximately two months. During the same time period, Lukens billed United for UDT *of the same patient* in the amount of $69,930. In addition, Wellness billed United for UDT of the same patient in the amount of $23,700. Thus, National Labs and Lukens billed United a total of $342,535 for UDT for a single patient. *See Exhibit B*, Patient 1 Chart.

- National Labs billed United $238,450 for UDT of *one patient*, Patient 2, in less than three months. During the same time period, Lukens also billed United

$19,500 for UDT of the same patient. Thus, National Labs and Lukens billed United $257,950 for UDT for just this patient. *See Exhibit C*, Patient 2 Chart.

- National Labs billed United $703,615 for UDT for *one patient*, Patient 3, over approximately 4.5 months. Treasure Coast billed United another $11,000 just for UDT of this patient, bringing the total billed for Patient 3 for UDT to $714,615. *See Exhibit D*, Patient 3 Chart.

- National Labs billed United $133,020 for UDT of *one patient*, Patient 4, in just over two months. During the same time period, Lukens billed United $35,600 for UDT of the same patient. Thus, National Labs and Lukens billed United $168,620 for UDT in total for just this patient. *See Exhibit E*, Patient 4 Chart.

- National Labs billed United $107,915 for UDT of *one patient*, Patient 5, in less than one month. During the same time period, Treasure Coast billed United $15,400 for UDT of the same patient. Thus, National Labs and Treasure Coast billed United a total of $123,315 for UDT of a single patient in less than a month. *See Exhibit F*, Patient 5 Chart.

- Wellness, Treasure Coast, and National Labs combined to bill United $167,370 for UDT of *one patient*, Patient 6, in less than one month. Wellness billed United $3,400 for UDT of Patient 6 on one date of service, and referred additional UDT for that patient to National Labs. On the same date of service, National Labs billed United $8,190 for UDT of the same patient, bringing the total UDT billing for a single date of service to $11,590. The very next day, Treasure Coast billed United $8,400 for UDT and National Labs billed United $21,790 for UDT of

Patient 6. This pattern continued for approximately 30 days. *See* ***Exhibit G***, Patient 6 Chart.

For these six patients alone, Lukens, Treasure Coast, and Nationals Labs billed United $1,795,505 over the course of just a few months. Further, these exorbitant amounts billed would have created tens of thousands of dollars in personal financial liability of the part of the patients resulting from their payment responsibilities, as TMC entities are all out-of-network providers. These patients represent only a small but illustrative example of the numerous patients who were subjected to a predetermined and rote protocol of outrageously priced, unnecessary, and improper UDT through the TMC entities.

16.     Further, as is demonstrated by the large amounts billed and as United has learned in discussions with numerous members, National Labs failed to engage in a good faith attempt to collect the tens of thousands in copayments and deductibles from its patients, a practice that constitutes insurance fraud under Florida law. *See* Fla. Stat. § 817.234 (7)(a).

17.     By submitting bills to United for these tests, National Labs, Wellness, Treasure Coast and Lukens with the assistance of Sunshine Doctors, represented to United that the tests were authorized, medically necessary, lawfully rendered, and compensable, when in fact these tests were ordered and performed as the result of a predetermined protocol for testing and were medically unnecessary. TMC, Wellness, Treasure Coast, Lukens, Sunshine Doctors and National Labs worked together to perpetrate this testing protocol scheme and obtain millions of dollars of insurance or employee health benefits to which they were not entitled.

18.     Further, National Labs, Lukens, Treasure Coast, and Wellness blatantly disregarded and attempted to circumvent United Reimbursement Policies. These violations of

34

United's policies resulted in nearly $3,000,000 in overpayment for which United seeks recoupment against National Labs.

19.     United paid or authorized payment of millions of dollars to National Labs, Lukens, Wellness, and Treasure Coast based on fraudulent, unfair, deceptive and unconscionable practices before learning of scheme, and brings claims for violations of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), unjust enrichment, recoupment under ERISA, and declaratory relief.

## II.     JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a), as this matter is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

21.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as some claims arise under the laws of the United States, namely the Employee Retirement Income Security Act of 1974 ("ERISA").

22.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1367(a), as United's claims form part of the same case or controversy as the claims alleged in National Labs', Lukens', and Treasure Coast's Amended Complaint [ECF No. 21] in this action.

23.     This Court has personal jurisdiction over National Labs, Wellness, Lukens, Treasure Coast, TMC, Sunshine Doctors, and Wellness, as all of these parties are citizens of Florida, are located in Palm Beach or Martin County, Florida, and conduct business in Palm Beach or Martin County, Florida.  In addition, National Labs, Lukens, and Treasure Coast filed their Original Complaint [ECF No. 1] and Amended Complaint [ECF No. 21] in this Court.

24.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the Counter-Defendants reside, are found, have agents, or transact affairs in this district; the Counter-Defendants reside in or conduct business in the State of Florida, and a substantial part of the events or omissions giving rise to the claims occurred in this District. Furthermore, National Labs, Lukens, and Treasure Coast initiated this action in this District.

### III.     THE PARTIES

25.     United HealthCare Services, Inc., is a corporation organized under the laws of Minnesota, with its principal place of business in Minnesota, and is a citizen of the State of Minnesota. It is engaged in business in Florida.

26.     UnitedHealth Group, Inc., is a corporation organized under the laws of Delaware, with its principal place of business in Minnesota, and is a citizen of the State of Minnesota. It is engaged in business in Florida.

27.     UnitedHealthCare Insurance Company is a corporation organized under the laws of Connecticut, with its principal place of business in Connecticut. It is engaged in business in Florida.

28.     Optum, Inc., is a corporation organized under the laws of Minnesota, with its principal place of business in Minnesota, and is a citizen of the State of Minnesota. It is engaged in business in Florida.

29.     Golden Rule Insurance Company is a corporation organized under the laws of Indiana, with its principal place of business in Indianapolis, Indiana, and is a citizen of the State of Indiana.

30.     National Laboratories, LLC, is a limited liability company organized under the laws of the State of Florida, and is located in Martin County, Florida. Upon information and belief, all of National Laboratories' members are citizens of Florida.

31.     Upon information and belief, The Lukens Institute, LLC, is a limited liability company organized under the laws of the State of Florida and is located in Martin County, Florida. Upon information and belief, all members of the Lukens Institute, LLC, are citizens of the State of Florida.

32.     Upon information and belief, Treasure Coast Recovery, LLC is a limited liability company organized under laws of the State of Florida and is located in Martin County, Florida. Upon information and belief, all members of Treasure Coast Recovery, LLC, are citizens of the State of Florida.

33.     Upon information and belief, Treatment Management Company, LLC is a limited liability company organized under the laws of the State of Florida, and located in Atlanta, Georgia. Upon information and belief, all members of Treatment Management Company are citizens of the State of Florida.

34.     Upon information and belief, Wellness Counseling and Residential Detoxification Services, LLC, is a limited liability company organized under the laws of Florida, and is located in Palm Beach County, Florida. Upon information and belief, all members of Wellness Counseling and Residential Detoxification are citizens of the State of Florida.

35.     Upon information and belief, Sunshine Doctors Group, LLC, is a limited liability company organized under the laws of Florida and located in Martin County, Florida. Upon information and belief, all of Sunshine Doctors' members are citizens of the State of Florida.

36.     Upon information and belief, Tarpon Management Services, LLC, is a limited liability company organized under the laws of Florida and located in Martin County, Florida. Upon information and belief, all of Tarpon Management Services' members are citizens of the State of Florida.

37.     Upon information and belief, Bass Holding Company, LLC, is a limited liability company organized under the laws of Florida and located in Martin County, Florida. Upon information and belief, all of Bass Holding Company's members are citizens of the State of Florida.

38.     Upon information and belief, Aid In Recovery, LLC, is a limited liability company organized under the laws of Florida and located in Martin County, Florida. Upon information and belief, all of Aid In Recovery's members are citizens of the State of Florida.

## IV.     THE DECEPTIVE CONDUCT AND SCHEME

### A.     Substance Abuse Treatment and Drug Testing Environment in South Florida

39.     Fraudulent and deceptive activity flowing from the treatment of patients suffering from substance use disorder ("SUD"), particularly in Florida, has recently been at the center of numerous investigations and arrests.  The problem is so widespread that the Florida Legislature established the Palm Beach County Sober Homes Task Force ("Task Force") to study the issues and make recommendations to stop the exploitation of substance abuse patients and curb the widespread fraud and other abuses that are occurring in this industry, including urine drug testing ("UDT") facilities and laboratories.  *See Palm Beach County Sober Homes Task Force Report* ("Task Force Report"), Jan. 1, 2017, at 1-2, 16, attached as ***Exhibit H*** and available at http://www.sa15.state.fl.us/stateattorney/SoberHomes/indexSH.htm.

45098513;1

40.     Given the rampant fraud occurring in the SUD treatment industry the State Attorney for the Fifteenth Judicial Circuit in Palm Beach County, Mr. Dave Aronberg, called for a grand jury "to investigate how government agencies are addressing the proliferation of fraud and abuse occurring within the addiction treatment industry," including UDT laboratories. *Presentment of the Palm Beach County Grand Jury: Report on the Proliferation of Fraud and Abuse in Florida's Addiction Treatment Industry* ("Grand Jury Report"), Dec. 8, 2016, at 1, 7-8, attached as **Exhibit I** and available at http://www.sa15.state.fl.us/stateattorney/Newsroom/GJ/GrandJuryReport2.pdf.

41.     Indeed, Mr. Aronberg provided testimony to the U.S. House Energy & Commerce Subcommittee on Oversight and Investigations, in the Subcommittee's hearing entitled, "Examining Concerns of Patient Brokering and Addiction Treatment Fraud." *See Examining Concerns of Patient Brokering & Addiction Treatment Fraud: Hearing Before the H. Energy & Commerce Subcommittee on Oversight & Investigations*, 115th Congress (Dec. 12, 2017), available at https://energycommerce.house.gov/hearings/examining-concerns-patient-brokering-addiction-treatment-fraud/, ***Exhibit J***.

42.     Alarmingly, the fraud and abuses specifically associated with drug testing facilities in South Florida have been widely documented and reported in Florida as well as in other states. *See, e.g.* David Segal, In Pursuit of Liquid Gold, N.Y. TIMES, Feb. 15, 2018, available at https://www.nytimes.com/interactive/2017/12/27/business/urine-test-cost.html (detailing fraudulent schemes involving UDT and exploitation of patients); Pat Beall, *Addiction Treatment Bonanza: How Urine Tests Rake in Millions*, PALM BEACH POST, Aug. 1, 2015, available at http://www.mypalmbeachpost.com/news/addiction-treatment-bonanza-how-urine-tests-rake-millions/rvmrD8VMBwykDtd6TCSALJ/ (reporting that when sober home operators

realized that insurers "would pay big bucks for urine testing," the "cash started rolling in" and urinalysis "became a financial linchpin – and now, a gold mine"); Lizette Alvarez, *Haven for Recovering Addicts Now Profits From Their Relapses*, NEW YORK TIMES, June 20, 2017, available at https://www.nytimes.com/2017/06/20/us/delray-beach-addiction.html?rref=collection%2Fsectioncollection%2Fus&action=click&contentCollection=us&region=stream&module=stream_unit&version=latest&contentPlacement=1&pgtype=sectionfront&_r=0 ("To increase profits, many treatment centers and labs overbill insurance companies thousands of dollars for a urine test screen. Patients often unnecessarily undergo multiple urine tests a week."); *Attorney General Pam Bondi Backed Testing at Center of Massive Fraud*, PALM BEACH POST, Jan. 9, 2016, available at http://www.mypalmbeachpost.com/news/attorney-general-pam-bondi-backed-testing-center-massive-fraud/TzG9jygVLmIEcFKkeQGkVL/; *Sober Home Task Force Makes 26th Arrest, Takes Aim at Labs*, PALM BEACH POST, May 11, 2017, available at http://www.mypalmbeachpost.com/news/crime--law/sober-home-task-force-makes-26th-arrest-takes-aim-labs/LtnPZwPc0wIJrP5aMAFviJ/ ("The urine of drug addicts with insurance is worth millions of dollars to the operators of labs, sober homes and treatment centers."); *Labscam: Rogue Laboratory Testing at Center of Addiction Treatment Scandal*, CARDIO BRIEF, http://www.cardiobrief.org/2017/07/03/labscam-rogue-laboratory-testing-at-center-of-addiction-treatment-scandal/ (July 3, 3017); *Feds: Delray rehab owner arrested, billed $58 million for urine tests*, PALM BEACH POST, July 12, 2017, https://www.mypalmbeachpost.com/news/crime--law/feds-delray-rehab-owner-arrested-billed-million-for-urine-tests/6GHtJ9zGgf953YfWc05SHL/. The fraud and abuses are so widespread that the Palm Beach Post has a dedicated page on its website reporting them. *See*

http://www.mypalmbeachpost.com/sober-homes/. These articles are attached as Composite *Exhibit K*.

43.    The Task Force Report, Grand Jury Report, Congressional testimony, and news articles all describe the prolific fraud occurring in the drug testing segment of the substance abuse industry, noting, among other things, the lucrative nature of the urinalysis testing, *the typical common ownership of treatment facilities and urinalysis testing laboratories that allow owners to generate tremendous profits, and the unnecessary urinalysis testing that is performed solely to increase those profits.*

44.    For example, the Task Force Report notes that abuse in the addiction treatment industry "has expanded to include *confirmatory and quantitative drug testing*." *See* Task Force Report, *Exhibit H*, at 16. It goes on to explain that POC tests are readily available and inexpensive, but that "[c]onfirmatory testing at a laboratory involves sophisticated instruments," "routinely results in billings of thousands of dollars per sample," and "is ordered by treatment providers multiple times per week." *Id.* Worse, the Task Force Report explains that "it is not unusual for unscrupulous treatment providers to bill tens or hundreds of thousands of dollars in insurance claims for confirmatory and quantitative [urinalysis] and other laboratory testing for an individual patient over the course of treatment." *Id.* Other issues noted include that "unscrupulous providers will submit falsely labeled samples" and that it is common for "a business nexus" to exist "between the owners of treatment programs, recovery residences, and drug testing laboratories" *Id.*

45.    Like the Task Force Report, the Grand Jury Report notes the fraud and abuse proliferating through the drug testing industry, explaining that "[i]nsurance fraud is another major problem in Florida's substance abuse treatment industry" involving expensive and

unnecessary confirmatory and quantitative testing at laboratories. *See* Grand Jury Report, ***Exhibit I***, at 7.

46.     In addition to the above-mentioned reports and articles, one particular article details misleading and deceptive marketing practices that Aid In Recovery employed to lure SUD patients and their lucrative insurance benefits into Wellness, Lukens, Treasure Coast, and affiliated facilities to profit from their urine. *See* Cat Ferguson, *Searching for Help*, THE VERGE, Sept. 7, 2017, available at https://www.theverge.com/2017/9/7/16257412/rehabs-near-me-google-search-scam-florida-treatment-centers, and attached as ***Exhibit L***. According to the article, Aid In Recovery promised to match patients with the program that best suited their individualized needs, applying heavy pressure and offering inducements such as free airline tickets to entice patients to enter treatment at affiliated facilities, without any regard to a patient's actual needs. *Id.* Further, the article mentions that TMC and affiliated entities' managers and employees referred to patients as "***gold bars***," representing the extraordinary profits each patient would mean for these entities. *See **Exhibit L***.

47.     The TMC entities, in trumpeting their 3/2 Protocol, have hired multiple experts to advance what they defend as a "community standard" which, as they have admitted under oath, flies in the face of accepted best practices for the treatment of SUD patients.  The community to which TMC points is one that is rife with fraud, waste and abuse, and is the subject of deep and widespread concern by various governmental and law enforcement entities.

**B.     Insurance Fraud in Florida**

48.     A person commits insurance fraud if that person, "with the intent to injure, defraud, or deceive any insurer . . . presents or causes to be presented any written or oral statement as part of, or in support of, a claim for payment or other benefit pursuant to an

insurance policy . . . , knowing that such statement contains any false, incomplete, or misleading information concerning any fact or thing material to such claim." Fla. Stat. § 817.234(a)(1).

49.     A person also commits insurance fraud if that person "[p]repares or makes any written or oral statement that is intended to be presented to any insurer in connection with, or in support of, any claim for payment or other benefit pursuant to an insurance policy . . . knowing that such statement contains any false, incomplete, or misleading information concerning any fact or thing material to such claim." Fla. Stat. § 817.234(a)(2).

50.     A statement "includes, but is not limited to, any notice, statement, proof of loss, bill of lading, invoice, account, estimate of property damages, bill for services, diagnosis, prescription, hospital or doctor records, X-ray, test result, or other evidence of loss, injury, or expense." Fla. Stat. § 817.234(6).

51.     In addition, Florida Statutes section 817.234 provides, "It shall constitute a material omission and insurance fraud, punishable as provided in subsection (11), for any service provider, other than a hospital, to engage in a general business practice of billing amounts as its usual and customary charge, if such provider has agreed with the insured or intends to waive deductibles or copayments, or does not for any other reason intend to collect the total amount of such charge." Fla. Stat. § 817.234(7)(a).

52.     The failure of a provider, such as Lukens, Treasure Coast, National Labs, or Wellness to make "a good faith attempt to collect such deductible or copayment" as a regular business practice constitutes insurance fraud in violation of section 817.234. *Id.*

53.     A violation of Florida's Insurance Fraud Statute is a basis for civil remedies under FDUTPA, Fla. Stat. § 501.001 *et seq.*; and the common law, as well as constitutes the commission of a felony under Florida law. *See* Fla. Stat. § 817.234(11).

54.     As detailed below, National Labs violated FDUTPA, and their submission of claims to United to collect charges that were not owed constituted insurance fraud under Florida Statutes § 817.234.  Further, their conduct in violation of these statutes was unlawful, unfair, and deceptive and forms the basis for United's claims below of unjust enrichment, declaratory judgment, overpayment and FDUTPA violations.

**C.     Background of Counter-Defendants and Related Parties**

55.     The Counter-Defendants and their numerous affiliates are organized through a web of limited liability companies that serve the many functions of the Web:

- Marketing, advertising, and selling to get the patients in the door (Aid In Recovery);

- Establishing, implementing, and managing various protocols to ensure maximum billing for each patient (TMC);

- Providing detoxification treatment to get the patients in the door at the highest and most lucrative level of care (Wellness);

- Providing partial hospitalization, intensive outpatient, and outpatient care to keep the patient under its control and continue to maximize billing (Lukens and Treasure Coast);

- Conducting POC and/or machine-analyzed presumptive UDT within each treatment facility multiple times per week regardless of individual patient diagnoses and risk factors, and charging exorbitant rates for such UDT (Wellness, Lukens and Treasure Coast);

- Conducting machine-analyzed presumptive as well as more expensive definitive testing for each and every patient multiple times per week regardless of individual

patient diagnoses and risk factors, and charging exorbitant rates for such UDT, often resulting in billing for three separate tests on the same date of service for the same patient (National Labs);

- Employing or contracting with physicians and other health care practitioners to sign orders for UDT for patients receiving treatment at Lukens, Treasure Coast, Wellness and affiliated facilities (Sunshine Doctors);

- Billing insurance companies and claims administrators for UDT services, including finding creative ways to circumvent United policies governing billing for UDT and other laboratory and facility services; and

- Creating pass-through entities to receive, hold, and distribute the tremendous profits generated by the large-scale UDT scheme (Tarpon and Bass).

56.     At times over the past several years, these entities have changed managers and registered agents, but can all trace their roots back, in one way or another, to Bryan T. Deering, Sr. ("Deering").

57.     National Labs was organized as a Florida limited liability company on or around January 8, 2014, with Deering listed as the sole organizer, manager, member, and registered agent on National Labs' Articles of Organization. At some point on or before April 6, 2016, Tarpon replaced Deering as manager of National Labs, as Deering is listed as manager on the March 26, 2015 Annual Report as manager, and Tarpon is listed on the April 6, 2016 Annual Report as manager. Currently, Tarpon remains manager. According to applications made by National Labs to the Florida Agency for Health Care Administration for licensure, Deering is the 100% owner of National Labs. *See **Exhibit M***, at 1-4.  Upon information and belief, National

Labs received a Clinical Laboratory License through the Florida Agency for Health Care Administration on or around July 25, 2014.

58.     Lukens was organized as a Florida limited liability company on or around April 12, 2013, with Deering listed as a managing member and registered agent, and Michael Lukens ("Dr. Lukens") as manager. On or around April 30, 2013, Bass replaced Deering and Dr. Lukens as Lukens' managing member, with Deering remaining as an authorized member. On or around June 6, 2013, Deering was replaced as registered agent by his spouse, Debra Deering. On or around January 26, 2015, Bass was replaced by Tarpon as Lukens' managing member, and Tarpon remains managing member currently.   According to inspection records of the Florida Department of Children & Families ("DCF") Office of Substance Abuse and Mental Health ("SAMH") dated January 24, 2017, Deering and Debra Deering fill the role of Owner/President. *Exhibit M* at 5. Similar reports dated September 26, 2016, list Tarpon as Lukens' owner, while others dated February 13, 2015, list Bass. *Id.* at 6-7. In addition, applications Lukens submitted to DCF for licensure dated February 18, 2016, and January 5, 2017, represent that Bryan and Debra Deering are the owners of Lukens. *Id.* at 8-15.

59.     Treasure Coast was organized as a Florida limited liability company on or around February 15, 2012, with Robert Bongard listed as its managing member and registered agent. On or around October 22, 2012, Deering was added as managing member. On or around November 13, 2012, Deering was replaced as managing member by Bass, with Debra Deering listed as an authorized person. Debra Deering then became Treasure Coast's registered agent on or around January 13, 2018. On or around January 26, 2015, Tarpon replaced Bass as Treasure Coast's manager, and remains in place as Treasure Coast's managing member. According to applications dated October 8, 2015, made by Treasure Coast to the Florida Agency for Health Care

45098513;1

Administration for licensure, Treasure Coast represented that it was owned by Bass. In a later application dated June 2, 2017, Treasure Coast represented that it is owned by Treasure Coast Management Company, LLC, which in turn, is owned by Bass. *Exhibit M,* at 16-20. Upon information and belief, Treasure Coast obtained a Clinical Laboratory License on or around December 23, 2015.

60.    Wellness was organized as a Florida limited liability company on or around March 7, 2013, with Deering listed as the sole organizer, manager, member, and registered agent on Wellness' Articles of Organization. On or around January 26, 2015, Tarpon replaced Deering as Wellness' manager, and remains in place in that capacity.

61.    Treatment Management was organized as a Florida limited liability company on or around June 18, 2014, with Bruce Abernethy listed as organizer and registered agent, and Deering listed as manager. On or around January 26, 2015, Tarpon replaced Deering as Treatment Management's manager, and remains in place as manager. According to records maintained by DCF, Treatment Management is owned by Bass. *Exhibit M*, at 21. Treatment Management operates and controls National Labs, Lukens, Treasure Coast, and Wellness, handling all aspects of the facilities, including handing down treatment protocols and directives, billing insurance companies, and handling advertising and marketing.

62.    Tarpon was organized as a Florida limited liability company on or around January 8, 2015, with Abernethy listed as organizer and registered agent, and Deering listed as manager. Shortly after its organization, on or around January 26, 2015, Tarpon became the manager and/or managing member of Lukens, Treasure Coast, Wellness, and Treatment Management. Subsequently, Tarpon also became manager of National Labs and Bass. On or around February 4, 2015, Debra Deering was added as a manager of Tarpon. In later annual reports filed in 2016-

2018, Francine Costello is listed as a manager of Tarpon. Thus, according to the Florida Division of Corporations, Bryan Deering, Debra Deering, and Francine Costello are all managers or members of Tarpon. Additionally, Tarpon is a manager and/or member of each entity named in this Counterclaim.

63.    Bass was organized on or around January 3, 2011, as a Delaware limited liability company. On or around October 14, 2014, Bass filed an application for authorization to transact business in Florida, listing Deering as manager. At some point, Tarpon was added as a manager, as Tarpon appears on Bass' 2016 Annual Report in that capacity. Tarpon remains as a manager of Bass. According to records maintained by DCF, Bass owns Treatment Management. *Exhibit M*, at 21.

64.    Sunshine Doctors was organized on or around March 27, 2013, as a Florida limited liability company, with Bryan T. Deering, Senior listed as manager and Bruce Abernethy as registered agent. Sunshine Doctors' principal address was listed as the same address associated with Deering in the Articles of Organization. On or around January 26, 2015, Tarpon replaced Deering as manager of Sunshine Doctors. Sunshine Doctors employs and/or contracts with physicians who may provide services at the TMC facilities and who sign orders for UDT of patients who are enrolled in treatment programs at the TMC facilities.

65.    Treasure Coast, Lukens, and Wellness each emphasize their individualized, customized, and evidence-based treatment methods, and take great pains to represent that they focus on the unique needs of each individual patient. *See* https://treasurecoastrecovery.com/; https://wellnessresidentialdetox.com/; https://executiverecoverycenter.com/.

66.    The patients in Treasure Coast, Lukens, and Wellness' care purportedly provided urine samples at the request of respective staff for drug testing and, oftentimes, based upon

orders signed by doctors affiliated with Sunshine Doctors. Treasure Coast, Lukens, and Wellness collected numerous urine samples from patients. As discussed above, Wellness, Treasure Coast and Lukens will sometime bill for POC and machine-analyzed presumptive UDT. Wellness, Treasure Coast, and Lukens sent most all of the samples to National Labs, which is owned and controlled by the same individuals and entities, for alleged processing and testing.

67.     Patients who receive treatment at Treasure Coast, Lukens, and Wellness frequently come to these facilities through an entity called Aid In Recovery, LLC, a marketing and advertising arm of these facilities and TMC. Aid In Recovery was established on or around March 25, 2013, by Deering. Like the entities discussed above, Tarpon became a manager of Aid In Recovery on or around January 27, 2015. People who are seeking treatment for SUD often search the Internet for treatment options, and during the timeframe at issue, were directed either to Aid In Recovery or facilities affiliated with Plaintiffs with great frequency due to investments made in search engines as part of the Web's marketing strategy.  As was described in detail in the Verge article identified above, *see **Exhibit L***, even those patients in faraway states who are seeking local treatment would be guided to Aid in Recovery.  Patients are then persuaded to enter treatment at one of the Plaintiff-related facilities.

68.     Aid In Recovery also attempts to market itself as a caring, patient-specific resource dedicated to helping SUD patients and their families, from representing that its team will work with the patient to identify and address individual needs, determine level of care. Aid In Recovery also offers same-day placement and provides free insurance verification, among other services. *See* www.aidinrecovery.com and ***Exhibit N***.  Up until approximately late June 2017, Aid In Recovery's website concealed its affiliation with the Web, implying to the public that it was an independent company with SUD patients' best interests in mind, as it provided:

45098513;1

> We do not promote any particular approach to addiction treatment, just high success rates. Our mission is to make sure you have the best possible chance to break free from alcohol and drug addiction. We do this by matching your specific needs with the best rehabs across the nation. Call us to find the best treatment options for you or your loved ones. We are always ready to take your call at our 24 Hour Recovery Hotline.

See *Exhibit N*; http://web.archive.org/web/20170624065416/https://aidinrecovery.com/.

69.     However, effective July 1, 2017, Florida Statute § 397.55 prohibits misleading advertising and marketing practices by referral services and SUD treatment entities, including such practices as misrepresenting information about SUD services, "surreptitiously" directing readers to certain websites, or failing to reveal affiliations between the referral services and treatment facilities. Sometime around the end of June 2017, Aid In Recovery changed some of the language on its website. Aid In Recovery's website now contains the following statement purporting to describe its affiliation with other entities, in place of the previous statement:

> Aid in Recovery is associated with affiliated treatment centers located in AZ, CA and FL and Aid in Recovery may refer a person to one of these entities if the person's treatment needs and payment abilities match the treatment offerings at these facilities. The person is free to decide another treatment center not affiliated with Aid in Recovery. Aid in Recovery also may recommend another treatment center not affiliated with it to a person based on his/her individual needs and payment ability.

See *Exhibit N*; https://aidinrecovery.com/.

70.     While Aid In Recovery changed portions of its disclaimer, it appears to still be engaged in directing patients to Web facilities.

**D.     Levels of Care for SUD Patients**

71.     Typically, treatment for substance use disorders can vary by the "level of care" the patient receives.  These levels of care vary in terms of the time and intensity of the treatment received. Patients may be transferred to a "lower" level of care as they successfully move through treatment.

50

72.     A patient may begin in the detoxification level of care.  Detoxification ("detox") is a set of interventions aimed at managing active intoxication and withdrawal. It is a medical intervention that manages an individual safely through the process of acute withdrawal. Detoxification is not substance use disorder treatment. Further, not all patients who are entering into substance use disorder treatment will need to begin a the "detox" level of care.

73.     Patients in the detox level of care tend to be in a residential setting with frequent monitoring, including taking of vital signs. As such, the risk of a patient having access to drugs or other illicit substances would be largely eliminated.

74.     TMC's detox provider is Wellness.

75.     The next level of care below detox is Partial Hospitalization. Partial Hospitalization Programs ("PHPs") are day-treatment programs which typically involve counseling services which are provided to patients during daytime hours; and patients return home (or potentially to a "sober living arrangement") in the evenings. Patients should typically have an individualized treatment plan for PHP.

76.     Wellness' website indicates that "while Wellness Counseling and Residential Detox does not provide PHP programs, we work directly with trusted health care partners who do provide this care. We can help you choose a program that is right for you, and we will work with you and the PHP staff to ensure a smooth transition with continuity of care and consideration of your individual needs."   https://wellnessresidentialdetox.com/php-partial-hospitalization/  However, in truth, this TMC entity refers the patient on to another provider in the TMC Web, for example, either Plaintiff Treasure Coast or Plaintiff Lukens.

77.     The next level of care below PHP is Intensive Outpatient Programs ("IOP").  IOP programs are similar to PHP programs, but require fewer hours of attendance per week. Again, here, one would expect a patient to have an individualized treatment plan.

78.     UDT may be used in the various levels of care, however, it is widely accepted that the use of UDT should also be individually tailored to a patients needs as opposed to the result of a rote or predetermined protocol for testing.

**E.     Types of UDT**

79.     Various types of UDT services are available and utilized to test for drug use. In treating SUD patients, it may be appropriate to test for the presence of drugs to monitor compliance with the program, as well as for deterrent effect, but such testing must be performed in accordance with each patient's specific clinical needs, and incorporated into a patient's individualized treatment plan. Abuse occurs in this setting when treatment providers subject patients to a rote, predetermined protocol using UDT as a matter of course, without considering individual diagnoses, risk factors, or progress. This occurred among National Labs, Lukens, Treasure Coast, and Wellness, with assistance from the Sunshine Doctors, as multiple layers of UDT were performed several times per week for numerous patients for every conceivable substance by the very lab owned by the same owners of the facilities.

80.     First, there are two general classes of UDT, (1) presumptive or qualitative, which detects whether certain drugs or classes of drugs are present within a patient's system; and (2) definitive or quantitative, which measure specific levels of particular drugs within a patient's system. These types of UDT services must be utilized in conjunction with a patient's specific needs and, generally, a definitive UDT should not be conducted absent a positive presumptive UDT.

81.     Within the qualitative class of UDT are (1) point-of-care ("POC") UDT and (2) enzyme immunoassay or other machine-analyzed "presumptive" UDT as described above.

82.     A POC (point-of-care) test is a type of presumptive or qualitative drug test that provides forensic-level accuracy and reliability, can be performed in a treatment facility or physician office, and provides almost immediate results. A POC test is performed by collecting a patient's urine into a cup with numerous test strips embedded within it, with each strip is designed to test for a certain class or type of drug.   The strip indicates a positive or negative result by changing color upon contact with the urine, providing an instantaneous result.   These tests are known as POC tests because they can be performed on-site at a drug treatment facility, rather than requiring a laboratory.

83.     POC testing typically tests for classes of commonly abused drugs, such as opiates, marijuana, cocaine, benzodiazepines, and numerous others. UDT for several drugs or classes at the same times is referred to as a "panel."

84.     A second kind of qualitative or presumptive test, the machine-analyzed presumptive UDT ("machine-analyzed presumptive"), can also detect the presence of multiple drugs and/or drug metabolites in the system.   It is significantly more expensive than a POC test and requires sophisticated analysis, and is appropriate for individualized situations in which a more thorough analysis is required.

85.     A third test, the definitive test ("definitive"), measures the precise amount of specific substances present in a person's system.   This test is sophisticated, costly, and must be performed in a laboratory. This test becomes increasingly expensive depending on the number of substances for which the urine is tested. A definitive test is appropriate in specific and documented circumstances, such as when a patient presents at treatment appearing to be under

the influence of a particular drug or when a presumptive test yields a positive result that requires further analysis of concentrations of certain drugs. Prior to ordering a definitive test, a patient's physician should undertake an individualized assessment of the qualitative results in conjunction with an examination of other factors such as patient history and current clinical indications, and should thoroughly document this particularized assessment, before determining whether a definitive test is necessary.

86.     In the treatment of IOP patients, UDT goals oftentimes can and are met through the use of POC testing. Confirmatory or definitive tests absent a positive POC test or some clinical indication that the patient is abusing drugs or alcohol are generally not required.

87.     Costs for machine-analyzed presumptive and definitive UDT can vary and are generally significantly higher amongst non-network providers.

**E.     CPT Codes and Billing for UDT**

88.     When a provider bills an insurance company for services rendered to a member of an insurance plan or policy, the provider enters a Current Procedural Terminology ("CPT") code on a claim form, along with other information needed to process the claim, such as Member ID number, provider information, and representations regarding the necessity and propriety of the claim. Each CPT code represents a particular health care service that is provided.

89.     These codes, promulgated by the American Medical Association's CPT Editorial Panel, are the nomenclature by which providers represent the services performed, and as such, utilization of an incorrect or misrepresentative CPT code results in a misrepresentation of the service performed. Payors rely on providers to use truthful and accurate CPT coding in the submission of claims for payment of benefits.

90.     Each specific health care service corresponds to a unique CPT code assigned by the American Medical Association and/or the Centers for Medicare and Medicaid Services ("CMS"), and universally recognized among payors. Accordingly, when submitting a claim, a provider enters the corresponding CPT code for each service in the appropriate sections of the claim form.  Payors then use this information to process the claim.

91.     Each year, the CPT codes are revised to reflect current technologies and services, deleting some codes and guidelines while adding others. Consequently, insurers, claims administrators, and providers must stay apprised of these changes and adapt their methods to conform to these changes.

92.     Each type of laboratory test corresponds to a unique CPT code. Various codes exist for different levels of POC, machine-analyzed presumptive, and definitive UDT, and many of those codes have changed during the relevant time period. A list of the codes and their descriptions National Labs, Lukens, and Treasure Coast used from 2014 – 2017 is attached hereto as ***Exhibit O***.

93.     In 2014, National Labs began billing United, starting with date of service August 1. Public records including materials from the Florida Agency for Health Care Administration, Florida Department of Children and Families, and the Commission on Laboratory Accreditation, indicate that National Labs was seeking the appropriate accreditation to perform certain forms of laboratory UDT, and could not perform the full complement of laboratory testing. During 2014, there were various CPT codes in place for different types of presumptive and definitive testing, and National Labs billed United for at least 11 different laboratory codes.

94.     In 2015, there were numerous CPT codes in place for POC, machine-analyzed presumptive, and definitive UDT, with at least one code for each substance that was the subject

of a definitive UDT. This allowed a provider to perform definitive UDT for all drug classes and submit a bill for that UDT. The CPT Code structure also allowed providers to perform definitive UDT for dozens of substances, and bill separately for each substance tested. For example, if a provider decided to perform a definitive test on one urine specimen for cocaine, marijuana, heroin, methamphetamine, alcohol, and oxycodone, the provider would bill each test separately, resulting in a cumbersome process as well as overbilling and fraudulent claim submissions.

95.    During 2015, National Labs billed United for approximately 83 different CPT codes for UDT on patients from Lukens and Treasure Coast. National Labs frequently billed United for 20 or more different codes for a single patient on a single date of service. For example, National Labs billed United $18,100 for 27 CPT codes on one date of service for Patient 7, and billed United $14,900 for 27 CPT codes on one date of service for Patient 8. *See Exhibits P-Q*.

96.    In 2016, various codes were deleted from the AMA's CPT Code set in an attempt to simplify the coding system for laboratory testing and curb the practices of billing separately for each substance. Rather than use a separate CPT code for each substance tested on a definitive UDT, the CPT codes represented a range of the number of drugs for which testing was performed. For example, Code G0480 represented a definitive UDT for 1-7 different substances, while Code G0481 represented a definitive UDT for 8-14 different substances, and so on. In addition to using these codes, National Labs also used other codes that represented definitive testing for particular substances. Accordingly, in 2016, National Labs used approximately 43 different CPT codes when billing United for UDT on patients from Lukens and Treasure Coast. Still, National Labs billed United for an inordinate number of CPT codes across the board. For example, National Labs billed United for approximately 27 different CPT codes for Patient 9 in

56

2016, *including* Code G0481 as well as various codes for definitive UDT of individual drugs and drug classes. National Labs billed United $114,500 for this testing of Patient 9 in just over one month, including $6,800 *per test* for Code G0481. *See Exhibit R*.

97.     In 2017, the CPT codes for UDT were further streamlined and simplified, essentially eliminating codes for definitive UDT of individual substances. During 2017, however, National Labs continued billing United at astronomical rates, using Code G0481 almost exclusively. For example, National Labs billed United $42,390 for Patient 9's UDT under Code G0481 over only 3 weeks, at $7,065 *per test*. **Exhibit R.**

98.     For reference, Centers for Medicare and Medicaid Services (CMS) reimbursements for machine-analyzed presumptive UDTs are typically less than $80, and reimbursements for definitive UDTs are approximately $150 or less.

99.     Interestingly, National Labs most often (and inaccurately) utilized a CPT Code (G0481) that corresponded to UDT for 8-14 substances, when in truth, they would test for the same large rambling panel for dozens of substances for most patients.  *See Exhibit A.*

## F.     Counter-Defendants' Predetermined UDT 3/2 Protocol and Failure to Consider Patients' Individualized Needs

100.     It is well-established that SUD treatment, and specifically UDT, requires individualized care and treatment of each patient, based on a number of factors including a patient's diagnosis, medical and psychological history, stability, type of addiction, treatment setting, and particular risk factors, among other considerations.

101.     Plaintiffs' own former Chief Medical Officer and current Medical Advisor, Andrea Barthwell, M.D. ("Dr. Barthwell"), as well as Plaintiffs' additional proffered expert, Arwen Podesta, M.D. ("Dr. Podesta"), have readily admitted the importance of individualized

UDT. *See **Exhibit S***, Arwen Podesta, M.D. Dep. 128:14-19; 134: 14-21; 246:10-247:5; ***Exhibit T***, Andrea Barthwell, M.D. Dep. 281:1-7.

102.    When UDT is used as an element of treatment by a clinician, it must be tailored to an individual patient's specific clinical needs. Dr. Podesta, Lukens, Treasure Coast and National Labs' own expert agrees that there is no medically appropriate one-size-fits-all protocol for UDT of SUD patient. *See **Exhibit S***, Podesta Dep. 134:14-21 (explaining that UDT requires individualized determinations regarding when to conduct testing and which substances to test for, and should not be subject to a "one size fits all" approach).

103.    Despite the need for individualized UDT for each patient, TMC and the treatment facilities, with the cooperation of the Sunshine Doctors, developed and implemented a one-size-fits-allpredetermined UDT protocol and business model, and applied it to patients indiscriminately and automatically without any consideration of the patients' individual clinical needs. This 3/2 Protocol, which Plaintiffs support with standing orders and blanket orders, signed by Sunshine Doctors, demonstrate not only Counter-Defendants' sweeping application of UDT for every single patient across the board, but also showcase Counter-Defendants' improper and unnecessary use of definitive testing after a presumptive screening that yields a negative or an expected result (for example, a positive result  for the presence of a prescribed medication, such as an anti-depressant, would be expected and appropriate). This 3/2 Protocol the Web has championed applies to every level of care for every facility, in all states, including Arizona, Florida, and California. *See **Composite Exhibit U***.

104.    This 3/2 Protocol provides for presumptive and definitive UDT across the board, and directs that the protocol should be followed, without accounting for individual needs or factors.  This protocol requires that ***all*** patients being transferred from one level of care to

another receive, at the time of discharge from the higher level of care, machine-analyzed presumptive UDT and also receive definitive UDT for a full panel of testing from National Labs, regardless of patient needs and irrespective of the results of the presumptive test. Then, upon admission to the next level of care, often on the same day, the facilities are directed to repeat the battery of UDT, again regardless of individual factors or previous test results. Not only does the 3/2 Protocol require presumptive and definitive testing upon discharge from one level of care and admission to the next level, it also mandates a rote schedule for UDT during the course of treatment.

105.    In addition, to further obfuscate the presence of this pre-determined and rote protocol, the Counter-Defendants, in the context of a submission of an individual claim, have represented to United through documents signed by a Web medical doctor representing that Counter-Defendants perform definitive UDT *only when clinically necessary and when considering a patient's individual needs*. *See **Exhibit V***, Medical Necessity Letter for Definitive Drug Testing.  These representations also noted that the facilities "***only perform confirmatory [definitive] testing when it is clinically indicated. There are many times when patient history and presumptive testing alone will suffice. This decision not to test all patients is based on the reality that testing is expensive. It is not cost effective and not clinically necessary to test every patient on every visit***." *Id.*  However, in direct contravention of this representation, Counter-Defendants intentionally utilized definitive testing on all patients across the board in an effort to drive up costs and obtain lucrative payments from insurance companies at the expense of patients.

106.    TMC's former Chief Medical Offer turned clinical advisor, as well as their other retained expert each expressed concerns regarding Counter-Defendants' protocol and use of

59

UDT. For example, Dr. Barthwell noted that National Labs appeared to be testing for every substance it could, regardless of what a physician order provided, and often in conflict with physician orders. ***Exhibit T***, at 277:21-278:3.

107.    Dr. Podesta and Dr. Barthwell also expressed concerns about UDT protocols driving up costs. For example, when Dr. Podesta learned that National Labs was charging $7,000 per definitive test, she noted that it was "***an exorbitant amount, and when we are talking about a reasonable cost, that is not a reasonable cost to assume would get reimbursed***." ***Exhibit S***, at 279:15-280:10. Dr. Barthwell expressed concerns about the use of routine and arbitrary laboratory UDT as a significant driver in increasing UDT costs, and noted that she was troubled by Plaintiffs' practice of ordering unnecessary UDT. ***Exhibit T***, 287:17-289:18.

**G.    National Labs, Lukens, Treasure Coast, Wellness and Sunshine Doctors blatantly disregarded appropriate directives and standards for individualized care.**

108.    Lukens, Treasure Coast, National Labs, Wellness and Sunshine Doctors regularly disregarded appropriate protocol, ignored patients' individualized needs, and routinely arranged for patients' urine samples to be tested on-site at the facilities for presumptive testing and at National Labs for all types of testing. Lukens, Treasure Coast, and Wellness sent samples to National Labs multiple times per week for both machine-analyzed presumptive and definitive UDT. These tests were performed across wide ranges of drug types and classes irrespective of the particular substance for which the patient was being treated, often absent any apparent POC testing, absent any documentation of reasons for such testing, and absent any individualized needs for such testing.

109.    Lukens, Treasure Coast, and Wellness, in concert with TMC, Sunshine Doctors, and National Labs, ordered these additional tests regardless of whether a patient tested positive for any drugs or alcohol, whether a patient was making progress in the treatment program, or

60

whether a patient was at risk for using a particular type of drug. The tests were simply ordered en masse with no consideration of individualized patient needs. If, in fact, an instance were to occur in which a patient actually benefitted from an additional confirmatory test, it would be the result of pure "happy accident," as Counter-Defendants' business model was applied to all of their "gold bars" to enhance profits.

110.    This testing regularly resulted in claims by National Labs, Lukens, Treasure Coast, and Wellness for many thousands of dollars in urinalysis testing of one patient's urine on one date of service.  *Exhibit A*, attached hereto, lists each claim line National Labs, Lukens, Treasure Coast, and Wellness submitted for payment to United for UDT of patients, and the amounts that were paid.

111.    By way of example, the patients described below were the subject of systematic, unnecessary, and unsupported urine testing protocol. These patients also serve as examples of testing that was belied by the very records that describe each patient's progress through treatment.  These examples illustrate the scheme National Labs, Lukens, Treasure Coast, and Wellness perpetrated with respect to these and dozens of other patients.

### *Improper Testing and Billing Relating to Patient 1*

112.    Lukens, Treasure Coast, Wellness, and National Labs wantonly and systematically used their patients as little more than a means to bill United and the plans it administers for inappropriate, fraudulent, and medically unnecessary urinalysis testing.  A review of records and data pertaining to Patient 1's treatment and testing at Wellness, Lukens, and National Labs provides one of many examples of the exploitation of these patients for their insurance benefits.

45098513;1

113.    Patient 1, age 55, received inpatient detox treatment for alcohol addiction at Wellness for approximately **one week**, during which time Wellness collected Patient 1's urine on at least two occasions and sent those samples to National Labs for UDT.  National Labs then billed United $39,950.04 just for UDT on just those two samples and dates of service.

114.    After completing detox at Wellness, Patient 1 was transferred to Lukens and admitted into Lukens' PHP. A review of the Lukens records for Patient 1 documents that this patient consistently presented to Lukens with an "appropriate" appearance, "normal" and "calm" demeanor, "good" eye contact, "cooperative" attitude, "euthymic" mood, "good" concentration, "clear" speech, and other positive descriptors. *See Exhibit W*. Lukens staff further described Patient 1 as "motivated," "pleasant," and, importantly, showing no signs during group or individual sessions of being under the influence of alcohol or drugs.

115.    Despite the fact that Patient 1 showed no outward indication of drug use and showed excellent progress in group and individual therapy sessions, Lukens and National Labs subjected patient Patient 1's urine to multiple types of testing several times per week over a two-month period. *See Exhibit W*. Lukens would collect Patient 1's urine and perform POC testing on those samples, charging between $1,400 and $4,200 per date of service. This "double dipping" of presumptive testing is wholly inappropriate.  Then, Lukens would send the same sample to National Labs ***for additional presumptive testing as well as definitive testing,*** often charging upwards of $14,000 per date of service for UDT alone.

116.    Lukens ordered comprehensive screening panels that tested for every conceivable substance for Patient 1, even though the patient was receiving treatment for alcohol addiction and had never used the vast majority of the drugs for which his urine was tested. Further, Patient

1's treatment notes do not reflect any discussion of UDT test results at any time, nor any incorporation of those test results into Patient 1's treatment.

117.    Patient 1 progressed through the treatment program at Lukens in less than two months, moving from PHP to IOP, then OP, followed by discharge. As Patient 1 moved from higher to lower levels of care, the UDT protocol remained the same, and Lukens continued collecting Patient 1's urine several times per week, performing UDT at Lukens, and also sending Patient 1's specimens to National Labs for both machine-analyzed presumptive and definitive UDT for dozens of substances.

118.    Lukens and National Labs even continued testing Patient 1's urine as he was on his way out the door, and well after Patient 1 had been discharged and moved out of state.  At the end of Patient 1's treatment, Lukens therapists noted that Patient 1 had improved to the point that he no longer met the ASAM criteria for treatment, and discharged him completely. Yet, Patient 1's urine was tested by National Labs and reported to Lukens well after discharge. For example, Patient 1's urine was collected on five occasions during the last 10 days of his treatment, but the test results for all five of those samples were not reported until after the patient was discharged. Indeed, one sample was not reported until nearly three weeks after discharge. This resulted in thousands of additional dollars – $31,600 – billed to United after the patient was no longer receiving treatment at Lukens.

119.    In total, Wellness, Lukens, and National Labs billed United, or caused United to be billed, $363,635 solely for UDT for this one patient in approximately two months.  ***Exhibit B.***

### *Improper Testing and Billing Relating to Patient 2*

120.    Patient 2, who was 52 years old, was admitted to Lukens' PHP program to receive treatment for alcohol use. Patient 2 progressed through treatment at Lukens showing no signs of

noncompliance or intoxication, with treatment records consistently describing him as "motivated," "engaged," "cooperative," and "attentive," and containing no suspicions that Patient 2 was ever under the influence of alcohol or drugs at any therapy session. *See **Exhibit X**.*

121.    Although Patient 2 was receiving treatment solely for alcohol addiction, and there was no indication that Patient 2 was using any alcohol or drugs, Lukens repeatedly collected his urine, performed its own testing, and then sent his urine samples to National Labs for testing of every conceivable substance, charging thousands of dollars per test. For example, Lukens collected Patient 2's urine five times in one week and sent those samples to National Labs for UDT, billing United $17,000 for just that week.  During the same time period, Lukens billed United $2,600 for UDT purportedly performed at Lukens. ***Exhibits C, X.***

122.    Over and over again, Patient 2 tested negative for drugs and alcohol. Indeed, every single test for which records were provided indicates that Patient 2 was not taking any illicit drugs or using alcohol. Yet, Lukens and National Labs continued running the same unnecessary and exorbitantly expensive tests throughout the course of treatment.

123.    This scheme of Lukens ordering and National Labs performing multiple, expensive machine-analyzed presumptive and definitive UDT while the patient showed nothing other than positive progress continued throughout the course of Patient 2's IOP, and extended until even after he was discharged.

124.    The summary chart attached as ***Exhibit Y*** documents Lukens' pattern of collecting urine samples from Patient 2 multiple times per week, performing POC and/or machine-analyzed presumptive testing at Lukens, and also ordering both machine-analyzed presumptive and definitive UDT from National Labs, despite any clinical indication to do so. Together, Lukens

and National Labs billed United $257,950 for urinalysis testing for Patient 2 in less than three months. *Exhibit Y.*

125.    The types of patterns described for Patients 1 and 2 are pervasive and in keeping with (if not in excess of) the 3/2 Protocol and are also consistent with written protocols. These pervasive patterns are demonstrated in the global list of patients at issue on *Exhibit A*, which shows the various CPT Codes billed for by the TMC entities.

### *Improper Testing of Urine Samples Prior to Reporting of Earlier Test Results*

126.    Another telling characteristic of the scheme involved Lukens and Treasure Coast collecting and National Labs testing new specimens before receiving the test results from earlier collections.  Lukens would routinely collect samples with no regard as to what the results of the analyses were for the patient taken days before. National Labs would often take its time processing the specimens as additional samples came in for the same patient.  This was the process by which these entities operated, as it was predetermined that Lukens and Treasure Coast would continue to collect the specimens, no matter what the outcome. Even if tests were negative, more testing would ensue. Similarly, National Labs would frequently conduct the analyses at its leisure, as no one, in truth, was waiting on the results. National Labs, by design, was provided a steady supply of specimens to analyze, irrespective of the results.

127.    Dr. Barthwell admitted under oath that this practice, as a rule, would be inappropriate. *See Exhibit T*, Barthwell Dep. 259:6-261:8 (testifying that such a protocol was not appropriate and that facilities' policies should have evolved differently).

128.    By way of example, Lukens collected individual specimens of Patient 1's urine on August 5, 7, 8, 11, and 12, and sent them to National Labs. National Labs reported the results of the UDT on these samples on August 8, 19, 15, 19, and 31, respectively. Thus, Lukens sent each

of these specimens to National Labs for testing *before* receiving the results of the previous testing. Even more disturbing, Lukens collected five samples from patient 1 between August 19 and 28, and sent them to National Labs. National Labs did not report the results until after the patient had already been discharged, as the patient was discharged August 28, but the results were reported between August 31 and September 18. This pattern is represented in the below summary table relating to Patient 1:

| Sample Collected | POC Presumptive | Date Received at National Labs | Date National Labs Reported Result | Did Lukens Collect New Sample Before/Same Day as Receiving Results from this Sample? |
|---|---|---|---|---|
| July 2 | Yes | July 2 | July 3 | Yes |
| July 3 | Yes | July 3 | July 6 | Yes |
| July 6 | Yes | July 6 | July 8 | Yes |
| July 8 | Yes | July 8 | July 8 | No |
| July 10 | Yes | July 10 | July 11 | No |
| July 13 | Yes | July 13 | July 13 | No |
| July 15 | Yes | --- | --- | --- |
| July 17 | Yes | --- | --- | --- |
| July 20 | Yes | July 20 | July 22 | Yes |
| July 22 | Yes | July 22 | July 22 | No |
| July 24 | Yes | July 24 | July 24 and August 3* | Yes |
| July 27 | Yes | July 27 | August 1 and 3 | Yes |
| July 29 | Yes | July 29 | August 1 and 3 | Yes |
| July 31 | Yes | July 31 | August 3 | Yes |
| August 3 | Yes | August 3 and 4 | August 6 and 8 | Yes |
| August 5 | Yes | August 6 | August 7 and 8 | Yes |
| August 7 | Yes | August 8 | August 19 | Yes |
| August 8 | Yes | August 10 and 12 | August 11 and 15 | Yes |
| August 11 | Yes | August 11 | August 19 | Yes |
| August 12 | Yes | August 13 | August 31 | Yes |
| August 17 | Yes | August 17 | August 18 | No |
| August 19 | Yes | August 20 | September 5 | Yes |
| August 21 | Yes | August 22 and 27 | August 31 and September 5 | Yes |
| August 24 | Yes | August 25 and 26 | September 1 and 3 | Yes |
| August 26 | Yes | August 27 | August 31 | Yes |
| August 28 | Yes | August 29 | September 18 | Yes |

129.    National Labs and Lukens billed United approximately $323,685 for Patient 1's UDT reflected in the above chart.

130.    Lukens' pattern of ordering both presumptive and definitive testing before receiving the results from testing of prior specimens also appeared during Patient 2's treatment. Likewise, National Labs' pattern of testing new samples before reporting the results of previous samples continued in Patient 2's treatment. For example, Lukens collected a specimen from Patient 2 on March 30, National Labs received the specimen on March 31, and National Labs did not report the result until April 3. In the meantime, Lukens had already obtained another sample on April 1, and sent that sample to National Labs the same day. National Labs did not report that result until April 5. This pattern repeated itself on multiple additional occasions.

### *Improper "Double Presumptive" Testing*

131.    The facilities also operated in concert to perform duplicative and "double" testing, whereby the facility would perform presumptive UDT on a urine specimen, then send that specimen to National Labs for *both* machine-analyzed presumptive and definitive testing, regardless of the results of any testing, and resulting in three separate tests for one urine specimen, and many thousands of dollars in billing.

132.    As an example, Lukens collected a urine sample from Patient 2 on April 27, and *performed a POC test*, the results of which were negative for all substances. Lukens sent the same sample to National Labs and *ordered both a machine-analyzed presumptive and definitive UDT* from National Labs. The presumptive UDT was negative, and reported to Lukens on April 28. Yet, National Labs still performed a definitive test, and reported those results on May 1 (also negative). Lukens and National Labs billed United $13,200 in total for just these three tests. *See Exhibit C*.

133.    As another example, Lukens systematically collected urine specimens from Patient 4 multiple times per week, performed POC tests on those samples, then sent the samples to National Labs for additional presumptive and, in some cases, definitive, UDT, regardless of the test results.  *See Exhibit E*. Through this pattern, Lukens and National Labs billed United a combined total of $183,020 for UDT of Patient 4 over approximately two months, of which United paid $44,647.

134.    Patients 2 and 4 represent just two examples of the Counter-Defendants' overarching protocol and pattern of conducting two or more presumptive tests, as well as definitive tests, on the same samples, whether or not any sample tested positive or negative.

### *Improper Attempts to Justify Testing*

135.    In repeated attempts to manufacture justification for their inappropriate mass testing of every patient for every conceivable substance, Lukens and Treasure Coast often include a cut-and-pasted, generic statement that the testing is medically necessary. For Patient 2, a 52-year-old individual who had never abused any substance other than alcohol and who was receiving treatment at Lukens related solely to alcohol addiction, Lukens represented that it was medically necessary to test Patient 2 for literally dozens of substances ranging from cocaine to bath salts to heroin. Even after Patient 2 progressed through treatment and tested negative for every substance, Lukens kept using this statement and kept testing for every possible substance. *See Exhibit X* (Patient 2 Records).

136.    As another example, for Patient 10, who treated at Treasure Coast and whose diagnosis is listed as addiction to alcohol, was tested for every conceivable substance. *See Exhibit Z*. Like Patient 2, Patient 10's records contain a generic statement listing dozens of

substances and attempting to justify the excessive and unnecessary UDT, with no patient-specific explanation. *See **Exhibit Z***. United was billed $134,800 in just one month for Patient 10's UDT.

137.    As yet another example, patients who were in detox at Wellness – an environment in which patients are closely monitored and supervised – were still tested multiple times, with similarly improper statements concerning medical necessity. United was billed for UDT on three separate dates of service for Patient 11, while that patient was treating at Wellness, totaling $21,195 just for those three tests.  *See **Exhibit AA***. A similar (although now known to be cut-and-pasted) medical necessity statement was submitted for each test. For both the first *and* second tests, the statement indicated that the testing was being performed in association with the patient's admission to Wellness. Then, the day after the second test was performed, despite the fact that the patient was continually monitored, a third test was performed. The justification for this test included the same generic language, except that this statement indicated that the test was being performed in association with the patient's discharge to another facility.

138.    Counter-Defendants employed a level-of-care scheme to ensure that they collectively were able to obtain maximum insurance benefits through each patient, by admitting patients to the highest level of care as often as possible, and running each patient through every level of care that the patient's insurance would cover, regardless of what level of care was appropriate for a particular patient.

139.    As discussed above, various levels of care exist for SUD treatment. The highest level available in this scheme, residential detoxification ("detox"), followed by partial hospitalization program ("PHP"), intensive outpatient program ("IOP"), and, finally, outpatient program ("OP"). Counter-Defendants employed a number of tactics to get patients admitted to the detox level of care, whether or not patients were suffering from acute withdrawal symptoms,

so that the patients could pass through each level of care the Counter-Defendants offered, enabling the Counter-Defendants to procure all available insurance benefits.

140.    The scheme begins with TMC and Aid In Recovery. First, TMC developed and implemented the plans and procedures to lure patients into the Web, including issuing protocols and directives to Aid In Recovery and each facility.

141.    Patients and their families who seek SUD treatment often turn to the Internet to research and locate treatment facilities. TMC, Aid In Recovery, and affiliated treatment facilities, have invested heavily in a form of search engine optimization so that when these patients and their families perform Google searches for SUD treatment, they are directed to Aid In Recovery and TMC-related entities.

142.    When the patients call Aid In Recovery or any of the associated facilities, their calls are routed to a call center. Representatives answer the call and persuade the patients to enter treatment at one of the facilities, focusing primarily on confirming that a patient is enrolled in an insurance plan and urging the patient to enter the detox level of care.

143.    Patients who enter the detox typically are admitted to Wellness, which is the TMC facility that provides this level of care. Patients receive presumptive and definitive testing upon admission to Wellness, and, even though this level of care involves strict monitoring of patients in an inpatient setting, often receive additional such testing during detox. Then, patients receive more presumptive and definitive testing upon discharge from the detox level of care before they are moved to the PHP level of care. After providing specimens for UDT upon discharge from Wellness, patients are transported by facility employees to the admission center for Lukens and Treasure Coast, where they provide another urine specimen. Even though the patients have been under the supervision of facility employees during their transport to the admission center, they

still receive the same battery of presumptive and definitive testing upon their admission to the PHP level of care.

## H.    United's Health Benefit Plans

144.    United provides health insurance, administration, and/or benefits to plan participants or plan members pursuant to various health benefit plans and insurance policies, including group benefit plans, individual benefit plans, employer-sponsored benefit plans, and government-sponsored benefit plans.

145.    United also provides administrative services for health benefit plans pursuant to the terms of plan documents and/or administrative services agreements ("ASAs"). These administrative services include processing claims for reimbursement of medical services provided to individuals covered by the plans, making factual determinations regarding such claims, paying claims, recovering overpayments and performing other related services.

146.    Generally, United's health benefit plans fall into two categories: (1) self-funded or self-insured plans, and (2) fully insured plans.

147.    For self-funded plans, United serves as a claims administrator and provides administrative services for each plan pursuant to an ASA. The ASA is an agreement between United and the plan sponsor, typically the employer, and identifies the rights and obligations of each party.  Under the ASAs, United typically has the authority, responsibility, and discretion to determine coverage eligibility, make factual determinations, process claims, remit payment for claims, adjudicate plan members' appeals regarding adverse benefit determinations, and pursue overpayment, fraud, waste, and abuse on behalf of the plan.

148.    The ASAs typically give United the exclusive authority to recover overpayments made on behalf of self-funded plans.  The ASAs typically provide that the self-funded client

71

delegates to United the authority to recover overpayments (including those related to fraud and abuse) and to initiate litigation to recover overpayments and payments made as a result of fraud. The ASAs also require United to return overpayments it recovers to the clients/plans, subject to United's right to retain a portion of the overpayment as compensation for its services, as provided in the ASAs.  The self-funded clients agree that they will not engage any other entity to provide these recovery services unless United consents.  It is imperative that United take efforts to recover these sorts of overpayments on behalf of companies and their hardworking employees, who are negatively impacted by these schemes.

149.    An example of ASA language would include the following:

You delegate to us the discretion and authority to develop and use reasonable standards and procedures for any recovery under this section taking into account the potential amount involved, including but not limited to, whether or not to seek recovery, what steps to take if we decide to seek recovery, and under what circumstances to compromise a claim or settle for less than the full amount of the claim; provided that in no event shall this section authorize letters asserting that the failure to reply may mean that coverage may be lost. You recognize that use of these standards and procedures may not result in recovery or in full recovery for any particular case. We will not pursue any recovery if any applicable law does not permit it, or, if recovery would be impractical. We may choose to initiate litigation to recover payments, but we have no obligation to pursue litigation.

150.    United ASAs also typically provide that United has the obligation to "provide services related to the detection and prevention of abusive and fraudulent claims." These types of provisions, or similar provisions, are contained in the ASAs for the United self-funded plans implicated by this counterclaim, and provide United with the authority to initiate litigation to pursue fraudulently obtained benefits.

151.    For self-funded plans, United typically adjudicates claims and works with plan sponsors and administrators to issue payments to providers.

152.    For United's fully insured plans, United insures the plans and provides the insurance policies that fund the plans.  It provides administrative services similar to those it provides to self-funded plans, though on its own behalf and not on behalf of the plans.  United adjudicates claims for fully insured plans and makes payments from its own assets.

153.    For both self-funded and fully insured plans, United typically approves claims for health benefits that satisfy the terms of the plans, and denies claims for health benefits that do not satisfy the terms of the plans.

154.    All of United's fully insured and self-funded plans only provide benefits for medically necessary and physician-authorized services.

155.    Wellness, Lukens, Treasure Coast, and National Labs submitted claims to United for benefits from both self-funded and fully insured plans. Those plans that are self-funded are identified on *Exhibit A* as "ASO," and those that are fully insured are identified as "INS."

156.    In its role as a claims administrator, United publishes various policies and guidelines, which are often generally referenced in the plans themselves, to both network and non-network health providers to guide providers in the submission of claims and the analysis of medical necessity.

157.    United has determined that payments were made to the Plaintiffs for services that were not allowable pursuant to United policies.

**I.      National Labs submitted more than 40,000 claims in violation of United's Reimbursement Policies, amounting to $3,025,170.26 in overpayments United made to National Labs.**

158.    United's Reimbursement Policies, some of which have been in effect since 2013, apply to independent, reference and referring laboratories. National Labs is required to abide by

the Reimbursement Policies since it renders services to United members and submits benefit claims to United for payment.

159.    United's policies and guidelines are publicly available at www.uhcprovider.com.

160.    Among other things, the Reimbursement Policies describe the reimbursement methodologies for laboratory panels and address duplicate laboratory code submissions by the same or multiple providers.

161.    The Reimbursement Policies, among other things, define when laboratory services such as UDT rendered to members enrolled in SUD treatment, are compensable. Specifically, the Reimbursement Policies provide, *inter alia*, that when a treatment facility (such as Lukens and Treasure Coast) collected a specimen and then sent the sample out for UDT, only the *facility* (e.g. Lukens or Treasure Coast) could submit and receive reimbursement for that service.

162.    National Labs is required to identify exactly where the Point of Collection (also known as "Point of Service" or "POS") of a specimen occurred. Those requirements again underscored the importance of accurately reporting *where the sample was taken,* which would allow United to properly assess the compensability of the claim.

163.    Based on the Reimbursement Policies, if a facility, like Lukens or Treasure Coast, collected a specimen for UDT and then sent the sample to National Labs for testing, the "POS" code 11 or 22 should have been identified on the claim form to reflect that the specimen was collected at the SUD treatment facility. If, however, National Labs took the specimen, POS code "81" should have been identified on the claim form to reflect that National Labs took the specimen.

74

164.    National Labs could only submit a claim to United with POS 81 if the specimen was collected by National Labs.

165.    As addressed above, identifying the correct point of service was particularly important because the Reimbursement Policies provided that where a facility obtained laboratory tests for patients, only the facility may be reimbursed for the services.

166.    Providing the correct POS code was essential to proper administration of claims submitted by National Labs to appropriately pay the facility that collected the specimen and to avoid paying duplicate claims.

167.    On or around December 1, 2015, National Labs began coding nearly every submission for UDT sent to United for reimbursement with the POS code 81.  This represented to United that the specimen was collected by National Labs, not the SUD treatment facility, so it impeded United's ability to appropriately administer and pay the benefit claims.

168.    Between January 1, 2014 and December 31, 2017, United received and processed more than 39,500 claims where National Labs identified "81" as the point of service.  Based on this representation, United paid over $3,025,170 to National Labs for associated UDT.  *See Exhibit CC*.  However, National Labs *never* collected *any* of these specimens.

169.    United has determined that each of the claims identified on *Exhibit CC* were *not* compensable to National Labs since, despite representing that the specimen was taken by National Labs, the sample was actually collected at an underlying treatment facility, like Lukens and Treasure Coast, and sent to National Labs for UDT analysis.  Pursuant to the Reimbursement Policy, each claim paid to National Labs where 81 was identified as the point of service, but, in fact, the specimen was collected by the SUD treatment facility, was improper and non-

compensable. As a result, National Labs was paid $3,025,170 for which United seeks reimbursement for overpayment.

**J.      In-Network and Out-Of-Network Providers**

170.    Commercial health insurance plans, including United's plans, generally utilize a two-tier provider system, allowing members the flexibility to choose health care services from network and out-of-network providers.

171.    Network providers are those with whom United has entered into an agreement under which United has agreed to reimburse the providers at specified rates for services provided to United's Members. In turn, network providers agree to provide services to United's Members, accept reimbursement at the specified rates as payment in full, and not "balance bill" United's Members for any other amounts. Accordingly, Members ordinarily have no financial obligation to the network providers for covered services beyond a copayment, co-insurance and/or deductible.

172.    Many plans provide that when a United Member receives services from an out-of-network provider, the provider bills the Member and the Member pays the full amount billed. The Member then submits a claim to United for reimbursement of some part of what the Member paid. United processes the member's claim and remits a reimbursement to the Member, pursuant to the terms of the Member's plan.

173.    Although many plans prohibit an assignment of benefits to medical providers, some plans authorize United, in its discretion and without waiving any anti-assignment provision, to make payment of the member's benefits directly to their out-of-network providers, as a courtesy to Members.

45098513;1

174.    Typically, a Member pays lower out-of-pocket costs if he or she utilizes network providers, rather than out-of-network providers. This allows United's Members to obtain medical services from network providers with less financial risk or out-of-pocket expense. Thus, Members utilize out-of-network providers carefully.

175.    Members' payment responsibilities serve as an important check on fraud, waste, and abuse. Since it is Members, not United, who ultimately control the services they receive, Members' payment responsibilities sensitize them to unnecessary or overpriced services, resulting in more affordable healthcare for all Members (and healthcare consumers, generally). This requirement prevents unscrupulous providers from billing exorbitant amounts to insurers to inflate reimbursements and also ensures providers are charging reasonable amounts for their services.

176.    Because United does not have contractual relationships with out-of-network providers, and out-of-network providers typically charge higher amounts for their services than network providers, United relies heavily on its Members' sensitivity to the greater out-of-pocket costs to ensure that Members seek out-of-network providers' services only when they are medically necessary and reasonably priced.

177.    There are circumstances that might cause a member to ignore finances when selecting a medical provider, such as a complex, lifesaving and technical operation.  It is conceivable that a member facing brain surgery would select an OON neurosurgeon based on reputation, skill or bedside manner—regardless of the resulting coinsurance or balance billing implications.  Laboratory services, on the other hand, are commoditized.  The same machines are used to perform the same tests, and patients rarely (potentially never) interact with any laboratory personnel.  There is no reason a fully-informed member would consent to testing by

an out of network facility over a laboratory in United's network when the latter would save the patients tens (if not hundreds) of thousands of dollars and provide the same test results.

178.    Generally, the patient is responsible for paying the difference between the amount United pays the provider (typically the "Eligible Expenses," "Allowed Amount," or "Covered Amount") and the amount the provider bills United.  This amount typically does not apply to a member's out-of-pocket maximum, meaning that no matter what the difference is between the amount billed and the amount paid, the member is responsible for that difference. If a Member's out-of-pocket maximum is $2,000, and the difference between the billed amount and the Eligible Expense is $5,000, the Member must still pay $5,000.

179.    Wellness, Lukens, Treasure Coast, and National Labs are out-of-network providers.

180.    In one example, Lukens, Treasure Coast, Wellness, and and National Labs billed United nearly $1,000,000 for patients. The applicable benefit plan provided that charges in excess of eligible expenses, including amounts in excess of the allowed amount, that are balanced billed by an out of network provider do not count toward the annual out-of-pocket maximum. The plan further provided that the member is responsible to pay out of network providers for all amounts above the eligible/allowed amount. United determined that, of the nearly $1,000,000 billed, the allowed amount was approximately $110,000, and paid, or authorized for payment, a total of approximately $90,000 in accordance with plan terms. Thus, these four patients were responsible for hundreds of thousands of dollars under the plan, and Lukens and National Labs were obligated to collect that amount from the patients.

181.    Similarly, National Labs, Lukens, Treasure Coast, and Wellness billed United nearly $1.1 million for UDT for patients who were members of another plan. United paid or

authorized for payment approximately $140,000. This plan provides that members must pay all applicable coinsurance and "are responsible for any amount a provider charges over the reasonable and customary charge. The plan further provides that amounts over the reasonable and customary charge are not covered expenses under the plan, do not count toward the plan's deductible or out-of-pocket maximums, and must be paid by the member.  In addition, the plan provides, that "no benefits are provided for health services for which any patient responsibility, such as copayments, deductibles, etc., are waived. Thus, at a minimum, National Labs, Lukens, Treasure Coast, and Wellness were responsible for collecting approximately $900,000 from these patients.

182.    Given the astronomical charges generated by National Labs, Lukens, and Treasure Coast, there is no reason that a United Member would ever knowingly consent to have his or her lab testing performed by these providers.  Even assuming that a Member's health benefit plan includes a 20% copayment/coinsurance obligation for out-of-network lab services and protection against any balance billing from out-of-network, a member would still be obligated to pay a copayment and/or coinsurance amounting to tens of thousands of dollars for urinalysis services alone. Indeed, Lukens, Treasure Coast, and National Labs made no good faith attempt to collect from its patients. Alerting patients to the vast sums that were being incurred would have resulted in patient complaints and refusals that would have threatened to unravel the scheme these providers were orchestrating.

183.    National Labs, Lukens, Wellness, and Treasure Coast's failure to collect coinsurance, copayments, and deductibles, and failure to seek to collect the full amount billed constitutes insurance fraud under Florida Statutes section 817.234(7)(a).

184.     Indeed, United representatives conducted interviews with a number of patients who received SUD treatment through the TMC Web facilities and UDT from National Labs. Patients described their experiences, including the following:

- The providers informed many patients that all treatment and UDT services were covered by their insurance plans, and never collected any copay, coinsurance, or deductible. In some cases, the providers told the patients that the providers would cover whatever costs the patients' insurance did not. In rare instances in which a payment was collected from a patient, that payment appeared to only be a small fraction of the patient's financial responsibility.

- Patients did not recognize the name "National Laboratories," and never received bills from National Labs.

- The "providers" frequently paid for patients' airfare to travel to TMC facilities, and did not require patients to repay these amounts.

- The providers never discussed the patients' UDT results with them.

- Patients learned of the facilities through the Internet, including through Aid In Recovery.

185.     In addition, the TMC facilities and National Labs worked in concert to drive up billing for UDT services, knowing that the patients would bear no financial responsibility and the providers could obtain the patients' lucrative insurance benefits. For example, National Labs' billing vastly exceeded even the typical out-of-network charges.

**K.      Claim Submission Process**

45098513;1

186.    Lukens, Treasure Coast, Wellness, and National Labs billed United by submitting claims and supporting documentation electronically and through the United States mail, and received payments for these claims electronically and through the United States mail.

187.    The claims at issue in this Counterclaim generally are submitted and arise under the following categories: a) individual health insurance policies issued by United; b) group health policies issued by United which may fund ERISA and non-ERISA employee health benefit plans; and c) ERISA and non-ERISA employer self-funded health plans administered, but not funded, by United.

188.    Sometimes, when a Plan Member receives services from an out-of-network provider, the provider bills the Member for the services performed and the Member pays the full amount billed. The Member then submits a claim to United for reimbursement of some part of what the Member paid. United processes the Member's claim and remits a reimbursement to the Member pursuant to the terms of the Member's Plan.

189.    However here, when a provider, such as National Labs, Lukens, Treasure Coast, or Wellness submits a claim to United, the provider certifies that the claim's contents are correct, complete, authorized by a physician, lawfully rendered, and medically necessary. National Labs, Lukens, Treasure Coast, and Wellness know that in order to receive payments from United for their services, they must certify and represent that the services were performed at the request of the medical provider listed in the claim and that the medical provider determined the services to be medically necessary. In paying or authorizing payment of claims for insurance or employee health benefits and determining whether services are eligible for payment, United relies on the claims submitted by medical service providers such as National Labs, Lukens, Treasure Coast,

45098513;1

and Wellness. The provider's certification is material and is relied upon by United, as United will not pay or authorize for payment a claim unless this certification is included.

190.    National Labs, Lukens, Treasure Coast, and Wellness submitted or caused to be submitted bills for reimbursement to United on CMS-1500 forms and/or 837p electronic forms, which constituted representations that the services were rendered on behalf of the patient, and that such services were lawfully provided and that "the services listed [in the forms submitted to United] were medically indicated and necessary to the health of this patient and were personally furnished by me [i.e., signing provider] or my employee under my personal direction." *See Exemplar CMS-1500 form, attached as **Exhibit CC**.*

191.    United receives nearly two million claims for health care benefits per day, and is subject to various laws, regulations, and health care plans that require United to make determinations and pay claims within a short time period.  Thus, United must rely on the information the providers include in the submission of the CMS 1500 and/or 837p forms to determine whether a claim should be paid.

**L.    Claims and Documents National Labs, Lukens, Treasure Coast, and Wellness Submitted to United**

192.    National Labs, Lukens, Treasure Coast, and Wellness submitted hundreds of thousands of claims for UDT from 2014-2017.  Charges for these claims totaled nearly $204 million. *See **Exhibit A.***

193.    National Labs, Lukens, Treasure Coast, and Wellness submitted these bills to United because the patients at issue were Members, insureds, or participants in individual or group policies or health care plans either insured or administered by United.

194.    United periodically reviews claims and billing procedures as part of its compliance process.  As United identified examples of discrepancies and other issues relating to

National Labs, Lukens, Treasure Coast, and Wellness' submissions for urinalysis testing, it requested additional information from these entities including, among other things, medical records, treatment records, laboratory testing orders, signed referrals/orders, laboratory reports, and related correspondence, to verify the propriety and necessity of the claims. *See **Exhibit DD***, Example Request for Medical Records. United typically does not receive these types of laboratory records through the normal claim submission process, and must rely on providers' representations in the standard claims forms to authorize and pay claims.

195.   National Labs, Lukens, and Treasure Coast responded to some of United's requests by providing some copies of treatment records, POC testing results, urinalysis testing order forms, machine-analyzed presumptive results, definitive UDT results, and invoices for urinalysis testing for certain patients. The documentation provided by these entities supports United's allegations regarding a fraudulent testing scheme and medically unnecessary and/or unauthorized urinalysis testing. *See **Exhibits A, W-AA***. Thus, National Labs, Lukens, and Treasure Coast were representing that the testing was medically necessary, lawfully rendered, and authorized, when in fact the UDT was done in furtherance of a predetermined testing scheme to maximize billing. *See id.; **Ex. U***.

196.   Each claim listed on ***Exhibits A*** and ***CC*** arose from the improper testing protocol scheme perpetrated by National Labs, Lukens, Treasure Coast, Wellness, and TMC to obtain insurance benefits by submitting bills for unauthorized and unnecessary UDT services.

## V.   CAUSES OF ACTION

**A.   First Claim for Relief – Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 502.201 *et seq.* ("FDUTPA") (As to All Counter-Defendants)**

197.   United incorporates, adopts, and re-alleges the factual allegations set forth in paragraphs 1 through 196 above as if fully set forth herein.

198.    FDUTPA prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. §§ 501.202(2); 501.204(1).

199.    National Labs, Lukens, Treasure Coast, and Wellness were, at all material times, actively engaged in trade and commerce in the State of Florida.

200.    United is a consumer as defined by Florida Statute § 501.203(7).

201.    As described in detail above and summarized below, National Labs, Lukens, Treasure Coast,  Wellness, TMC, and Sunshine Doctors, all with common ownership, engaged in a pattern of unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce by, among other things:

- All Counter-Defendants, in concert with one another, instituted and executed a predetermined protocol pattern of ordering excessive, unnecessary, and exorbitantly expensive UDT for all patients multiple times per week, irrespective of a patient's individualized needs, risk factors, clinical indications, or health concerns, in order to maximize billing and enrich the TMC Web;

- Wellness, Lukens, and Treasure Coast, through Sunshine Doctors and under TMC's direction, performed UDT on-site and also ordered the UDT according to the rote 3/2 Protocol of testing patients several days per week and also upon "discharge" from one level of care and "admission" to a lower level, even if the "admission" and "discharge" occurred on the same day and the patient never went unsupervised.

- Wellness, Lukens, and Treasure Coast would perform additional UDT and order additional UDT before receiving results from previous testing. Likewise, National

45098513;1

Labs often performed UDT on urine specimens prior to reporting results of the previous specimens.

- National Labs knowingly accepted the urine specimens multiple times per week, often delayed performing UDT and reporting results, and submitted astronomical charges to United.

- The Counter-Defendants made no effort to locate in-network labs from which Counter-Defendants could order UDT and reduce costs; rather, ordered UDT from National Labs to enrich the Web.

- Under TMC's direction, Wellness, Lukens, Treasure Coast, and Sunshine Doctors would routinely and intentionally perform and/or order "double presumptive" tests on the same date of service, and also order definitive UDT before receiving the results of presumptive UDT.

- Wellness, Lukens, Treasure Coast, and National Labs ordered and/or performed UDT for predetermined and extensive lists of all conceivable substances, regardless of patient-specific factors and across all levels of care.

202.    National Labs, Lukens, Treasure Coast, Wellness, Sunshine Doctors, and TMC's conduct is deceptive because it is based on representations, omissions, and other acts and practices that are likely to mislead consumers, including United, who acted reasonably under the circumstances to its detriment.

203.    The above-described acts and omissions of National Labs, Lukens, Treasure Coast, Wellness, Sunshine Doctors, and TMC offend the established public policy of the State of Florida and are illegal, immoral, unethical, oppressive, unscrupulous, and substantially injurious to United and its insureds.

45098513;1

204.    As a direct and proximate result of the above-described deceptive and unfair trade practices of National Labs, Lukens, Treasure Coast, Wellness, Sunshine Doctors, and TMC, United was damaged.   These deceptive and unfair trade practices caused United to pay or authorize payment to National Labs, Lukens, Treasure Coast, and Wellness for millions of dollars for medical services that were unauthorized and medically unnecessary. It also created tens or hundreds of thousands of dollars in personal financial liability to each patient pursuant to their copayment, coinsurance, and deductible obligations for out-of-network providers.

205.    Each claim for services submitted by National Labs, Lukens, Treasure Coast, and Wellness to United for unauthorized and/or medically unnecessary services constitutes a violation of FDUTPA, as each claim falsely represented that the services were medically necessary and lawfully rendered.

206.    National Labs, Lukens, Treasure Coast, and Wellness' unlawful, deceptive, and unfair practices have harmed not only United, but also plan members and health care consumers generally by artificially inflating the cost of health care services for their own pecuniary gain.

207.    National Labs, Lukens, Treasure Coast, and Wellness's failure to engage in a good faith effort to collect copayments, coinsurance, deductibles, and differentials between billed amounts and Eligible Expenses constitutes insurance fraud, which serves as a per se basis for violation of FDUTPA pursuant to Fla. Stat. § 501.203(3)(c); Fla Stat. § 817.234(7).

208.    National Labs, Lukens, Treasure Coast, and Wellness are jointly and severally liable for the violations of FDUTPA, as each played an essential role as a perpetrator of the scheme and each participated in the unfair, deceptive, and unlawful conduct.

209.    United has retained the services of the undersigned counsel to represent it in this matter and agreed to pay such firm a reasonable fee for their services for which National Labs, Lukens, Treasure Coast, and Wellness are liable pursuant to Florida Statutes § 501.2105.

**B.    Second Claim for Relief – Unjust Enrichment**
**(As to National Labs, Lukens, Treasure Coast, and Wellness)**

210.    United incorporates as though fully set forth herein the allegations in paragraphs 1 through 196 above.

211.    United conferred benefits on National Labs, Lukens, Treasure Coast, and Wellness by making or authorizing payments to them, directly or indirectly, in the amounts listed on ***Exhibits A*** and ***CC***, pursuant to false, illegal, and improper claims for health insurance benefits related to medical services that were not lawfully rendered. The applicable policies and plans issued or administered by United are not required to cover unlawful, unauthorized, or medically unnecessary treatment and/or testing, and United is not obligated to pay or authorize payment of claims arising from such treatment and/or testing.

212.    As described above, National Labs, Lukens, Treasure Coast, and Wellness have made false and fraudulent statements or omissions of fact to United, with respect to the medical necessity and authorization for the UDT it allegedly performed on substance abuse patients.

213.    In reliance upon the bills, claims, supporting documentation, and other statements of National Labs, Lukens, Treasure Coast, and Wellness, United processed benefits and paid or authorized payment of claims submitted for services allegedly provided by National Labs, Lukens, Treasure Coast, and Wellness and, as a result, National Labs, Lukens, Treasure Coast, and Wellness received payments amounting to $16,547,089.37 from United. *See **Exhibit A***.

214.    Thus, for the claims referenced on ***Exhibit A***, National Labs, Lukens, Treasure Coast, and Wellness have obtained a benefit from United through fraudulent conduct, receiving

45098513;1

payment for claims that included charges for unreasonable, unauthorized, and unnecessary treatment, diagnostics, and related health care services based not on patient needs but an intentionally fraudulent protocol scheme designed to significantly inflate the value of the patients' insurance claims.

215.    National Labs, Lukens, Treasure Coast, and Wellness' conduct in developing, implementing, and concealing the scheme was designed to enrich National Labs, Lukens, Treasure Coast, and Wellness, and their owners, to the detriment of United and the health benefit plans it administers. These benefits were procured by National Labs, Lukens, Treasure Coast, and Wellness fraud, and involved the violation of Florida criminal statutes that prohibit health care professionals from submitting to a patient or a third-party payor a bill for a treatment that the facility or professional knows was not provided or knows was improper, unreasonable, or medically or clinically unnecessary. *See* Fla. Stat. § 817.234(1).

216.    Under these circumstances, National Labs, Lukens, Treasure Coast, and Wellness were not entitled to seek, receive, or retain payments from or authorized by United, and it would be unjust for National Labs, Lukens, Treasure Coast, and Wellness to be permitted to keep these payments. National Labs, Lukens, Treasure Coast, and Wellness have not returned the payments to United or to the health benefit plans United administers.

217.    The money National Labs, Lukens, Treasure Coast, and Wellness received from United belongs in good conscience to United, United's plans, and to the sponsors and administrators of those plans.

218.    By virtue of the foregoing, United and the health benefit plans it administers are entitled to restitution in the amount of the benefits National Labs, Lukens, Treasure Coast, and Wellness obtained from or through United by fraud. In the alternative, United is entitled to

disgorgement of the value of the benefits National Labs, Lukens, Treasure Coast, and Wellness wrongfully secured from or through United by operation of their fraudulent scheme.

219.    National Labs, Lukens, Treasure Coast, and Wellness are jointly and severally liable to United, as each played an essential role as a perpetrator of the scheme and each participated in the fraudulent and unlawful conduct underlying this claim.

## C.    Third Claim for Relief – Claim for Overpayment Under ERISA § 502(a)(3)

220.    United incorporates by reference every allegation set forth in paragraphs 1 through 196 above.

221.    With  respect to the ERISA-governed plans United insures or administers, United acts as a claims fiduciary, either as a third-party administrator of employer-sponsored and employer-funded group health benefit plans, or as an insurer of employer-sponsored group health benefit plans.

222.    In addition, under the relevant plans, United is an ERISA fiduciary and has the authority to review and make decisions on claims for benefits under the applicable plans, and has standing to sue under Section 502(a)(3) of ERISA to obtain appropriate equitable relief and enforce the terms of the ERISA-governed plans.

223.    The payments identified in *Exhibit BB* provided to National Labs do not constitute covered services under the relevant health and welfare benefit plans, and violate United reimbursement policies applicable to these  benefit claims.

224.    National Labs was not entitled to seek, collect, or retain the payments it received from or through United's administration of the benefit claims at issue. National Labs has not returned the payments to United.

225.     The ERISA-governed plans grant United, as an ERISA fiduciary, the right to recover any overpayments or other payments made under the plans. Pursuant to ERISA and the express terms of the plans, United is entitled to recover the overpayments made to National Labs.

226.     United seeks to recover all overpayments that have been made to National Labs identified in *Exhibit BB*.

227.     These overpayments were made or authorized directly by United to National Labs.

228.     Without limitation, United seeks (i) a constructive trust over the payments that United made or authorized to the National Labs, (ii) an order requiring the return of such funds, and (iii) a constructive trust over any such funds in the possession or control of the National Labs as a result of the conduct specified herein.

**D.     Fourth Claim for Relief – Declaratory Relief under 28 U.S.C. § 2201**
**(As to National Labs, Lukens, Treasure Coast, and Wellness)**

229.     United incorporates as though fully set forth herein the allegations in paragraphs 1 through 196 above.

230.     There is an actual case or controversy between United and National Labs, Lukens, Treasure Coast, and Wellness as to the demands and charges submitted to United by National Labs, Lukens, Treasure Coast, and Wellness, which have not been paid and which are set forth in *Exhibit A*.

231.     By submitting, or causing to be submitted, false and misleading bills, claims, and supporting documentation that were actually the result of unauthorized and medically unnecessary urinalysis testing, National Labs, Lukens, Treasure Coast, and Wellness falsely represented that these charges are legitimate, medically necessary and compensable.

232.     Payment for National Labs, Lukens, Treasure Coast, and Wellness' charges is not owed because these charges are the product of an unlawful testing scheme to obtain insurance payments for unauthorized, medically unnecessary urinalysis testing, and National Labs, Lukens, Treasure Coast, and Wellness' claims for these charges are fraudulent and misleading.

233.     There is a bona fide, present, and practical need for a declaration as to all such outstanding charges.

234.     Accordingly, pursuant to 28 U.S.C. § 2201(a), United seeks a judgment declaring that any of National Labs, Lukens, Treasure Coast, and Wellness' unpaid charges for POC, machine-analyzed presumptive, and definitive UDT are not owed because they are the product of an unlawful testing scheme to collect insurance benefits, and enforcement of those charges would contravene the strong public policy of Florida.

## JURY DEMAND

235.     Pursuant to Federal Rule of Civil Procedure 38, United demands a trial by jury on all issues so triable.

WHEREFORE, United respectfully requests this Court to enter judgment in its favor, jointly and severally against National Labs, Lukens, Treasure Coast, Wellness, TMC, and Aid In Recovery, and grant such other relief as the Court deems just and appropriate.

Date: May 1, 2018                                    Respectfully submitted,


                                    /s/ Sandra L. Heller
                                    David I. Spector (FBN: 086540)
                                    E-mail: david.spector@akerman.com
                                    Sandra L. Heller (FBN: 037055)
                                    E-mail: sandra.heller@akerman.com
                                    Irene A. Bassel Frick (FBN: 158739)
                                    E-mail: irene.basselfrick@akerman.com
                                    Andrew M. Loewenstein  (FBN: 073096)
                                    E-mail: andrew.loewenstein@akerman.com

Darcie A. Thompson (FBN: 124888)
E-mail: darcie.thompson@akerman.com
AKERMAN LLP
777 South Flagler Drive,
Suite 1100, West Tower
West Palm Beach, FL 33401
Telephone:  (561) 653-5000
Facsimile:   (561) 659-6313
Attorneys for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on May 1, 2018, I electronically filed this Motion with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on parties listed in the below Service List via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner.

By: */s/ Sandra Heller*_____

## SERVICE LIST

*National Laboratories, LLC, The Lukens Institute, LLC, Treasure Coast Recovery, LLC v. Unitedhealth Group, Inc., United Healthcare Services, Inc., Unitedhealthcare Insurance Company, United Healthcare Services LLC, Optum, Inc., and Golden Rule Insurance Company. Case No.: 9:17-cv-81178-DMM United States District Court, Southern District of Florida, West Palm Beach Division*

| | |
|---|---|
| Jason S. Mazer, Esq.<br>CIMO MAZER MARK PLLC<br>100 SE 2nd Street, Ste. 3650<br>Miami, FL 33131<br>Telephone:  (305) 374-6481<br>jmazer@cmmlawgroup.com<br>kshaw@cmmlawgroup.com<br><br>Anthony S. Hearn, Esq.<br>VER PLOEG & LUMPKIN, P.A.<br>100 S.E. 2nd Street, 30th Floor<br>Miami, FL 33131<br>Telephone: (305) 577-3996<br>Facsimile:  (305) 577-3558<br>ahearn@vpl-law.com<br><br>Glenn E. Solomon, Esq. (*pro hac vice*)<br>Jonathan H. Shin, Esq. (*pro hac vice*)<br>HOOPER, LUNDY & BOOKMAN, PC<br>1875 Century Park East, Suite 1600<br>Los Angeles, CA 90067<br>Telephone: (310) 551-8179<br>gsolomon@health-law.com<br>jshin@health-law.com<br><br>David S. Schumacher, Esq. (*pro hac vice*)<br>HOOPER, LUNDY & BOOKMAN, PC<br>470 Atlantic Avenue, Suite 1201<br>Boston, MA  02210<br>Telephone:  (617) 532-2704<br>dschumacher@health-law.com<br><br><br>*Attorneys for Plaintiffs* | David I. Spector, Esq.<br>Sandra L. Heller, Esq.<br>Irene A. Bassel Frick, Esq.<br>Andrew M. Loewenstein, Esq.<br>Darcie A. Thompson, Esq.<br>AKERMAN LLP<br>777 South Flagler Drive<br>Suite 1100, West Tower<br>West Palm Beach, FL 33401<br>Telephone: (561) 653-5000<br>Facsimile: (561) 659-6313<br>david.spector@akerman.com<br>sandra.heller@akerman.com<br>irene.bassel@akerman.com<br>andrew.loewenstein@akerman.com<br>darcie.thompson@akerman.com<br><br>*Attorneys for Defendants, Unitedhealth Group, Inc.; United, Healthcare Services, Inc.; Unitedhealthcare Insurance Company, Inc.; United Healthcare Services, LLC; Optum, Inc.; and Golden Rule Insurance Company* |