**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**CASE NO. 9:17-cv-81178-DMM**

NATIONAL LABORATORIES, LLC, THE LUKENS
INSTITUTE, LLC, TREASURE COAST
RECOVERY, LLC,

       Plaintiffs and Counter-Defendants,

v.

UNITEDHEALTH GROUP, INC., UNITED
HEALTHCARE SERVICES, INC.,
UNITEDHEALTHCARE INSURANCE COMPANY,
UNITED HEALTHCARE SERVICES LLC,
OPTUM, INC., and GOLDEN RULE INSURANCE
COMPANY,

       Defendants and Counter-Plaintiffs,

v.

NATIONAL LABORATORIES, LLC, THE LUKENS
INSTITUTE, LLC, TREASURE COAST
RECOVERY, LLC, TREATMENT MANAGEMENT
COMPANY, LLC, WELLNESS COUNSELING AND
RESIDENTIAL DETOXIFICATION, LLC, SUNSHINE
DOCTORS GROUP, LLC, and AID IN RECOVERY, LLC

       Counter-Defendants.

_____/

**<u>AMENDED COUNTERCLAIM</u>**

Pursuant to Federal Rule of Civil Procedure 15(a)(1), Defendants and Counter-Plaintiffs

UnitedHealth Group, Inc., United HealthCare Services, Inc., UnitedHealthcare Insurance

Company, Optum, Inc., and Golden Rule Insurance Company (collectively, "United"), hereby

file this Amended Counterclaim against Treatment Management Company, LLC ("Treatment

Management"), National Laboratories, LLC ("National Labs"), The Lukens Institute, LLC

45448753;3

("Lukens"), Treasure Coast Recovery, LLC ("Treasure Coast"), Wellness Counseling and Residential Detoxification Services, LLC ("Wellness"), Sunshine Doctors, LLC ("Sunshine", and Aid In Recovery, LLC ("Aid In Recovery") (collectively, "Counter-Defendants"), and allege the following in support:

## I.   NATURE OF THE ACTION

1. This case involves a fraudulent, unfair, deceptive and unconscionable scheme orchestrated and jointly perpetrated by a group of entities that share common ownership, through a structure of sham "holding" companies.  This web of entities targets, recruits, and imports patients from all over the country into their "substance use disorder" treatment facilities (the "Web"), and includes a marketing arm, a "detox" facility, outpatient treatment facilities, a physicians group, a testing laboratory, and various iterations of holding companies through which the Web is organized.

2. The goal of the Web is to maximize billing by moving the patients through various levels of care, from the most intense to the least, all the while collecting specimens for urine drug testing ("UDT"). UDT, performed by Web entity National Laboratories, LLC ("National Labs"), provides the greatest opportunity for Web billing.  All of the 30-plus treatment facilities throughout the Web, from as far away as California and Arizona, send urine specimens to Florida so that National Labs can test (and re-test) specimens, to the tune of $11,000 or more per specimen. This intentional pattern of UDT is performed in a rote and pre-determined manner on substance use disorder ("SUD") patients.

3. The scheme begins with the marketing company, Aid In Recovery, which pays millions of dollars annually to companies like Yahoo and Bing to obtain "leads" on people searching the internet for addiction help.  Through Aid In Recovery, Counter-Defendants engage

2

in patient brokering and pay kickbacks in violation of Florida law.  As explained in more detail below, Aid In Recovery provides incentives to prospective patients, including paying for plane tickets, to come to Florida for substance abuse treatment at one of the Web facilities.  Aid In Recovery also ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████.[1]  Finally, other entities in the Web ███████ ████████████████████████████████████████████████████████ ████████ in the related treatment facilities.

4.     Charges that are the product of an unlawful patient brokering arrangement are unconscionable, deceptive, unfair, and fraudulent, and consequently are non-compensable and not owed by the patient or his or her insurance plan.  Counter-Defendants obtained more than $22,650,000 in health insurance benefits for the patients whose treatment is at issue in this litigation and believes that many, if not all, of these patients were illegally brokered in violation of Florida law and public policy.

5.     While moving patients through their continuum of "care," Counter-Defendants subject patients to excessive and expensive urine drug testing ("UDT") under the pretense of monitoring and treating the patients, while in reality Counter-Defendants perform the UDT to maximize profits. The Web related entities collect UDT specimens at pre-set, pre-determined intervals, irrespective of any legitimate medical necessity for the UDT.  UDT, performed at the

---

[1] In an abundance of caution, United is redacting certain portions of this Amended Counterclaim because they may contain confidential information, including information that is the subject of United's *Motion for Expedited* In Camera *Review or Order Overruling Counter-Defendants' Improper Clawback of Documents and Motion to Compel Deposition Testimony and for Sanctions.* While United continues to assert that the Counter-Defendants' positions are without merit, it redacts some information in the event there are legitimate designations of confidentiality.

Web treatment facilities and also by Web entity National Laboratories, LLC ("National Labs"), provides the greatest opportunity for Web billing. All of the 30-plus treatment facilities throughout the Web, from as far away as California and Arizona, send urine specimens to Florida so that National Labs can test (and re-test) specimens, to the tune of $11,000 or more per specimen. This intentional pattern of UDT is performed in a rote and pre-determined manner on substance use disorder ("SUD") patients.

6.      The Web, whose facilities are all out-of-network, charges exorbitant prices and exploits those patients who are suffering from SUD.

7.      These treatment facilities, based upon "Standing Orders" provided by TMC, direct the collection and testing of UDT specimens throughout each level of care, regardless of individual patient needs.

8.      Many of the patients referred into the Web through Aid In Recovery begin at the detoxification level of care ("detox"). Detox is the highest level of care for SUD patients and is appropriate only for those patients suffering from acute and serious addiction, to assist patients in managing the symptoms of withdrawal. The Web detox facility located in Palm Beach County is Wellness Counseling and Residential Detoxification Services, LLC, ("Wellness"). Wellness also provides residential treatment to patients.

9.      Florida Web facilities The Lukens Institute, LLC, ("Lukens") and Treasure Coast Recovery, LLC ("Treasure Coast") are located in Martin County, Florida, which borders Palm Beach County. National Labs is also located in Martin County, Florida.  These treatment facilities would treat the Web patients after "discharge" from Wellness through less intensive levels of care, including Partial Hospitalization ("PHP") and Intensive Outpatient Program

("IOP"). Both of these subsequent levels of care include sober housing options for patients via the Web.

10.     Beginning with detox and throughout the various levels of care, Web patients were subjected to excessive and medically unnecessary UDT under the guise of monitoring and treating these patients. Web providers, including Wellness, Lukens and Treasure Coast, with the participation of Sunshine Doctors and at the direction of TMC, ordered excessive, expensive and unnecessary urinalysis testing from the Web's companion laboratory business, National Labs, based on a rote and predetermined protocol for UDT.  Florida Web members Wellness, Treasure Coast, Lukens and Treatment Management Company worked in concert to perpetrate this scheme, take advantage of patients, and defraud United out of approximately $16.5 million in UDT claims. *See Exhibit A*. The Web intentionally engaged in a predetermined "protocol" pattern of UDT irrespective of a patient's individual needs, under the guise of "blanket orders" and "standing orders" for excessive UDT testing.

11.     Between February 2013 and June 2017, Web entities Wellness, Lukens, Treasure Coast and National Labs billed United more than $200 Million for UDT alone. *See Exhibit A*. The many facets of the UDT scheme included the following:

- Wellness, Treasure Coast and Lukens, at the direction of TMC, ordered UDT from National Labs for every single patient, multiple times per week, often for weeks on end, throughout the various levels of care regardless of the patient's individual needs, risk factors, treatment progress, or health concerns;

- National Labs knowingly received and accepted the above-mentioned urine samples of each patient, multiple times per week, often for weeks on end, pursuant to a protocol by which TMC ensured that Wellness, Lukens and

5

Treasure Coast staff were directed to send countless UDTs to National Labs for testing;

- TMC, as part of its business model to maximize profits from UDT, made no effort to send patients' specimens to a lab that was within network for these patients, but rather, sent all specimens to the Web lab, which could bill exorbitantly to enrich the owners of the Web;

- Wellness, Treasure Coast and Lukens would, as part of the TMC business model, order UDT for a presumptive or "screening" test to test for the presence of drugs. Even in those instances in which the results were negative, or "as expected," Wellness, Treasure Coast and Lukens would order a definitive or "confirming" test. This aspect of the business model allowed the Web to bill over $11,000.00 for UDT of a single specimen.  This testing and billing protocol would oftentimes be repeated multiple times per week.

- TMC directed that its member facilities implement this predetermined protocol for testing, that required UDT testing for patients of at least 3 presumptive and 2 definitives UDTs each week ("3/2 Protocol"), irrespective of the patients' severity of addiction, the nature and extent of the addiction, the patients' physical condition, the patients' compliance with the program or the patients' lucidity and sobriety during treatment.  If a patient was in the Web, then TMC directed that they be tested according to the 3/2 Protocol.

- As part of the 3/2 Protocol, Wellness, Lukens and Treasure Coast would typically order both a presumptive and definitive test from National Labs at the time the

specimen was sent, meaning it did not wait for the results of the presumptive before ordering the definitive test from National Labs;

- TMC directed Treasure Coast and Lukens to order from National Labs identical, expansive, predetermined "laundry lists" of dozens of substances to test for across patients and levels of care, irrespective of patient specific factors, such as the nature of the addiction treated for;

- Wellness, Lukens, and Treasure Coast ordered and National Labs performed expensive definitive tests for those patients who suffered from addiction to alcohol, despite National Labs not having an assay in place to test for the presence of the specific substances needed to detect the presence of alcohol in the patients' system;

- TMC spent hundreds of thousands of dollars on an "expert" to defend its use of the 3/2 Protocol and champion its position to insurance companies and the industry and to ensure that its revenue stream continued;

- Wellness, Treasure Coast, and Lukens would routinely order more testing from National Laboratories on additional samples from the same patient prior to having received the results of the UDTs collected only a few days before;

- National Labs, despite knowing that it had not finished testing the previous specimen and thus did not have the results, accepted the new specimen and performed additional unnecessary tests before reporting the results of the previous tests;

- TMC directed Wellness to order from National Labs expensive and unnecessary UDT testing for all patients upon discharge from detox (despite the fact that

patients had been in a controlled residential facility under monitoring); the results of which would not be received until after the patient was gone from the facility;

- TMC directed Wellness to order from National Labs expensive machine-analyzed presumptive and definitive UDT for all patients based upon determinations of "high risk" which were inapplicable and/or not patient specific;

- TMC directed Treasure Coast and Lukens to order from National Labs expensive presumptive and definitive UDT upon "admission" into their programs, even in instances in which patients had just been "discharged" from detox at Wellness, had remained in the care of TMC while transported to Treasure Coast or Lukens, and before the results of the prior "discharge" UDT that had just been ordered by Wellness;

- TMC directed Treasure Coast and Lukens to order from National Labs expensive presumptive and definitive UDT for all patients upon "discharge" from PHP level to the lower IOP level of care, despite not receiving the results until the patient had commenced the next level of treatment in the same facility;

- TMC directed Treasure Cost and Lukens to order from National Labs expensive and definitive UDT for all patients upon "admission" in the IOP lower level of care, despite the fact that a "discharge" UDT had just been ordered in the same facility;

- In those instances in which Treasure Coast and Lukens performed what should have been an inexpensive in house point-of-care test ("POC"), they would charge $1,500 for this simple "dip stick" test that could be purchased in a drug store for

roughly $15. Indeed, online pricing for the exact types of POC tests Treasure Coast, Lukens, and Wellness used ranged from $6 to $10;

- Both Lukens and Treasure Coast purchased equipment that permitted it to perform presumptive tests on site at the facilities.  Lukens and Treasure Coast would, on occasion, bill for a presumptive test performed at their respective facilities and then order the same presumptive test from National Labs. This allowed the Web to "double dip" by billing for multiple presumptive tests from the same sample for the same patient;

- National Labs, at the direction of TMC, between September 2014 and June 2017, billed United an average close to $100,000.00 *per patient* for this testing, typically over the course of only a few months;

- Lukens, between July 2013 and June 2017, in addition to the robust billing by National Labs, billed United on average tens of thousands of dollars for its patients for UDT alone;

- Treasure Coast, between January 2014 and June 2017, in addition to the robust billing by National Labs,  billed United on average tens of thousands of dollars for its patients for UDT alone;

- Wellness, between April 2015 and March 2018, in addition to  the robust billing by National Labs, billed United on average tens of thousands of dollars for its patients for UDT alone; and

- For those patients at issue in this action, they were billed an average of more than $133,000.00 in UDT from Web providers including Wellness, Lukens, Treasure Coast and National Labs.

9

- The Web, as owners of Aid in Recovery, Sunshine Doctors, TMC, Wellness, Treasure Coast, Lukens and National Labs, used UDT to generate and inflate profits and to enrich member entities and their owners at the expense of patients, members, benefit plan sponsors and United.

12.     These "orders" for UDT, purportedly authorized by Web physicians, many of whom were associated with Web entity Sunshine Doctors, were largely template-driven, "cut and pasted" documents with pre-formatted justifications of "medical necessity."

13.     These orders typically requested two types of expensive and unnecessary tests. First, the treatment facilities ordered (and/or performed themselves) an enzyme immunoassay or other machine-analyzed "qualitative" or "presumptive" test ("machine-analyzed presumptive"), which measured whether drugs or certain classes of drugs were in the patient's system.  Then, even if the machine-analyzed presumptive test indicated that no drugs were present, National Labs performed a gas chromatography-tandem mass spectrometry or similarly sophisticated "quantitative" or "definitive" ("definitive") UDT, which measures specific levels of particular drugs in an individual's system.

14.     As described in detail below, Aid in Recovery, TMC, Sunshine Doctors, Wellness, Lukens, Treasure Coast and National Labs worked in concert to submit bills to United for these laboratory tests for virtually all patients, multiple times per week, based upon the profit driven predetermined 3/2 Protocol for testing without any regard to medical necessity or individualized patient needs.

15.      In fact, this "scheme" was largely invisible to United in the context of an individual claim, and only began to emerge when patterns between large numbers of claims were analyzed.  Even after placing a prospective review on National Labs in 2015 and Lukens and

Treasure Coast in early 2016 (due to observations regarding common ownership and excessive amounts billed), these Web providers refused, virtually across the board, to submit supporting documentation with its claims submissions, making it exceedingly difficult to for United to identify the patterns described herein. They also submitted "medical necessity" statements and retained a "subject matter" expert to lobby for the propriety of its practices to hide these patterns. As United undertook to defend itself from litigation involving massive numbers of claims brought by National Labs, Treasure Coast and Lukens the pervasiveness of these patterns became apparent. United did not discover (and could not have discovered) the Web's scheme until shortly before filing this counterclaim. It was only after the United reviewed claim files collectively and considered them holistically, that it became apparent that individualized patient care was not occurring.

16.     As a result of the UDT scheme, Lukens, Wellness, Treasure Coast and National Labs submitted bills to United for multiple POC, machine-analyzed presumptive, and definitive tests each week, billing many thousands of dollars per patient each week for months at a time. For example:

- National Labs billed United $401,165 for UDT of *one patient*, Patient 1, over the course of approximately two months. During the same time period, Lukens billed United for UDT *of the same patient* in the amount of $69,930. In addition, Wellness billed United for UDT of the same patient in the amount of $23,700. Thus, National Labs and Lukens billed United a total of $342,535 for UDT for a single patient. *See Exhibit B*, Patient 1 Chart.

- National Labs billed United $258,065, for UDT of *one patient*, Patient 2, in less than five months. During the same time period, Lukens also billed United

$190,895 for UDT of the same patient. Thus, National Labs and Lukens billed United $448,960 for UDT for just this patient. *See **Exhibit C***, Patient 2 Chart.

- National Labs billed United $703,615 for UDT for ***one patient***, Patient 3, over approximately 4.5 months. Treasure Coast billed United another $11,000 just for UDT of this patient, bringing the total billed for Patient 3 for UDT to $714,615. *See **Exhibit D***, Patient 3 Chart.

- National Labs billed United $133,020 for UDT of ***one patient***, Patient 4, in just over two months. During the same time period, Lukens billed United $35,600 for UDT of the same patient. Thus, National Labs and Lukens billed United $168,620 for UDT in total for just this patient. *See **Exhibit E***, Patient 4 Chart.

- National Labs billed United $107,915 for UDT of ***one patient***, Patient 5, in less than one month. During the same time period, Treasure Coast billed United $15,400 for UDT of the same patient. Thus, National Labs and Treasure Coast billed United a total of $123,315 for UDT of a single patient in less than a month. *See **Exhibit F***, Patient 5 Chart.

- Wellness, Treasure Coast, and National Labs combined to bill United $167,370 for UDT of ***one patient***, Patient 6, in less than one month. Wellness billed United $3,400 for UDT of Patient 6 on one date of service, and referred additional UDT for that patient to National Labs. On the same date of service, National Labs billed United $8,190 for UDT of the same patient, bringing the total UDT billing for a single date of service to $11,590. The very next day, Treasure Coast billed United $8,400 for UDT and National Labs billed United $21,790 for UDT of

Patient 6. This pattern continued for approximately 30 days. *See **Exhibit G**,*

Patient 6 Chart.

For these six patients alone, Lukens, Treasure Coast, and Nationals Labs billed United $1,795,505 over the course of just a few months.  Further, these exorbitant amounts billed would have created tens of thousands of dollars in personal financial liability of the part of the patients resulting from their payment responsibilities, as TMC entities are all out-of-network providers. These patients represent only a small but illustrative example of the numerous patients who were subjected to a predetermined and rote protocol of outrageously priced, unnecessary, and improper UDT through the TMC entities.

17.     Further, as is demonstrated by the large amounts billed and as United has learned in discussions with numerous members, National Labs failed to engage in a good faith attempt to collect the tens of thousands in copayments and deductibles from its patients, a practice that constitutes insurance fraud under Florida law. *See* Fla. Stat. § 817.234 (7)(a).

18.     By submitting bills to United for these tests and other services, National Labs, Wellness, Treasure Coast and Lukens with the assistance of Sunshine Doctors, represented to United that the tests and other services were authorized, medically necessary, lawfully rendered, and compensable, when in fact these tests and other services were ordered and performed as the result of an unlawful patient brokering arrangement, as well as a predetermined protocol for UDT and were medically unnecessary. TMC, Aid In Recovery, Wellness, Treasure Coast, Lukens, Sunshine Doctors and National Labs worked together to perpetrate these schemes and obtain millions of dollars of insurance or employee health benefits to which they were not entitled.

19.     Further, National Labs, Lukens, Treasure Coast, and Wellness blatantly disregarded and attempted to circumvent United Reimbursement Policies. These violations of United's policies resulted in nearly $3,000,000 in overpayments for which United seeks recoupment against National Labs.

20.     In addition, National Labs, Lukens, Treasure Coast, Wellness, and Sunshine Doctors, at the direction of TMC and through Aid In Recovery, engaged in an unlawful patient brokering scheme and submitted bills totaling more than $6.5 million for SUD treatment and related services which, as a result of that scheme, are noncompensable.

21.     United paid or authorized payment of millions of dollars to National Labs, Lukens, Wellness, and Treasure Coast based on fraudulent, unfair, deceptive and unconscionable practices before learning of this scheme, and asserts claims for unjust enrichment, recoupment under ERISA, violations of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), and declaratory relief.

## II.     JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a), as this matter is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

23.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as some claims arise under the laws of the United States, namely the Employee Retirement Income Security Act of 1974 ("ERISA").

24.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1367(a), as United's claims form part of the same case or controversy as the claims alleged in National Labs', Lukens', and Treasure Coast's Amended Complaint [ECF No. 21] filed in this action.

45448753;3

25.     This Court has personal jurisdiction over National Labs, Wellness, Lukens, Treasure Coast, Treatment Management, Sunshine Doctors, Aid In Recovery, and Wellness because all of these parties are citizens of Florida, are located in Palm Beach County or Martin County, Florida, and conduct business in Palm Beach County or Martin County, Florida.  In addition, National Labs, Lukens, and Treasure Coast filed their Complaint [ECF No. 1] and Amended Complaint [ECF No. 21] in this Court.

26.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because the Counter-Defendants reside in this district, and also because a substantial part of the events or omissions giving rise to the claims occurred in this district.  Furthermore, National Labs, Lukens, and Treasure Coast initiated this action in this district.

### III.     THE PARTIES

27.     United HealthCare Services, Inc. is a corporation organized under the laws of Minnesota, with its principal place of business in Minnesota, and is a citizen of the State of Minnesota.  It is engaged in business in Florida.

28.     UnitedHealth Group, Inc. is a corporation organized under the laws of Delaware, with its principal place of business in Minnesota, and is a citizen of the State of Minnesota.  It is engaged in business in Florida.

29.     UnitedHealthCare Insurance Company is a corporation organized under the laws of Connecticut, with its principal place of business in Connecticut.  It is engaged in business in Florida.

30.     Optum, Inc. is a corporation organized under the laws of Minnesota, with its principal place of business in Minnesota, and is a citizen of the State of Minnesota.  It is engaged in business in Florida.

31.     Golden Rule Insurance Company is a corporation organized under the laws of Indiana, with its principal place of business in Indianapolis, Indiana, and is a citizen of the State of Indiana.

32.     Upon information and belief, Treatment Management Company, LLC is a limited liability company organized under the laws of the State of Florida with its principal address in Stuart, Florida.  Upon information and belief, all members of Treatment Management Company are citizens of the State of Florida.

33.     National Laboratories, LLC is a limited liability company organized under the laws of the State of Florida with its principal address in Stuart, Florida.  Upon information and belief, all of National Labs' members are citizens of Florida.

34.     Upon information and belief, The Lukens Institute, LLC is a limited liability company organized under the laws of the State of Florida with its principal address in Stuart, Florida.  Upon information and belief, all members of the Lukens Institute, LLC are citizens of the State of Florida.

35.     Upon information and belief, Treasure Coast Recovery, LLC is a limited liability company organized under laws of the State of Florida with its principal address in Stuart, Florida.  Upon information and belief, all members of Treasure Coast Recovery, LLC are citizens of the State of Florida.

36.     Upon information and belief, Wellness Counseling and Residential Detoxification Services, LLC is a limited liability company organized under the laws of Florida with its principal address in Stuart, Florida.  Upon information and belief, all members of Wellness Counseling and Residential Detoxification are citizens of the State of Florida.

45448753;3

37.     Upon information and belief, Sunshine Doctors Group, LLC is a limited liability company organized under the laws of Florida with its principal address in Palm City, Florida. Upon information and belief, all of Sunshine Doctors' members are citizens of the State of Florida.

38.     Upon information and belief, Aid In Recovery, LLC is a limited liability company organized under the laws of Florida with its principal address in Palm City, Florida.  Upon information and belief, all of Aid In Recovery's members are citizens of the State of Florida.

### IV.     SUBSTANCE USE DISORDER TREATMENT AND DRUG TESTING ENVIRONMENT IN SOUTH FLORIDA

39.     Fraudulent and deceptive activity flowing from the treatment of patients suffering from substance use disorder, particularly in Florida, has recently been at the center of numerous investigations and arrests.

40.     The influx of patients from out of state and proliferation of unscrupulous treatment providers prompted the Florida Legislature to ask the State Attorney to establish the Palm Beach County Sober Homes Task Force ("Task Force") to study the issues and make recommendations to stop the exploitation of substance abuse patients and curb the widespread fraud and other abuses occurring in the substance abuse treatment industry.  *See Exhibit H*, *Palm Beach County Sober Homes Task Force Report* at 1-2, 16 (Jan. 1, 2017) ("Task Force Report").[2]

41.     Given the rampant fraud occurring in the substance abuse treatment industry the State Attorney for the Fifteenth Judicial Circuit in Palm Beach County, Dave Aronberg, called for a grand jury "to investigate how government agencies are addressing the proliferation of fraud and abuse occurring within the addiction treatment industry."  *Exhibit I*, *Presentment of*

---

[2] Available at http://www.sa15.state.fl.us/stateattorney/SoberHomes/indexSH.htm.

*the Palm Beach County Grand Jury: Report on the Proliferation of Fraud and Abuse in Florida's Addiction Treatment Industry* ("Grand Jury Report"), at 1, 7-8 (Dec. 8, 2016).[3]

42.     Mr. Aronberg provided testimony to the United States House Energy and Commerce Subcommittee on Oversight and Investigations, in the Subcommittee's hearing entitled, "Examining Concerns of Patient Brokering and Addiction Treatment Fraud."   *See* Exhibit J, *Examining Concerns of Patient Brokering & Addiction Treatment Fraud: Hearing Before the H. Energy & Commerce Subcommittee on Oversight & Investigations*, 115th Congress (Dec. 12, 2017).[4] Mr. Aronberg described the "Florida Shuffle," a pattern of abuses and fraudulent activities in which unscrupulous opportunists seek to benefit from patients' lucrative insurance benefits. Mr. Aronberg explained that this pattern starts with "deceptive marketing practices, offers or inducements" such as free plane tickets to lure patients into particular treatment facilities. Then, the patients often go through substandard care, live in "sober homes," where sobriety may or may not be reality, and are discharged when their insurance benefits are exhausted. Mr. Aronberg's full statement and presentation to Congress are attached hereto as ***Exhibit J***.

43.     The frauds and abuses specifically associated with drug testing facilities in South Florida have been widely documented and reported.  *See, e.g.* David Segal, In Pursuit of Liquid Gold, N.Y. TIMES, Feb. 15, 2018[5] (detailing fraudulent schemes involving UDT and exploitation of patients); Pat Beall, *Addiction Treatment Bonanza: How Urine Tests Rake in*

---

[3] Available at http://www.sa15.state.fl.us/stateattorney/Newsroom/GJ/GrandJuryReport2.pdf.

[4] Available at https://energycommerce.house.gov/hearings/examining-concerns-patient-brokering-addiction-treatment-fraud/.

[5] Available at https://www.nytimes.com/interactive/2017/12/27/business/urine-test-cost.html.

*Millions*, PALM BEACH POST, Aug. 1, 2015[6] (reporting that when sober home operators realized that insurers "would pay big bucks for urine testing," the "cash started rolling in" and urinalysis "became a financial linchpin – and now, a gold mine"); Lizette Alvarez, *Haven for Recovering Addicts Now Profits From Their Relapses*, NEW YORK TIMES, June 20, 2017[7] ("To increase profits, many treatment centers and labs overbill insurance companies thousands of dollars for a urine test screen. Patients often unnecessarily undergo multiple urine tests a week."); *Attorney General Pam Bondi Backed Testing at Center of Massive Fraud*, PALM BEACH POST, Jan. 9, 2016[8]; *Sober Home Task Force Makes 26th Arrest, Takes Aim at Labs*, PALM BEACH POST, May 11, 2017[9] ("The urine of drug addicts with insurance is worth millions of dollars to the operators of labs, sober homes and treatment centers."); *Labscam: Rogue Laboratory Testing at Center of Addiction Treatment Scandal*, CARDIO BRIEF (July 3, 3017)[10]; *Feds: Delray rehab owner arrested, billed $58 million for urine tests*, PALM BEACH POST, July 12, 2017.[11]  These articles are attached in a composite as ***Exhibit K***.

44.     Indeed, problems in the addiction treatment industry are so widespread that the Palm Beach Post has a page on its website specifically dedicated to reporting on the frauds,

---

[6] Available at http://www.mypalmbeachpost.com/news/addiction-treatment-bonanza-how-urine-tests-rake-millions/rvmrD8VMBwykDtd6TCSALJ/.

[7] Available at https://www.nytimes.com/2017/06/20/us/delray-beach-addiction.html?rref=collection%2Fsectioncollection%2Fus&action=click&contentCollection=us&region=stream&module=stream_unit&version=latest&contentPlacement=1&pgtype=sectionfront&_r=0.

[8] Available at http://www.mypalmbeachpost.com/news/attorney-general-pam-bondi-backed-testing-center-massive-fraud/TzG9jygVLmIEcFKkeQGkVL/.

[9]    Available    at    http://www.mypalmbeachpost.com/news/crime--law/sober-home-task-force-makes-26th-arrest-takes-aim-labs/LtnPZwPc0wIJrP5aMAFviJ/.

[10] Available at http://www.cardiobrief.org/2017/07/03/labscam-rogue-laboratory-testing-at-center-of-addiction-treatment-scandal/.

[11] Available at https://www.mypalmbeachpost.com/news/crime--law/feds-delray-rehab-owner-arrested-billed-million-for-urine-tests/6GHtJ9zGgf953YfWc05SHL/.

19

abuses, and other criminal activity associated with the substance abuse treatment industry in the community.  *See* http://www.mypalmbeachpost.com/sober-homes/.

45.     The Task Force Report, Grand Jury Report, Congressional testimony, and news articles all describe systemic and pervasive problems in the substance abuse treatment industry – ranging from deceptive marketing practices and patient brokering to abusive practices in connection with urine drug testing.  As alleged in further detail below, these reports largely catalogue the precise practices employed by Counter-Defendants.

46.     In fact, ***the same Congressional Subcommittee that is investigating patient brokering in the SUD treatment industry specifically requested information from Counter-Defendant Treatment Management about Treatment Management's referral/admission process***, including whether its "call center" (i.e. Aid In Recovery") is paid for its services, how Treatment Management determines where to place a patient, whether it has affiliations with the treatment facilities, whether it owns any websites that advertise for the call center, whether Treatment Management pays for search engine optimization, and certification of Aid In Recovery employees, among other requests.[12]  This letter is attached hereto as ***Exhibit L***.

47.     Among other things, these reports note the lucrative nature of the urinalysis drug testing, the typical common ownership of treatment facilities and urinalysis testing laboratories that allow owners to generate tremendous profits, the unnecessary urinalysis testing that is performed solely to increase those profits, as well as the deceptive marketing and advertising, the profiteering, and the outright brokering of patients.

48.     For example, the Task Force Report notes that abuse in the addiction treatment industry "has expanded to include *confirmatory and quantitative drug testing*."  ***See Exhibit H***,

---

[12]  Available at  https://energycommerce.house.gov/news/letter/letters-to-eight-call-aggregators-regarding-their-practices-and-reports-of-patient-brokering/.

Task Force Report at 16 (emphasis added).  The Report explains that point of care (known as "POC") tests are "readily available" and inexpensive, but that "[c]onfirmatory testing at a laboratory involves sophisticated instruments," "routinely results in billings of thousands of dollars per sample," and "is ordered by treatment providers multiple times per week."  *Id.*

49.     The Task Force Report explains that, "[f]requently, a business nexus exists between the owners of treatment programs, recovery residences, and drug testing laboratories." ***Exhibit H***, Task Report Report at 16.  Further, "it is not unusual for unscrupulous treatment providers to bill tens or hundreds of thousands of dollars in insurance claims for confirmatory and quantitative [urinalysis] and other laboratory testing for an individual patient over the course of treatment."  *Id.*  The Task Force Report explicitly found that "laboratory testing as a complement to clinical care may be routinely billed for without legitimate proof of medical necessity.  This is one of the engines that currently run the industry."  *Id.*

50.     Like the Task Force Report, the Grand Jury Report notes that "[i]nsurance fraud is another major problem in Florida's substance abuse treatment industry."  ***Exhibit I***, Grand Jury Report at 7.  In this regard, the Grand Jury observes that "a point of care (POC) urinalysis (UA) test kit is readily available over the counter and costs under ten dollars.  On the other hand, confirmatory and quantitative testing at a lab involves sophisticated instruments, tests for specific and collateral drugs (panels), and results in charges that can exceed five thousand dollars per test[13].  In many cases, confirmatory and quantitative tests are ordered by treatment providers multiple times per week.  . . .  Even when confirmatory tests are ordered by a doctor, many are never reviewed, evincing the lack of medical necessity in the first place."  ***Exhibit I***, Grand Jury Report at 7.

---

[13] As detailed herein, National Labs bills anywhere from $6,800.00 to $7,200.00 for just one confirming test.

51.     Marketing practices and patient brokering are also identified by the Sober Homes Task Force and the Grand Jury as significant problems in the addiction treatment industry.  For example, the Grand Jury Report states that "patient brokering is a major problem in this industry as well."  *Exhibit I*, Grand Jury Report at 8.

52.     The Grand Jury heard testimony that the average patient referral fee to a recovery residence from a treatment provider is $500 per week per patient.  *Exhibit I*, Grand Jury Report at 8.  Of course, "[t]he more a treatment provider bills, the more the provider can pay in kickbacks to obtain more patients.  This leads patients away from quality treatment providers to business that are only concerned with billing as much as possible."  *Id.*

## V.     COUNTER-DEFENDANTS' DECEPTIVE PRACTICES AND SCHEME

### A.     Background of Counter-Defendants and Related Parties

53.     Counter-Defendants and their numerous affiliates are organized under an umbrella of holding companies, limited liability parent companies, and various limited liability company subsidiaries, but all can be traced back to, and are ultimately owned by, trusts associated with Bryan T. Deering, Sr. ("Deering Sr.") and his wife Debra Deering.  Deering Sr. is the founder and Chief Executive Officer of Treatment Management.

54.     Upon information and belief, neither Deering Sr. nor Debra Deering are health care practitioners.  According to the Florida Department of Health's license verification website, neither of them has ever had any Florida health care license.

55.     In Florida, Treatment Management and another company, Tarpon Management Services, LLC, are at the top of the pyramid.  Treatment Management manages, directs, and controls the other Florida entities to maximize marketing, admissions, billing, and collection of insurance proceeds.

56.     While each entity is a separate corporate entity, with its own bank accounts, tax identification number ("TIN") employees, compensation structures, and profit and loss calculations; each corporate entity within the Web works in concert to support and facilitate schemes including unlawful patient brokering, as well as the overutilization of UDT via a rote and predetermined protocol for testing.

57.     Counter-Defendants have taken great pains to disguise the nature of their affiliations and represent to the outside world that each Web entity operates independently, and that Web entities' claims are submitted separately, so that United and other insurers remain unaware of the Web's improper activities and referrals. Web entities submit claims separately under different tax identification numbers, file suit independently, utilize their own letterheads. Accordingly, without an exhaustive investigation, an insurer cannot know about this affiliation and the issues that come along with it.

58.     In addition, Aid In Recovery projects an independent image to the public, representing that it assists prospective patients in finding SUD treatment that meets a patient's individual needs. Although it vaguely mentions that it is affiliated with unnamed treatment centers, it provides no further information to the public regarding its connection to the Web and its activities in enrolling patients in Web treatment facilities, described in more detail below.

59.     These Florida entities act in concert and each plays a key role in the scheme as follows:

        a.     Aid In Recovery is responsible for marketing, advertising, and providing incentives to its employees as well to patients, to get the patients in the door;

b.      Wellness purportedly provides detoxification treatment and a residential, inpatient program to get the patients in the door at the highest and most lucrative level of care, as well as provide opportunities for lucrative UDT irrespective of the patients' individualized needs; and, upon information and belief, Wellness also provides revenue to Aid In Recovery by paying it "per head" or "per deal" for each patient referral;

c.      Lukens and Treasure Coast purportedly provide the next, step-down levels of care – partial hospitalization (PHP), intensive outpatient care (IOP), and outpatient (OP) to keep the patient within the Web and to continue to maximize billing, as well as conduct additional "in house" UDT services for which it can also bill; and, upon information and belief, Lukens and Treasure Coast also provides revenue to Aid In Recovery by paying it "per head" or "per deal" for each patient referred

d.      Sunshine Doctors employs and/or contracts with physicians who purportedly provide medical services at the Florida treatment facilities and who sign orders for UDT of patients who are enrolled in treatment programs at the treatment facilities; and

e.      National Labs performs machine-analyzed presumptive as well as definitive testing for each and every patient multiple times per week regardless of individual patient diagnoses and risk factors, and charging exorbitant rates for such UDT, often resulting in billing for multiple separate tests for the same specimen for the same patient irrespective individual patient need.

B.     **Levels of Care for Substance Abuse Patients**

60.     Typically, treatment for substance use disorders can vary by the "level of care" the patient receives.  These levels of care vary in terms of the time and intensity of the treatment received.  Patients may be transferred to a "lower" level of care as they successfully move through treatment.

61.     A patient may begin in the detoxification ("detox") level of care, which is the highest level of care.  Detox is not substance use disorder treatment; rather, it is a set of medical interventions aimed at managing active intoxication and subsequent withdrawal symptoms.  Not all patients who enter into substance use disorder treatment program will need to begin at the detox level of care.  Patients in the detox level of care are in an in-patient setting with constant attendance at the facility by licensed health care practitioners and frequent monitoring, including taking of vital signs. As such, the risk of a patient having access to drugs or other illicit substances would be largely eliminated.

62.     The next level of care below detox is a residential, in-patient facility.  Patients stay at the treatment facility and participate in a structured counseling and therapy program during the day.

63.     The next level of care below a residential, in-patient facility is partial hospitalization.  Partial hospitalization programs (also known as "PHP") are structured, day-long treatment programs that typically involve counseling services provided to patients during daytime hours with patients typically returning home or to a sober living residence in the evenings. Patients should have an individualized treatment plan for partial hospitalization program.

64.     The next level of care below partial hospitalization is an intensive outpatient program (also known as "IOP").   Intensive outpatient programs are similar to partial hospitalization programs in that they involve structured counseling and therapy sessions, but they require fewer hours of attendance per week.  Again, here, a patient should have an individualized treatment plan.

65.     The level of care below intensive inpatient is an outpatient program also known as ("OP").  Outpatient programs provide ongoing counseling and therapy sessions, but require even fewer hours of attendance each week than an intensive outpatient program.

66.     Sober living residences are an ancillary service typically for patients who are engaged in partial hospitalization, intensive outpatient, or outpatient programs where the patient either does not have a home close to his or her treatment program or needs alternative living arrangements to ensure a sober environment.

67.     UDT may be used in the various levels of care from residential in-patient to outpatient programs; however, it is generally accepted by legitimate addiction treatment providers that the frequency and use of UDT should also be individually tailored to a patient's needs and not simply employed based on a rote or predetermined protocol for testing.

**C.      Types of UDT**

68.     Various types of UDT services are available and utilized to test for drug use.  In treating SUD patients, it may be appropriate to test for the presence of drugs to monitor compliance with the program, as well as for deterrent effect, but such testing should be performed in accordance with each patient's specific clinical needs and incorporated into a patient's individualized treatment plan.

69.     Subjecting patients to a rote, predetermined protocol of drug testing as a matter of course, without considering individual diagnoses, risk factors, or treatment progress to appropriately determine medical necessity, is improper and violates the standard of care.

70.     There are two general classes of UDT: (a) presumptive or qualitative, which detects whether certain drugs or classes of drugs are present in a patient's system; and (b) definitive or quantitative, which measures specific levels of particular drugs in a patient's system.  These types of UDT services should be utilized based on a patient's specific needs, circumstances, and risks.  Generally, a definitive UDT should not be performed absent a positive presumptive UDT.

71.     Within the qualitative class of UDT are: (a) point-of-care ("POC") UDT; and (b) enzyme immunoassay or other machine-analyzed "presumptive" UDT.

a.      A POC (point-of-care) test is a type of presumptive or qualitative drug test that provides accuracy and reliability, can be performed in a treatment facility or physician office, and provides almost immediate results.  A POC test is performed by collecting a patient's urine in a cup with numerous test strips embedded in the cup, with each strip is designed to test for a certain class or type of drug.  The strip indicates a positive or negative result by changing color upon contact with the urine, providing an instantaneous result without the need to send the urine to an outside laboratory.  POC testing typically tests for classes of commonly abused drugs, such as opiates, marijuana, cocaine, benzodiazepines, and numerous others.

b.      A second kind of qualitative or presumptive test is the immunoassay or the machine-analyzed test.   The machine-analyzed presumptive can also detect the presence of multiple drugs and/or drug metabolites in the system.  It is significantly more expensive than a POC test and requires sophisticated analysis, and is appropriate for individualized situations in which a more thorough analysis is required.

72.     The definitive urine drug test measures the precise amount of specific substances present in a person's system.  This test is sophisticated, costly, and must be performed in a laboratory.  This test becomes increasingly expensive depending on the number of substances for which the urine is tested.  UDT for several drugs or classes at the same times is referred to as a "panel."

73.     A definitive test is appropriate in specific and documented circumstances, such as when a patient presents at treatment appearing to be under the influence of a particular drug or when a presumptive test yields a positive result that requires further analysis of concentrations of certain drugs.  Prior to ordering a definitive test, a patient's physician should undertake an individualized assessment of the qualitative results in conjunction with an examination of other factors such as patient history and current clinical indications, and should thoroughly document this particularized assessment, before determining whether a definitive test is necessary.

74.     In the treatment of IOP patients, UDT goals oftentimes can and are met through the use of POC testing.  Confirmatory or definitive tests absent a positive POC test or some indication that the patient is abusing drugs or alcohol are generally not required.

75.     Costs for machine-analyzed presumptive and definitive UDT can vary and are generally significantly higher among non-network providers.

28

**D.      The Process Is Rotten From the Start:  The Web Misleads and Brokers Patients**

76.      Patients who receive treatment at Treasure Coast, Lukens, and Wellness usually come to these facilities through Aid In Recovery, the marketing and advertising arm of the Web.

77.      Aid In Recovery markets itself as a caring, patient-focused resource dedicated to helping substance abuse patients and their families.  Aid In Recovery represents that its team is qualified and willing to work with the patient to identify and address individual needs and determine the appropriate level of care.  *See* www.aidinrecovery.com.  The (secret) reality is that Aid In Recovery's mission is to ensure the Web's treatment facilities are filled with patients at almost any cost.

78.      According to promotional information presented to potential lenders or investors by Treatment Management Company, "Aid in Recovery is a full service marketing company that guides clients through the entire rehabilitation process." **Exhibit M**, at 12. Aid In Recovery "drives intake to the facility, beginning a client's treatment program." *Id.* at 13.

79.      Patients and their families who seek substance abuse treatment often turn to the internet to research and locate treatment facilities.  Treatment Management, Aid In Recovery, and affiliated treatment facilities invested heavily in search engine optimization so that when these patients and their families perform internet searches for substance abuse treatment, they are directed to Aid In Recovery and Treatment Management-related entities. Treatment Management and Aid In Recovery regularly spend in excess of $1 million per month (and as much as $3.5 million per month) with entities like Google, Yahoo, and Bing on a pay-per-click advertising to drive leads to the Treatment Management-related entity websites, including Aid In Recovery.

80.      This strategy was apparently so successful that, as Treatment Management Company told prospective lenders and investors in 2016, Aid In Recovery has "leads beyond

capacity, excess leads are currently not monetized." *Exhibit M*, at 12.  According to Treatment Management Company, in 2016, Aid In Recovery was "generating a significant number of leads which are currently being referred to other treatment centers – the Company has the demand from AIR [Aid In Recovery] to reach close to full occupancy within a month of opening each new facility." *Id.* at 15.

81.     This degree of success, especially when these facilities are not in network with health insurance companies, begs the question of how Aid In Recovery was obtaining patients so robustly.  The answer is that Aid In Recovery and the rest of the Web entities were (and are) ignoring the law and engaging in misleading and deceptive marketing tactics that amount to patient brokering.

82.     When prospective patients landed at the Aid In Recovery website, they were led to believe Aid in Recovery was an independent treatment referral service.  Until approximately late June 2017, Aid In Recovery's website concealed its affiliation with the Web entities, implying to the public that it was an independent company with substance abuse patients' best interests in mind:

> We do not promote any particular approach to addiction treatment, just high success rates. Our mission is to make sure you have the best possible chance to break free from alcohol and drug addiction. We do this by matching your specific needs with the best rehabs across the nation. Call us to find the best treatment options for you or your loved ones. We are always ready to take your call at our 24 Hour Recovery Hotline.

*Exhibit N* (http://web.archive.org/web/20170624065416/; https://aidinrecovery.com/).

83.     In response to abuse in the addiction treatment industry, the Florida Legislature enacted a statute that was specifically directed at misleading advertising and marketing in the industry.  Effective July 1, 2017, Florida Statutes § 397.55 prohibits a variety of deceptive marketing practices, including misrepresenting information about substance abuse services,

"surreptitiously" directing readers to certain websites, or failing to reveal affiliations between the referral services and treatment facilities.

84.    Sometime around the end of June 2017, Aid In Recovery changed some of the language on its website.  Aid In Recovery's website now contains the following statement purporting to describe its affiliation with other, unspecified entities:

> Aid In Recovery is associated with affiliated treatment centers located in AZ, CA and FL and Aid In Recovery may refer a person to one of these entities if the person's treatment needs and payment abilities match the treatment offerings at these facilities. The person is free to decide another treatment center not affiliated with Aid In Recovery. Aid In Recovery also may recommend another treatment center not affiliated with it to a person based on his/her individual needs and payment ability.

*See Exhibit O*; https://aidinrecovery.com/.

85.    Although Aid In Recovery changed portions of its disclaimer, it is still engaged in directing patients to Web treatment facilities, including statements like the following, which patently suggest that placement of patients is an objective and patient-specific process, as opposed to a commission-motivated "deal" by Aid In Recovery call center employees:

> a.    *Aid in Recovery has access to treatment centers across the country. Let our representatives match you with a treatment center that meets your needs and gets you on the road to full recovery as soon as possible*;
>
> b.    *Determining the need for medical detox will depend on a number of factors. Things like your substance of choice, usage interval, and amount come into play. Trying to detox yourself can be a painful, uncomfortable, or even deadly process. We work with Medical Detoxification Facilities around the country that provide 24-hour*

> *medical supervision. Our partners' facilities will put their years of experience and knowledge to your aid providing a comfortable detox*;

c. *We will help you find a rehab to fit your specific addiction, your insurance options, location, your family situation, your personal desires, and of course, your budget*; and, perhaps most deceptively,

d. **Whether you are looking for a place near home**, *or you're ready to get away from your current surroundings, our representatives can help you.*

*Id.* (emphasis added).

86.     One investigative article details misleading and deceptive marketing practices specifically by Aid In Recovery employed to lure SUD patients (and their lucrative insurance benefits) into Wellness, Lukens, Treasure Coast, and affiliated facilities.  *See* **Exhibit P**, Cat Ferguson, *Searching for Help*, THE VERGE (Sept. 7, 2017).[14]  According to the article, Aid In Recovery promised to match patients with the program that best suited their individualized needs, applying heavy pressure and offering inducements such as free airline tickets to entice patients to enter treatment at affiliated facilities, without any regard to a patient's actual needs. *Id.*  Further, the article notes that multiple former employees independently told the article author that Deering Sr. referred to patients as "**gold bars**."  *See* **Exhibit P** (emphasis added).

87.     Information discovered in this action and through online searches indicates that Aid In Recovery is paying, and getting paid, for patients in violation of Florida law.

88.     Florida Statutes § 817.505 ("Patient Brokering Statute") broadly prohibits "any person, including any health care provider or health care facility" from offering or paying "a commission, benefit, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, .

---

[14]   Available at https://www.theverge.com/2017/9/7/16257412/rehabs-near-me-google-search-scam-florida-treatment-centers.

. . , to induce the referral of a patient or patronage to or from a health care provider or facility." Fla. Stat. § 817.505(1)(a).  The Patient Brokering Statute also prohibits soliciting or receiving "a commission, benefit, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, . . . , in return for referring a patient or patronage to or from a health care provider or facility." Fla. Stat. § 817.505(1)(b).  Finally, the Patient Brokering Statute prohibits aiding, abetting, advising, or other participating in the conduct prohibited by the Statute.  *See* Fla. Stat. § 817.505(1)(d).

89.     The Patient Brokering Statute defines "health care provider or health care facility" to include "any substance abuse service provider licensed under Chapter 397" of the Florida Statutes.  Fla. Stat. § 817.505(2)(a).

90.     Similar to the Patient Brokering Statute, Florida Statutes § 456.054 prohibits health care providers and providers of health care services from "offer[ing], pay[ing], solicit[ing], or receiv[ing] a kickback, directly or indirectly, overtly or covertly, in cash or in kind, for referring or soliciting patients."  Fla. Stat. § 456.054(2).  A kickback means "a remuneration or payment, by or on behalf of a provider of health care services or items, to any person as an incentive or inducement to refer patients for past or future services or items, when the payment is not tax deductible as an ordinary and necessary expense." Fla. Stat. § 456.054(1). Paying or receiving a kickback is patient brokering.  *See* Fla. Stat. § 456.054(3).

91.     Upon information and belief, Lukens, Wellness, and Treasure Coast are all substance abuse service providers licensed under Florida Statutes Chapter 397 and, consequently, are health care providers within the meaning of the Patient Brokering Statute.

92.     Beginning in approximately 2014, Aid In Recovery, Lukens, Wellness, and Treasure Coast pay for patients' flights to induce them to travel to Florida to treat at the Web

treatment facilities. ████████████████████████████████████████████████

████████████████████████████████████████████████████████.

93.    Based on ████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

█████████████████████████████████████.

94.    Upon information and belief, the Florida treatment facilities continued to pay for

patient flights to Florida in 2016, 2017, and 2018. ████████████████████████████

██████████████████████████████████████████████████████████████████

█████████████████████████████████████.

95.    Based on ████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

███████████.

96.    Upon information and belief, Aid In Recovery continued to pay for patient flights

to Florida in 2016, 2017, and 2018.  Indeed, in documents produced by Plaintiffs in this action,

Aid In Recovery was projected to spend more than $2.1 million on patient flights in 2016, more

than $2.4 in 2017, and more than $2.8 million in 2018.

97.    Paying for flights or providing any incentive to patients to induce them to treat

with a health care provider or facility violates Florida's Patient Brokering Statute, Florida

Statutes § 817.505.

98.    Beginning in approximately 2014, Aid In Recovery also pays ████████████

██████████████████████████████████████████████████████████████████

████████████████████████████.

34

99.     Treatment Management Company and Aid In Recovery ███████████████

████████████████████████████████.   Upon   information   and   belief,

Treatment Management Company and Aid in Recovery ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████.   *See **Exhibit Q**.*

100.    Upon information and belief, each ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████. *Id.* This ████████████████

████████ structure is clearly the type of offensive and improper conduct Florida's anti-

brokering laws are designed to prevent.  Fla. Stat. § 817.505.

101.    For example,  Aid In Recovery  often paid ████████████████████

██████████████████████████████████. *See **Exhibit R**.*

102.    In  addition  to  paying ████████████████████████████████

████████████████████████████████████████████████████.

103.     For example, if the Aid In Recovery ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████. *See **Exhibit Q**.*

104.    If the Aid In Recovery ████████████████████████████████

████████████████████████████████████. *Id.*

105.    For example, in December 2015, Aid In Recovery paid ██████████████. *Exhibit R*.

106.    Aid In Recovery's payments ████████████████████████████████████ violates Florida's Patient Brokering Statute, Florida Statutes § 817.505, and the Anti-Kickback Statute, Florida Statutes § 456.054.

107.    Further, for each patient that Aid In Recovery places in a treatment facility, ████████████████████████████████████████. Upon information and belief, Wellness, Treasure Coast and Lukens █████████████ for each patient that Aid In Recovery refers to Treasure Coast and Lukens.   The only way Aid In Recovery makes money ████ ████████████████████.  This arrangement is also a violation of Florida's Patient Brokering Statute, Florida Statutes § 817.505, and Anti-Kickback Statute, Florida Statutes § 456.054.

108.    Through these unlawful arrangements in which there is ████████████ ████, Aid In Recovery and its employees or contractors are █████████████ ████████████████████.

109.    The results of ████████████ are high-pressure sales tactics applied to a vulnerable population and their family members, misrepresentations about the cost of care and the patient's responsibility to pay for a portion of that care, and unlawful inducements provided to patients themselves.

110.    Charges for services that are rendered as a result of unlawful kickback and patient brokering arrangements are against public policy, void, and non-compensable.   Because the

claims submitted to United by the Counter-Defendants resulted from such an unlawful scheme, those claims are against public policy, void, and non-compensable. Accordingly, United is entitled to recover any such claims it paid. *See **Exhibits A, S, and T***, charts showing claims paid under the unlawful scheme.

### E.      Patients Get Caught in the Web

111.    When the patients call Aid In Recovery or any of the associated facilities, their calls are routed to a call center.  Representatives answer the call and persuade the patients to enter treatment at one of the facilities, focusing primarily on confirming that a patient is enrolled in an insurance plan and urging the patient to enter the detox level of care.

112.    Once prospective patients are lured by Aid In Recovery, Counter-Defendants employed a level-of-care scheme to ensure that they collectively were able to obtain maximum insurance benefits through each patient, by admitting patients to the highest level of care as often as possible, and running each patient through every level of care that the patient's insurance would cover, regardless of what level of care was appropriate for a particular patient.

113.    As Treatment Management Company described it in a presentation it made to prospective commercial lenders:  its "model retains patients and drives enhanced profitability" because patients can go from one level of care down to the next, down to the next, and so on. *See **Exhibit M*** at 13.

114.    Further, patients who came into the Web via Aid In Recovery would first be processed in a "Welcome Center", which provided an opportunity to again verify expected benefits and ensure the patient was placed in the highest level of care available.  It was at this

37

stage that decisions as to placement would be made largely by Aid In Recovery personnel as opposed to health care practitioners.[15]

115.    As discussed above, various levels of care exist for substance abuse treatment. The highest level available in this scheme, residential detoxification ("detox"), followed by residential in-patient, partial hospitalization program ("PHP"), intensive outpatient program ("IOP"), and, finally, outpatient program ("OP").

116.    Many of the patients referred into the Web through Aid In Recovery begin at the detoxification level of care.  Detoxification is the highest level of care for substance abuse patients and is appropriate only for those patients suffering from acute and serious addiction to assist patients in managing the symptoms of withdrawal.  Wellness serves as the detoxification provider for the Web in Florida.

117.    Counter-Defendants employed a fleet of non-medical, non-licensed call center employees who were specifically incentivized ███████████████ to get the most patients with the best insurance delivered in the door.  Upon information and belief, they were given scripts and production targets to get patients admitted to the Web facilities, despite the representations on the website that trumpeted local care options or a neutral partner in placement guidance.

118.    Wellness's website indicates that "while Wellness Counseling and Residential Detox does not provide PHP programs, we work directly with trusted health care partners who do provide this care.  *We can help you choose a program that is right for you*, and we will work with you and the PHP staff to ensure a smooth transition with continuity of care and

_____

[15] According to testimony obtained from TMC's Senior Vice President and former Chief Financial Officer in May 2018, this "Welcome Center" practice has recently been abandoned by Aid In Recovery and the Web entities. *See Exhibit U*, excerpts from Deposition of Chuck Campagna, May 15, 2018, at 272:24-273:20.

consideration of your individual needs." *See* https://wellnessresidentialdetox.com/php-partial-hospitalization/ (emphasis added). However, in truth, Wellness merely refers the patient to another provider in the Web, for example, either Treasure Coast or Lukens. The vast majority of the patients whose claims are at issue received services from two or more Web treatment facilities in addition to UDT services from National Labs. *See Exhibit V* (Table showing each Web facility that billed United for each patient at issue).

119.    The ▮▮▮▮▮▮ employed by Aid In Recovery are not licensed health care practitioners or licensed addiction specialists, according to the Senior Vice President and former Chief Financial Officer of TMC.  *See Exhibit U*, Campagna Dep. at 174:19-21. These unlicensed individuals, incentivized by opportunities to earn attractive bonuses and commissions, as evidenced by postings on Glassdoor.com, are the people connecting with and drawing patients into the Web. *See Exhibit W*, Glassdoor.com Postings; *Exhibit U*, Campagna Dep. at 162:9-166:24.

**F.     CPT Codes and Billing for UDT**

120.    When a provider bills an insurance company for services rendered to a member of an insurance plan or policy, the provider enters a Current Procedural Terminology ("CPT") code on a claim form, along with other information needed to process the claim, such as the patient's member identification number, provider information, and representations regarding the necessity and propriety of the claim.  Each CPT code represents that a particular health care service has been provided.

121.    These codes, promulgated by the American Medical Association's CPT Editorial Panel, are the nomenclature by which providers communicate to a payor the services the provider performed.  Accordingly, utilization of an incorrect or inaccurate CPT code results in a

misrepresentation concerning the service performed.  Payors rely on providers to use truthful and accurate CPT coding in the submission of claims for payment of benefits.

122.    Each specific health care service corresponds to a unique five-digit CPT code assigned by the American Medical Association and/or the Centers for Medicare and Medicaid Services ("CMS"), and universally recognized among payors.  Accordingly, when submitting a claim, a provider enters the corresponding CPT code for each service in the appropriate section of the claim form.  Payors then use this information to process the claim.

123.    Each year, the CPT codes, and related guidelines, are revised to reflect current technologies and services, deleting some codes while adding others.  Consequently, insurers, claims administrators, and providers must stay apprised of these changes and adapt their claim processes to conform to these changes.

124.    Each type of laboratory test corresponds to a unique CPT code.  Various CPT codes describe different levels of POC presumptive, machine-analyzed presumptive, and definitive UDT, and some of those codes changed during the relevant time period.  A list of the codes and their descriptions National Labs, Lukens, and Treasure Coast used from 2014 through 2017 is attached as *Exhibit X*.

125.    In 2014, National Labs began billing United, starting with the first date of service on August 1, 2014.  Public records including materials from the Florida Agency for Health Care Administration, Florida Department of Children and Families, and the Commission on Laboratory Accreditation, indicate that National Labs was seeking the appropriate accreditation to perform certain forms of laboratory UDT, and could not perform the full complement of laboratory testing.  During 2014, various CPT codes described different types of presumptive and definitive testing, and National Labs billed United for at least 11 different laboratory codes.

126.     In 2015, numerous CPT codes described POC, machine-analyzed presumptive, and definitive UDT, with at least one code for each substance that was the subject of a definitive UDT.  This allowed a provider to perform definitive UDT for all drug classes and submit a bill for that UDT.  The CPT code structure also allowed providers to perform definitive UDT for dozens of substances, and bill separately for each substance tested.  For example, if a provider decided to perform a definitive test on one urine specimen for cocaine, marijuana, heroin, methamphetamine, alcohol, and oxycodone, the provider would bill each test separately, resulting in a cumbersome process as well as overbilling and fraudulent claim submissions.

127.     During 2015, National Labs billed United for approximately 83 different CPT codes for UDT on patients from Lukens and Treasure Coast.  National Labs frequently billed United for 20 or more different codes for a single patient on a single date of service.  For example, National Labs billed United $18,100 for 27 CPT UDT codes on one date of service for Patient 7, and billed United $14,900 for 27 CPT UDT codes on one date of service for Patient 8. *See **Exhibits Y and Z**.*

128.     In 2016, various codes were deleted from the American Medical Association's ("AMA") CPT code set in an attempt to simplify the coding system for laboratory testing and curb the practice of billing separately for each substance tested.  Rather than use a separate CPT code for each substance tested on a definitive UDT, the CPT codes represented a range of the number of drugs for which testing was performed.  For example, CPT code G0480 represented a definitive UDT for one to seven different substances, while CPT code G0481 represented a definitive UDT for eight to fourteen different substances, and so on.

129.     In addition to using these codes, National Labs also used other codes that represented definitive testing for particular substances.  Accordingly, in 2016, National Labs

used approximately 43 different CPT codes when billing United for UDT on patients from Lukens and Treasure Coast.  Still, National Labs billed United for an inordinate number of CPT codes across the board.  For example, National Labs billed United for approximately 27 different CPT codes for Patient 9 in 2016, *including* code G0481 as well as various codes for definitive UDT of individual drugs and drug classes.  National Labs billed United $114,500 for UDT testing of Patient 9 in just over one month, including $6,800 *per test* for code G0481 (eight to fourteen drug classes).  *See **Exhibit AA**.*

130.    In 2017, the CPT codes for UDT were further streamlined and simplified, essentially eliminating codes for definitive UDT of individual substances.   During 2017, however, National Labs continued billing United at astronomical rates, using code G0481 (eight to fourteen drug classes) almost exclusively.  For example, National Labs billed United $42,390 for Patient 9's UDT under code G0481 over only three weeks at $7,065 *per test*.  *See **Exhibit AA**.*

131.    For reference, the Centers for Medicare and Medicaid Services (CMS) allowable reimbursement for machine-analyzed presumptive UDTs is typically less than $80 and for definitive UDTs is approximately $150 or less.

132.    Interestingly, National Labs most often (and inaccurately) utilized a CPT code (G0481) that corresponded to UDT for eight to fourteen substances, when in truth, National Labs tested for the same large rambling panel for dozens of substances for most patients. *See **Exhibit A**.*

## G.    Counter-Defendants' Predetermined UDT 3/2 Protocol and Failure to Consider Patients' Individualized Needs

133.    It is well-established that substance abuse treatment, and specifically UDT, requires individualized care and treatment of each patient, based on a number of factors

including a patient's diagnosis, medical and psychological history, stability, type of addiction, treatment setting, and particular risk factors, among other considerations.

134.    Plaintiffs' own former Chief Medical Officer and current Medical Advisor, Andrea Barthwell, M.D. ("Dr. Barthwell"), as well as Plaintiffs' expert witness, Arwen Podesta, M.D. ("Dr. Podesta"), readily admitted the importance of individualized UDT.  *See **Exhibit BB***, Arwen Podesta, M.D. Dep. Tr. 128:14-19; 134: 14-21; 246:10-247:5; ***Exhibit CC***, Andrea Barthwell, M.D. Dep. Tr. 281:1-7.

135.    When UDT is used as an element of treatment by a clinician, it must be tailored to an individual patient's specific clinical needs.  Dr. Podesta, Lukens, Treasure Coast and National Labs' own expert agrees that there is no medically appropriate one-size-fits-all protocol for UDT of substance abuse patient.  *See **Exhibit BB***, Podesta Dep. Tr. 134:14-21 (explaining that UDT requires individualized determinations regarding when to conduct testing and which substances to test for, and should not be subject to a "one size fits all" approach).

136.    Despite the need for individualized UDT for each patient, Treatment Management and the treatment facilities, with the cooperation of the Sunshine Doctors, developed and implemented a one-size-fits-all predetermined UDT protocol and business model, and applied it to patients indiscriminately and automatically without any consideration of the patients' individual clinical needs.  This 3/2 Protocol, which Plaintiffs support with standing orders and blanket orders signed by Sunshine Doctors, demonstrate not only Counter-Defendants' sweeping application of UDT for every single patient across the board, but also showcase Counter-Defendants' improper and unnecessary use of definitive testing after a presumptive screening that yields a negative or an expected result (for example, a positive result  for the presence of a prescribed medication, such as an anti-depressant, would be expected and appropriate).  This 3/2

43

Protocol applies to every level of care for every facility, in all states, including Arizona, Florida, and California. *See **Exhibit DD***.

137.    This 3/2 Protocol provides for presumptive and definitive UDT across the board, and directs that the protocol should be followed, without accounting for individual needs or factors.  This protocol requires that ***all*** patients being transferred from one level of care to another receive, at the time of discharge from the higher level of care, machine-analyzed presumptive UDT and also receive definitive UDT for a full panel of testing from National Labs, regardless of patient needs and irrespective of the results of the presumptive test.  Then, upon admission to the next level of care, often on the same day, the facilities are directed to repeat the battery of UDT, again regardless of individual factors or previous test results.  Not only does the 3/2 Protocol require presumptive and definitive testing upon discharge from one level of care and admission to the next level, it also mandates a rote schedule for UDT during the course of treatment.

138.    The 3/2 Protocol also directed that in addition to the "in the door/out the door/back in the next door" UDT on admission and discharge and re-admission, patients would also receive "random" testing three times weekly, typically on Monday, Wednesday and Friday.

139.    The 3/2 Protocol also directed that the patients would also undergo UDT due to "high risk" indicators.  These "high risk" indicators included:

> a.   less than 30 days of sobriety,
>
> b.   living with a roommate who had a SUD (despite living in a sober home with other patients, which rendered this a forgone conclusion),
>
> c.   addiction to drugs that were dangerous (again, a forgone conclusion for many SUD patients),

    d.   addiction to more than one substance and/or

    e.   financial stress.

140.    These "justifications" for UDT could be and were easily applied to every patient, allowing ample opportunity to conduct expensive UDT for all patients irrespective of whether they needed it or not. In fact, virtually all patients were tested due to indications of high risk, even if they were complying with the treatment program. By design, to be part of the Web, you were deemed high risk.

141.    In fact, the justifications for presumptive and definitive testing were "supported" by orders signed by the Sunshine Doctors.  The Orders were required to be issued when: a patient was getting discharged out of a level of care, into a new level of care, an additional 3 times per week, and also due to one of the myriad of available "high risk" justifications. This resulted in patients oftentimes tested five or more times per week, both presumptive and definitive, across several weeks.  This was quite simply a business model for the use of UDT to ensure prolific billing that was designed to be applied across patients.

142.    However, in a calculated attempt to further obfuscate their predetermined protocol, the Counter-Defendants, in the context of a submission numerous individual claims, represented to United that Counter-Defendants perform definitive UDT *only when clinically necessary and when considering a patient's individual needs. See **Exhibit EE***, Medical Necessity Letter for Definitive Drug Testing.  These representations also noted that the facilities "*only perform confirmatory [definitive] testing when it is clinically indicated.  There are many times when patient history and presumptive testing alone will suffice.  This decision not to test all patients is based on the reality that testing is expensive.  It is not cost effective and not clinically necessary to test every patient on every visit.*"  *Id.*  However, in direct contravention of this

representation, Counter-Defendants intentionally utilized definitive testing on all patients across the board in an effort to drive up costs and obtain lucrative payments from insurance companies at the expense of patients.

143.    Treatment Management's former Chief Medical Offer turned clinical advisor, as well as their other retained expert each expressed concerns regarding Counter-Defendants' protocol and use of UDT.  For example, Dr. Barthwell noted that National Labs appeared to be testing for every substance it could, regardless of what a physician order provided, and often in conflict with physician orders. ***Exhibit CC***, Barthwell Dep. Tr. 277:21-278:3.

144.    Dr. Podesta and Dr. Barthwell also expressed concerns about UDT protocols driving up costs.  For example, when Dr. Podesta learned that National Labs was charging $7,000 per definitive test, she noted that it was "***an exorbitant amount, and when we are talking about a reasonable cost, that is not a reasonable cost to assume would get reimbursed***." ***Exhibit BB***, Podesta Dep. Tr. 279:15-280:10 (emphasis added).  Dr. Barthwell expressed concerns about the use of routine and arbitrary laboratory UDT as a significant driver in increasing UDT costs, and noted that she was troubled by Plaintiffs' practice of ordering unnecessary UDT. ***Exhibit CC***, Barthwell Dep. Tr. 287:17-289:18.

**H.    National Labs, Lukens, Treasure Coast, Wellness, and Sunshine Doctors blatantly disregarded appropriate directives and standards for individualized care.**

145.    Lukens, Treasure Coast, National Labs, Wellness and Sunshine Doctors regularly disregarded appropriate protocol, ignored patients' individualized needs, and routinely arranged for patients' urine samples to be tested on-site at the facilities for presumptive testing and at National Labs for all types of testing. Lukens, Treasure Coast, and Wellness sent samples to National Labs multiple times per week for both machine-analyzed presumptive and definitive UDT. These tests were performed across wide ranges of drug types and classes irrespective of

the particular substance for which the patient was being treated, often absent any apparent POC testing, absent any documentation of reasons for such testing, and absent any individualized needs for such testing.

146.   Lukens, Treasure Coast, and Wellness, in concert with Treatment Management, Sunshine Doctors, and National Labs, ordered these additional tests regardless of whether a patient tested positive for any drugs or alcohol, whether a patient was making progress in the treatment program, or whether a patient was at risk for using a particular type of drug. The tests were simply ordered en masse with no consideration of individualized patient needs. If, in fact, an instance were to occur in which a patient actually benefitted from an additional confirmatory test, it would be the result of pure "happy accident," as Counter-Defendants' business model was applied to all of their "gold bars" to enhance profits.

147.   Sunshine Doctors blindly authorized testing consistent with the 3/2 Protocol, as directed by the Web entities, under the direction and control of TMC.

148.   This testing regularly resulted in claims by National Labs, Lukens, Treasure Coast, and Wellness for many thousands of dollars in urinalysis testing of one patient's urine on one date of service.   *Exhibit A* lists each claim line National Labs, Lukens, Treasure Coast, and Wellness submitted for payment to United for UDT of patients, and the amounts that were paid.

149.   By way of example, the patients described below were the subject of systematic, unnecessary, and unsupported urine testing protocol.   These patients also serve as examples of testing that was belied by the very records that describe each patient's progress through treatment.   These examples illustrate the scheme National Labs, Lukens, Treasure Coast, and Wellness perpetrated with respect to these and numerous other patients.

### *Improper Testing and Billing Relating to Patient 1*

150.    Lukens, Treasure Coast, Wellness, and National Labs wantonly and systematically used their patients as little more than a means to bill United and the plans it administers for inappropriate, fraudulent, and medically unnecessary urinalysis testing.  A review of records and data pertaining to Patient 1's treatment and testing at Wellness, Lukens, and National Labs provides one of many examples of the exploitation of these patients for their insurance benefits.

151.    Patient 1, age 55, received inpatient detox treatment for alcohol addiction at Wellness for approximately *one week*, during which time Wellness collected Patient 1's urine on at least two occasions and sent those samples to National Labs for UDT.  National Labs then billed United $39,950.04 just for UDT on just those two samples and dates of service.

152.    After completing detox at Wellness, Patient 1 was transferred to Lukens and admitted into Lukens' PHP.  A review of the Lukens records for Patient 1 documents that this patient consistently presented to Lukens with an "appropriate" appearance, "normal" and "calm" demeanor, "good" eye contact, "cooperative" attitude, "euthymic" mood, "good" concentration, "clear" speech, and other positive descriptors.  *See Exhibit FF*.  Lukens staff further described Patient 1 as "motivated," "pleasant," and, importantly, showing no signs during group or individual sessions of being under the influence of alcohol or drugs.

153.    Despite the fact that Patient 1 showed no outward indication of drug use and showed excellent progress in group and individual therapy sessions, Lukens and National Labs subjected patient Patient 1's urine to multiple types of testing several times per week over a two-month period.  *See Exhibit FF*.  Lukens collected Patient 1's urine and perform POC testing on those samples, charging between $1,400 and $4,200 per date of service.  This "double dipping"

of presumptive testing is wholly inappropriate.  Then, Lukens would send the same sample to National Labs *for additional presumptive testing as well as definitive testing,* often charging upwards of $14,000 per date of service for UDT alone.  *Exhibit B, FF*.

154.    Lukens ordered comprehensive screening panels that tested for every conceivable substance for Patient 1, even though the patient was receiving treatment for alcohol addiction and had never used the vast majority of the drugs for which his urine was tested.  Further, Patient 1's treatment notes do not reflect any discussion of UDT test results at any time, nor any incorporation of those test results into Patient 1's treatment.

155.    Patient 1 progressed through the treatment program at Lukens in less than two months, moving from PHP to IOP, then OP, followed by discharge.  As Patient 1 moved from higher to lower levels of care, the UDT protocol remained the same, and Lukens continued collecting Patient 1's urine several times per week, performing UDT at Lukens, and also sending Patient 1's specimens to National Labs for both machine-analyzed presumptive and definitive UDT for dozens of substances.

156.    Lukens and National Labs even continued testing Patient 1's urine as he was on his way out the door, and well after Patient 1 had been discharged and moved out of state.  At the end of Patient 1's treatment, Lukens therapists noted that Patient 1 had improved to the point that he no longer met the American Society of Addiction Medicine criteria for treatment, and discharged him completely.  Even so, Patient 1's urine was tested by National Labs and reported to Lukens well after discharge.  For example, Patient 1's urine was collected on five occasions during the last 10 days of his treatment, but the test results for all five of those samples were not reported until after he was discharged.  Indeed, one sample was not reported until nearly three

weeks after discharge.  These tests resulted in thousands of additional dollars – $31,600 – billed to United after Patient 1 was no longer receiving treatment at Lukens.

157.     In total, Wellness, Lukens, and National Labs billed United, or caused United to be billed, $342,535 <u>solely for UDT</u> for this one patient in approximately two months.  *See Exhibit B*.

### *Improper Testing and Billing Relating to Patient 2*

158.     Patient 2, who was 52 years old, was admitted to Lukens' PHP program to receive treatment for alcohol use.  Patient 2 progressed through treatment at Lukens showing no signs of noncompliance or intoxication, with treatment records consistently describing him as "motivated," "engaged," "cooperative," and "attentive," and containing no suspicions that Patient 2 was ever under the influence of alcohol or drugs at any therapy session.  *See Exhibit GG*.

159.     Although Patient 2 was receiving treatment solely for alcohol addiction, and there was no indication that Patient 2 was using any alcohol or drugs, Lukens repeatedly collected his urine, performed its own testing, and then sent his urine samples to National Labs for testing of every conceivable substance, charging thousands of dollars per test. For example, Lukens collected Patient 2's urine five times in one week and sent those samples to National Labs for UDT, billing United $17,000 for just that week.  During the same time period, Lukens billed United $2,600 for UDT purportedly performed at Lukens.  *See Exhibits C, GG*.

160.     Over and over again, Patient 2 tested negative for drugs and alcohol.  Indeed, every single test for which records were provided indicates that Patient 2 was not taking any illicit drugs or using alcohol. Yet, Lukens and National Labs continued running the same

unnecessary and exorbitantly expensive tests throughout the course of treatment despite having no clinical indication that they were necessary.

161.    This scheme of Lukens ordering and National Labs performing multiple, expensive machine-analyzed presumptive and definitive UDT while the patient showed nothing other than positive progress continued throughout the course of Patient 2's IOP, and extended until even after he was discharged.

162.    The summary chart attached as ***Exhibit HH*** documents Lukens' pattern of collecting urine samples from Patient 2 multiple times per week, performing POC and/or machine-analyzed presumptive testing at Lukens, and also ordering both machine-analyzed presumptive and definitive UDT from National Labs, without any documented clinical indication to do so.  Together, Lukens and National Labs billed United $257,950 for urinalysis testing for Patient 2 in less than three months.  *Id*.

163.    The types of patterns described for Patients 1 and 2 are pervasive and in keeping with (if not in excess of) the 3/2 Protocol and are also consistent with written protocols.  These pervasive patterns are demonstrated in the global list of patients at issue on ***Exhibit A***, which shows the various CPT codes billed for by the Treatment Management entities.

### *Improper Testing of Urine Samples Prior to Reporting of Earlier Test Results*

164.    Another telling characteristic of the scheme involved Lukens and Treasure Coast collecting and National Labs testing new specimens before receiving the test results from earlier collections.  Lukens would routinely collect samples even though it did not have the results of the UDT done days before.  National Labs would often have significant lag time processing the specimens as additional samples came in for the same patient.  National Labs would frequently conduct the analyses at its leisure, as no one, in truth, was waiting on the results.  This was the

process by which these entities operated, as it was predetermined that Lukens and Treasure Coast would continue to collect the specimens, no matter what the outcome.  Even if tests were negative, more testing would follow.  National Labs, by design, was provided a steady supply of specimens to analyze, irrespective of the results.

165.    Dr. Barthwell admitted under oath that this practice, as a rule, would be inappropriate.  *See **Exhibit CC***, Barthwell Dep. Tr. 259:6-261:8 (testifying that such a protocol was not appropriate and that facilities' policies should have evolved differently).

166.    By way of example, Lukens collected individual specimens of Patient 1's urine on August 5, 7, 8, 11, and 12, and sent them to National Labs. National Labs reported the results of the UDT on these samples on August 8, 19, 15, 19, and 31, respectively.  Thus, Lukens sent each of these specimens to National Labs for testing *before* receiving the results of the previous testing.  Even more disturbing, Lukens collected five samples from patient 1 between August 19 and 28, and sent them to National Labs.  National Labs did not report the results until after the patient had already been discharged, as the patient was discharged August 28, but the results were reported between August 31 and September 18. This pattern is represented in the below summary table relating to Patient 1:

| Sample Collected | POC Presumptive | Date Received at National Labs | Date National Labs Reported Result | Did Lukens Collect New Sample Before/Same Day as Receiving Results from this Sample? |
|---|---|---|---|---|
| July 2 | Yes | July 2 | July 3 | Yes |
| July 3 | Yes | July 3 | July 6 | Yes |
| July 6 | Yes | July 6 | July 8 | Yes |
| July 8 | Yes | July 8 | July 8 | No |
| July 10 | Yes | July 10 | July 11 | No |
| July 13 | Yes | July 13 | July 13 | No |
| July 15 | Yes | --- | --- | --- |
| July 17 | Yes | --- | --- | --- |
| July 20 | Yes | July 20 | July 22 | Yes |
| July 22 | Yes | July 22 | July 22 | No |

| July 24 | Yes | July 24 | July 24 and August 3* | Yes |
|---------|-----|---------|------------------------|-----|
| July 27 | Yes | July 27 | August 1 and 3 | Yes |
| July 29 | Yes | July 29 | August 1 and 3 | Yes |
| July 31 | Yes | July 31 | August 3 | Yes |
| August 3 | Yes | August 3 and 4 | August 6 and 8 | Yes |
| August 5 | Yes | August 6 | August 7 and 8 | Yes |
| August 7 | Yes | August 8 | August 19 | Yes |
| August 8 | Yes | August 10 and 12 | August 11 and 15 | Yes |
| August 11 | Yes | August 11 | August 19 | Yes |
| August 12 | Yes | August 13 | August 31 | Yes |
| August 17 | Yes | August 17 | August 18 | No |
| August 19 | Yes | August 20 | September 5 | |
| August 21 | Yes | August 22 and 27 | August 31 and September 5 | Yes |
| August 24 | Yes | August 25 and 26 | September 1 and 3 | Yes |
| August 26 | Yes | August 27 | August 31 | Yes |
| August 28 | Yes | August 29 | September 18 | Yes |

167.    National Labs and Lukens billed United approximately $323,685 for Patient 1's UDT reflected in the above chart.

168.    Lukens' pattern of ordering both presumptive and definitive testing before receiving the results from testing of prior specimens also appeared during Patient 2's treatment. Likewise, National Labs' pattern of testing new samples before reporting the results of previous samples continued in Patient 2's treatment.  For example, Lukens collected a specimen from Patient 2 on March 30, National Labs received the specimen on March 31, and National Labs did not report the result until April 3.  In the meantime, Lukens had already obtained another sample on April 1, and sent that sample to National Labs the same day.  National Labs did not report that result until April 5.  This pattern repeated itself on multiple additional occasions.

### *Improper "Double Presumptive" Testing*

169.    The facilities also operated in concert to perform duplicative and "double" testing, whereby the facility would perform presumptive UDT on a urine specimen, then send that

specimen to National Labs for *both* machine-analyzed presumptive and definitive testing, regardless of the results of any testing, and resulting in three separate tests for one urine specimen, and many thousands of dollars in billing.

170.    As an example, Lukens collected a urine sample from Patient 2 on April 27, and *performed a POC test*, the results of which were negative for all substances.  Lukens sent the same sample to National Labs and *ordered both a machine-analyzed presumptive and definitive UDT* from National Labs.  The presumptive UDT was negative, and reported to Lukens on April 28. Yet, National Labs still performed a definitive test, and reported those results on May 1 (also negative).  Lukens and National Labs billed United $13,200 in total for just these three tests.  *See Exhibit C*.

171.    As another example, Lukens systematically collected urine specimens from Patient 4 multiple times per week, performed POC tests on those samples, then sent the samples to National Labs for additional presumptive and, in some cases, definitive, UDT, regardless of the test results.  *See Exhibit E*.  Through this pattern, Lukens and National Labs billed United a combined total of $183,020 for UDT of Patient 4 over approximately two months, of which United paid $44,647.

172.    Patients 2 and 4 represent just two examples of the Counter-Defendants' overarching protocol and pattern of conducting two or more presumptive tests, as well as definitive tests, on the same samples, whether or not any sample tested positive or negative.

*Improper Attempts to Justify Testing*

173.    In repeated attempts to manufacture justification for their inappropriate mass testing of every patient for every conceivable substance, Lukens and Treasure Coast often include a cut-and-pasted, generic statement that the testing is medically necessary.  For Patient 2,

a 52-year-old individual who had never abused any substance other than alcohol and who was receiving treatment at Lukens related solely to alcohol addiction, Lukens represented that it was medically necessary to test Patient 2 for literally dozens of substances ranging from cocaine to bath salts to heroin.  Even after Patient 2 progressed through treatment and tested negative for every substance, Lukens kept using this same medical necessity statement and kept testing for every possible substance.  *See Exhibit GG*, Patient 2 Records.

174.    As another example, Patient 10, who treated at Treasure Coast and whose diagnosis is listed as addiction to alcohol, was tested for every conceivable substance.  *See Exhibit II*.  Like Patient 2, Patient 10's records contain a generic medical necessity statement listing dozens of substances and attempting to justify the excessive and unnecessary UDT, with no patient-specific explanation of why all such testing was necessary for Patient 10.  *See Exhibit II*.  United was billed $134,800 in just one month for Patient 10's UDT.

175.    As yet another example, patients who were in detox at Wellness – an environment in which patients are closely monitored and supervised – were still tested multiple times, with similarly generic, non-patient-specific statements concerning medical necessity.  United was billed for UDT on three separate dates of service for Patient 11, while that patient was treating at Wellness, totaling $21,195 just for those three tests.  *See Exhibit JJ*.  A similar (now known to be cut-and-pasted) medical necessity statement was submitted for each test.  For both the first *and* second tests, the statement indicated that the testing was being performed in association with the patient's admission to Wellness.  Then, the day after the second test was performed, despite the fact that the patient was continually monitored, a third test was performed.  The justification for this test included the same generic language, except that this statement indicated that the test was being performed in association with the patient's discharge to another facility.

45448753;3

## VI.  UNITED'S HEALTH BENEFIT PLANS

176.    United provides health insurance, administration, and/or benefits to plan participants or plan members pursuant to various health benefit plans and insurance policies, including group benefit plans, individual benefit plans, employer-sponsored benefit plans, and government-sponsored benefit plans.

177.    United also provides administrative services for health benefit plans pursuant to the terms of plan documents and/or administrative services agreements ("ASAs"). These administrative services include processing claims for reimbursement of medical services provided to individuals covered by the plans, making factual determinations regarding such claims, paying claims, recovering overpayments and performing other related services.

178.    Generally, United's health benefit plans fall into two categories: (1) self-funded or self-insured plans; and (2) fully insured plans.

179.    For self-funded plans, United serves as a claims administrator and provides administrative services for each plan pursuant to an ASA.  The ASA is an agreement between United and the plan sponsor, typically the employer, and identifies the rights and obligations of each party.  Under the ASAs, United typically has the authority, responsibility, and discretion to determine coverage eligibility, make factual determinations, process claims, remit payment for claims, adjudicate plan members' appeals regarding adverse benefit determinations, and pursue overpayment, fraud, waste, and abuse on behalf of the plan.

180.    The ASAs typically give United the exclusive authority to recover overpayments made on behalf of self-funded plans.  The ASAs typically provide that the self-funded client delegates to United the authority to recover overpayments (including those related to fraud and abuse) and to initiate litigation to recover overpayments and payments made as a result of fraud.

The ASAs also require United to return overpayments it recovers to the clients/plans, subject to United's right to retain a portion of the overpayment as compensation for its services, as provided in the ASAs.  The self-funded clients agree that they will not engage any other entity to provide these recovery services unless United consents.  It is imperative that United take efforts to recover these sorts of overpayments on behalf of companies and their hardworking employees, who are negatively impacted by these schemes.

181.    An example of ASA language would include the following:

You delegate to us the discretion and authority to develop and use reasonable standards and procedures for any recovery under this section taking into account the potential amount involved, including but not limited to, whether or not to seek recovery, what steps to take if we decide to seek recovery, and under what circumstances to compromise a claim or settle for less than the full amount of the claim; provided that in no event shall this section authorize letters asserting that the failure to reply may mean that coverage may be lost. You recognize that use of these standards and procedures may not result in recovery or in full recovery for any particular case. We will not pursue any recovery if any applicable law does not permit it, or, if recovery would be impractical. We may choose to initiate litigation to recover payments, but we have no obligation to pursue litigation.

182.    United ASAs also typically provide that United has the obligation to "provide services related to the detection and prevention of abusive and fraudulent claims."  These types of provisions, or similar provisions, are contained in the ASAs for the United self-funded plans implicated by this counterclaim, and provide United with the authority to initiate litigation to pursue fraudulently obtained benefits.

183.    For self-funded plans, United typically adjudicates claims and works with plan sponsors and administrators to issue payments to providers.

184.    For United's fully insured plans, United insures the plans and provides the insurance policies that fund the plans.  It provides administrative services similar to those it

provides to self-funded plans, though on its own behalf and not on behalf of the plans.  United adjudicates claims for fully insured plans and makes payments from its own assets.

185.    For both self-funded and fully insured plans, United typically approves claims for health benefits that satisfy the terms of the plans, and denies claims for health benefits that do not satisfy the terms of the plans.

186.    All of United's fully insured and self-funded plans only provide benefits for medically necessary and physician-authorized services.

187.    Wellness, Lukens, Treasure Coast, and National Labs submitted claims to United for benefits from both self-funded and fully insured plans.  Those plans that are self-funded are identified on *Exhibits A, S, and T* as "ASO," and those that are fully insured are identified as "INS."

188.    In its role as a claims administrator, United publishes various policies and guidelines, which are often generally referenced in the plans themselves, to both network and non-network health providers to guide providers in the submission of claims and the analysis of medical necessity.

189.    United has determined that payments were made to the Plaintiffs for services that were not allowable pursuant to United policies.

### VII.   NATIONAL LABS' VIOLATIONS OF UNITED'S REIMBURSEMENT POLICIES

**National Labs Submitted More Than 40,000 Claims in Violation of United's Reimbursement Policies, Which Resulted in $3,025,170.26 in Overpayments United Made to National Labs.**

190.    United's Reimbursement Policies describe, among other things, the reimbursement methodologies for laboratory panels and address duplicate laboratory code submissions by the same or multiple providers.

191.    United's "Laboratory Services Policy," which has been in effect since 2003, applies to "all products and all network and non-network physicians, and other qualified health care professionals, including…**independent, reference and referring laboratories.**" *See* 2015 Laboratory Services Policy at 2 (emphasis added), attached as ***Exhibit KK*** ("Laboratory Services Policy").   National Labs is required to abide by this policy as an Independent Laboratory[16] that renders services to United members. *See id.*, Laboratory Services Policy at 2.

192.    United's Laboratory Services Policy, as well as other policies and guidelines, are publicly available at www.uhcprovider.com.

193.    Among other things, the Laboratory Services Policy, "describe[d] the reimbursement methodology for laboratory panels and individual Component Codes…" and addressed, "[d]uplicate laboratory code submissions by the same or multiple physicians or other health care professionals, as well as certain laboratory services provided **in a facility place of service.**" *Id.*  (emphasis added).

194.    The Laboratory Services Policy defines when Laboratory Services, such as UDT rendered to Members enrolled in SUD treatment, are compensable.  Specifically, the Laboratory Services Policy provides, *inter alia*, that when a specimen is collected in a treatment facility (such as Lukens and Treasure Coast) and then sent to a laboratory for UDT pursuant to an arrangement with an Independent Laboratory,[17] only the *facility* (e.g. Lukens or Treasure Coast) could submit and receive reimbursement for that service:

---

[16] The 2015 Laboratory Services Policy Defines "Independent Laboratory" as, " An Independent Laboratory is one that is independent both of an attending or consulting physician's office and of a hospital that meets at least the requirements to qualify as an emergency hospital. An Independent Laboratory has met Federal and State requirements for certification and proficiency testing under the Clinical Laboratories Improvement Act (CLIA). *See* <u>Exhibit JJ</u> at 16.

[17] Pursuant to the definitions section of the Laboratory Services Policy, "An Independent Laboratory is one that is independent both of an attending or consulting physician's office and of

Manual and automated laboratory services submitted with a CMS facility POS 21, 22, 23, 26, 34, 51, 52, 56 or 61 will not be reimbursable. These services are reimbursable to the facility. When facilities obtain manual or automated laboratory tests for patients under arrangements with an Independent Laboratory, Reference Laboratory or pathology group, only the facility may be reimbursed for the services.

*Id.* at 4 (emphasis added).

195.    The Laboratory Services Policy requires specific notations on claims submitted by National Labs to identify exactly where the point of pollection (also known as "Place of Service" or "POS") of a specimen occurred, meaning where the urine specimen was collected. Those requirements again underscored the importance of accurately reporting *where the sample was collected,* which would allow United to properly assess the compensability of the claim:

The POS designation identifies the location where the laboratory service was provided, except in the case of an Independent or a Reference Laboratory. **An Independent or Reference Laboratory must show the place where the sample was taken (if drawn in an Independent Lab or a Reference Lab, POS 81 is reported; if drawn in a hospital inpatient setting, the appropriate inpatient POS is reported).** All entities billing for laboratory services should append identifying modifiers (e.g., 90), when appropriate, in accordance with correct coding. For example, a physician billing for a laboratory service provided by an Independent Laboratory or a Reference Laboratory would bill with POS 81 and would append modifier 90 to the code.

*Id.* at 3.

196.    Based on the Laboratory Services Policy, if a specimen is collected at a facility, such as Lukens or Treasure Coast, and then sent to National Labs for testing, the "POS" code 11 or 22 should have been identified on the claim form to reflect that the specimen was collected at the SUD treatment facility. If, however, the patient provided the specimen at National Labs, POS code "81" should have been identified on the claim form to reflect the location where the

---

a hospital that meets at least the requirements to qualify as an emergency hospital. An Independent Laboratory must meet Federal and State requirements for certification and proficiency testing under the Clinical Laboratories Improvement Act (CLIA)." *Id.* at 17.

specimen was collected.  This procedure is further clarified in the "Questions and Answers" section of the Laboratory Services Policy:

> **Q:**  What Place of service should an Independent or Reference Laboratory report when billing?

> **A:**  When billing, the place of service reported should be the location where the Specimen was obtained, For example, a specimen removed from a hospitalized patient and sent to the laboratory would be reported with Place of Service (POS) 21 or 22; **a sample taken at a physician's office and referred to the laboratory would be reported with POS 11; if the Independent or Reference Laboratory did the blood drawing in its own setting, it should report POS 81.**

*Id.* at 17-18 (emphasis added).

197.    Based on the Laboratory Services Policy, National Labs could only submit a claim to United with POS 81 if the specimen was obtained from the patient at National Labs.

198.    As addressed above, identifying the correct point of service was particularly important because the Laboratory Services Policy provided that where a patient provided a specimen at a facility, **"under arrangements with an Independent Laboratory…only the facility may be reimbursed for the services**."  *Id.* at 4 (emphasis).

199.    Providing the correct POS code was essential to proper administration of claims submitted by National Labs to appropriately pay the facility where the specimen was collected and to avoid paying duplicate claims.

200.    On or around December 1, 2015, National Labs began coding nearly every submission for UDT sent to United for reimbursement with the POS code 81.  This represented to United that the specimen was collected at National Labs' physical location (represented by POS 81), not the SUD treatment facility, so it impeded United's ability to appropriately administer and pay the benefit claims.

201.    Between January 1, 2014 and December 31, 2017, United received and processed more than 70,000 claims where National Labs identified "81" as the point of service.  Based on

this representation, United paid over $2,971,243 to National Labs for associated UDT. *See Exhibit LL*. However, National Labs *never* collected *any* of these specimens at their location.

202.    United has determined that each of the claims identified on **Exhibit LL** was *not* compensable to National Labs since, despite representing that the specimen was taken by National Labs, the sample was actually collected at an underlying treatment facility, like Lukens and Treasure Coast, and sent to National Labs for UDT analysis.  Pursuant to the Laboratory Services Policy, each claim paid to National Labs where 81 was identified as the place of service, but, in fact, the specimen was collected by the SUD treatment facility at that facility, was improper and non-compensable. As a result, National Labs was paid $3,025,170 for which United seeks reimbursement

## VIII.      IN-NETWORK AND OUT-OF-NETWORK PROVIDERS

**A.      Implications of Out-Of-Network Providers to United's Members**

203.    Commercial health insurance plans, including United's plans, generally utilize a two-tier provider system, allowing members the flexibility to choose health care services from network and out-of-network providers.

204.    Network providers are those with whom United has entered into an agreement under which United has agreed to reimburse the providers at specified rates for services provided to United's members.  In turn, network providers agree to provide services to United's members, accept reimbursement at the specified rates as payment in full, and not "balance bill" United's members for any other amounts.  Accordingly, members ordinarily have no financial obligation to the network providers for covered services beyond a copayment, co-insurance and/or deductible.

45448753;3

205.     Many plans provide that when a United member receives services from an out-of-network provider, the provider bills the member and the member pays the full amount billed. The member then submits a claim to United for reimbursement of some part of what the member paid. United processes the member's claim and remits a reimbursement to the member, pursuant to the terms of the member's plan.

206.     Although many plans prohibit an assignment of benefits to medical providers, some plans authorize United, in its discretion and without waiving any anti-assignment provision, to make payment of the member's benefits directly to their out-of-network providers, as a courtesy to members.

207.     Typically, a member pays lower out-of-pocket costs if he or she utilizes network providers, rather than out-of-network providers.  This allows United's members to obtain medical services from network providers with less financial risk or out-of-pocket expense. Thus, Members utilize out-of-network providers carefully.

208.     Members' payment responsibilities serve as an important check on fraud, waste, and abuse.  Since it is members, not United, who ultimately control the services they receive, members' payment responsibilities sensitize them to unnecessary or overpriced services, resulting in more affordable healthcare for all members (and healthcare consumers, generally). This requirement prevents unscrupulous providers from billing exorbitant amounts to insurers to inflate reimbursements and also ensures providers are charging reasonable amounts for their services.

209.     Because United does not have contractual relationships with out-of-network providers, and out-of-network providers typically charge higher amounts for their services than network providers, United relies heavily on its members' sensitivity to the greater out-of-pocket

45448753;3

costs to ensure that members seek out-of-network providers' services only when they are medically necessary and reasonably priced.

210.     There are circumstances that might cause a member to ignore finances when selecting a medical provider, such as a complex, lifesaving and technical operation.  It is conceivable that a member facing brain surgery would select an out-of-network neurosurgeon based on reputation, skill or bedside manner—regardless of the resulting coinsurance or balance billing implications.  Laboratory services, on the other hand, are commoditized.  The same machines are used to perform the same tests, and patients rarely (potentially never) interact with any laboratory personnel.  There is no reason a fully-informed member would consent to testing by an out of network facility over a laboratory in United's network when the latter would save the patients tens (if not hundreds) of thousands of dollars and provide the same test results.

211.     Generally, the patient is responsible for paying the difference between the amount United pays the provider (typically the "Eligible Expenses," "Allowed Amount," or "Covered Amount") and the amount the provider bills United.  This amount typically does not apply to a member's out-of-pocket maximum, meaning that no matter what the difference is between the amount billed and the amount paid, the member is responsible for that difference.   If a member's out-of-pocket maximum is $2,000, and the difference between the billed amount and the Eligible Expense is $5,000, the member must still pay $5,000.

212.     Wellness, Lukens, Treasure Coast, and National Labs are out-of-network providers.

213.     In one example, Lukens, Treasure Coast, Wellness, and National Labs billed United nearly $1,000,000 for four patients.  The applicable benefit plan provided that charges in excess of eligible expenses, including amounts in excess of the allowed amount, that are

balanced billed by an out-of-network provider do not count toward the annual out-of-pocket maximum. The plan further provided that the member is responsible to pay out of network providers for all amounts above the eligible/allowed amount. United determined that, of the nearly $1,000,000 billed, the allowed amount was approximately $110,000, and paid, or authorized for payment, a total of approximately $90,000 in accordance with plan terms. Thus, these four patients were responsible for hundreds of thousands of dollars under the plan, and Lukens and National Labs were obligated to collect that amount from the patients.

214. Similarly, National Labs, Lukens, Treasure Coast, and Wellness billed United nearly $1.1 million for UDT for patients who were members of another plan. United paid or authorized for payment approximately $140,000. This plan provides that members must pay all applicable coinsurance and "are responsible for any amount a provider charges over the reasonable and customary charge. The plan further provides that amounts over the reasonable and customary charge are not covered expenses under the plan, do not count toward the plan's deductible or out-of-pocket maximums, and must be paid by the member. In addition, the plan provides, that "no benefits are provided for health services for which any patient responsibility, such as copayments, deductibles, etc., are waived. Thus, at a minimum, National Labs, Lukens, Treasure Coast, and Wellness were responsible for collecting approximately $900,000 from these patients.

215. Given the astronomical charges generated by National Labs, Lukens, and Treasure Coast, there is no legitimate or rational reason that a United member would ever knowingly consent to have his or her lab testing performed by these providers. Even assuming that a member's health benefit plan includes a 20% copayment/coinsurance obligation for out-of-network lab services and protection against any balance billing from out-of-network (which

is the best case scenario for services obtained from out-of-network services), a member would still be obligated to pay a copayment and/or coinsurance amounting to tens of thousands of dollars for urinalysis services alone. Indeed, Lukens, Treasure Coast, and National Labs made no good faith attempt to collect from their patients. Alerting patients to the vast sums that were being incurred undoubtedly would have resulted in patient complaints and refusals that would have threatened to unravel the scheme these providers orchestrated.

216.     National Labs, Lukens, Wellness, and Treasure Coast's general business practice of failing to make a good faith effort to collect coinsurance, copayments, and deductibles, and failure to seek to collect the full amount billed constitutes insurance fraud under Florida Statutes § 817.234(7)(a).

217.     Indeed, United representatives conducted interviews with a number of patients who received substance abuse treatment through the Treatment Management Web facilities and UDT from National Labs. Patients described their experiences, including the following:

   a.     The providers informed many patients that all treatment and UDT services were covered by their insurance plans, and never collected any copay, coinsurance, or deductible.

   b.     In some cases, the providers told the patients that the providers would cover whatever costs the patients' insurance did not.

   c.     In rare instances in which a payment was collected from a patient, that payment appeared to only be a small fraction of the patient's actual financial responsibility.

   d.     Patients did not recognize the name "National Laboratories," and never received bills from National Labs.

e.      The "providers" frequently paid for patients' airfare to travel to Treatment Management facilities, and did not require patients to repay these amounts.

f.      The providers never discussed the patients' UDT results with them.

g.      Patients learned of the facilities through the Internet, including through Aid In Recovery.

218.    In addition, the Treatment Management facilities and National Labs worked in concert to drive up billing for UDT services, knowing that the patients would bear no financial responsibility and the providers could obtain the patients' lucrative insurance benefits.  National Labs' billing vastly exceeded even the typical out-of-network charges.

**B.      Claim Submission Process**

219.    Lukens, Treasure Coast, Wellness, and National Labs billed United by submitting claims and supporting documentation electronically and through the United States mail, and received payments for these claims electronically and through the United States mail.

220.    The claims at issue in this Counterclaim generally are submitted and arise under the following categories: (a) individual health insurance policies issued by United; (b) group health policies issued by United which may fund ERISA and non-ERISA employee health benefit plans; and (c) ERISA and non-ERISA employer self-funded health plans administered, but not funded, by United.

221.    Sometimes, when a plan member receives services from an out-of-network provider, the provider bills the member for the services performed and the member pays the full amount billed.  The member then submits a claim to United for reimbursement of some part of

what the member paid.  United processes the member's claim and remits a reimbursement to the member pursuant to the terms of the member's Plan.

222.    However here, when a provider, such as National Labs, Lukens, Treasure Coast, or Wellness submits a claim to United, the provider certifies that the claim's contents are correct, complete, authorized by a physician, lawfully rendered, and medically necessary.  National Labs, Lukens, Treasure Coast, and Wellness know that in order to receive payments from United for their services, they must certify and represent that the services were performed at the request of the medical provider listed in the claim and that the medical provider determined the services to be medically necessary.  In paying or authorizing payment of claims for insurance or employee health benefits and determining whether services are eligible for payment, United relies on the claims submitted by medical service providers such as National Labs, Lukens, Treasure Coast, and Wellness.  The provider's certification is material and is relied upon by United, and United will not pay or authorize for payment a claim unless this certification is included.

223.    National Labs, Lukens, Treasure Coast, Wellness, and Sunshine Doctors submitted or caused to be submitted bills for reimbursement to United on CMS-1500 forms and/or 837p electronic forms, which constituted representations that the services were rendered on behalf of the patient, and that such services were lawfully provided and that "the services listed [in the forms submitted to United] were medically indicated and necessary to the health of this patient and were personally furnished by me [i.e., signing provider] or my employee under my personal direction." *See **Exhibit MM***, exemplar CMS-1500 form.

224.    United receives nearly two million claims for health care benefits per day, and is subject to various laws, regulations, and health care plans that require United to make determinations and pay claims within a short time period.  Thus, United must rely on the

information the providers include in the submission of the CMS 1500 and/or 837p forms to determine whether a claim should be paid.

**C.     Claims and Documents National Labs, Lukens, Treasure Coast, Wellness, and Sunshine Doctors Submitted to United**

225.     National Labs, Lukens, Treasure Coast, Sunshine Doctors, and Wellness submitted hundreds of thousands of claims for SUD treatment and UDT from 2014 through 2017.  Charges for these claims totaled nearly $204 million for UDT and more than $44 million for SUD treatment and related services.  *See Exhibits A, S, and T*.

226.     National Labs, Lukens, Treasure Coast, Sunshine Doctors, and Wellness submitted these bills to United because the patients at issue were members, insureds, or participants in individual or group policies or health care plans either insured or administered by United.

227.     United periodically reviews claims and billing procedures as part of its compliance process.  As United identified examples of discrepancies and other issues relating to National Labs, Lukens, Treasure Coast, and Wellness' submissions for urinalysis testing, it requested additional information from these entities including, among other things, medical records, treatment records, laboratory testing orders, signed referrals/orders, laboratory reports, and related correspondence, to verify the propriety and necessity of the claims.  *See Exhibit NN*, Example Request for Medical Records.  United typically does not receive these types of laboratory records through the normal claim submission process, and must rely on providers' representations in the standard claims forms to authorize and pay claims.

228.     National Labs, Lukens, and Treasure Coast responded to some of United's requests by providing some copies of treatment records, POC testing results, urinalysis testing order forms, machine-analyzed presumptive results, definitive UDT results, and invoices for

69

urinalysis testing for certain patients.  The documentation provided by these entities supports United's allegations regarding a fraudulent testing scheme and medically unnecessary and/or unauthorized urinalysis testing.  *See, e.g., **Exhibits A, FF-HH***.  Thus, National Labs, Lukens, and Treasure Coast were representing that the testing was medically necessary, lawfully rendered, and authorized, when in fact the UDT was done in furtherance of a predetermined testing scheme to maximize billing.  *See id.; **Exhibit DD***.

229.     Each claim listed on Exhibits A, S, T, and LL arose from the improper testing protocol scheme perpetrated by National Labs, Lukens, Treasure Coast, Wellness, and Treatment Management to obtain insurance benefits by submitting bills for unauthorized and unnecessary UDT services.

230.    A person commits insurance fraud if that person, "with the intent to injure, defraud, or deceive any insurer . . . presents or causes to be presented any written or oral statement as part of, or in support of, a claim for payment or other benefit pursuant to an insurance policy . . . , knowing that such statement contains any false, incomplete, or misleading information concerning any fact or thing material to such claim."  Fla. Stat. § 817.234(a)(1).

231.    A person also commits insurance fraud if that person "[p]repares or makes any written or oral statement that is intended to be presented to any insurer in connection with, or in support of, any claim for payment or other benefit pursuant to an insurance policy . . . knowing that such statement contains any false, incomplete, or misleading information concerning any fact or thing material to such claim."  Fla. Stat. § 817.234(a)(2).

232.    A statement "includes, but is not limited to, any notice, statement, proof of loss, bill of lading, invoice, account, estimate of property damages, bill for services, diagnosis,

prescription, hospital or doctor records, X-ray, test result, or other evidence of loss, injury, or expense." Fla. Stat. § 817.234(6).

233.    Florida Statutes section 817.234 also provides, "[i]t shall constitute a material omission and insurance fraud, punishable as provided in subsection (11), for any service provider, other than a hospital, to engage in a general business practice of billing amounts as its usual and customary charge, if such provider has agreed with the insured or intends to waive deductibles or copayments, or does not for any other reason intend to collect the total amount of such charge." Fla. Stat. § 817.234(7)(a).

234.    The failure of a provider, such as Lukens, Treasure Coast, National Labs, or Wellness to make "a good faith attempt to collect such deductible or copayment" as a regular business practice constitutes insurance fraud in violation of section 817.234. *Id.*

235.    In addition, as described above, the Patient Brokering Statute, § 817.505 broadly prohibits "any person, including any health care provider or health care facility" from offering or paying "a commission, benefit, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, . . . , to induce the referral of a patient or patronage to or from a health care provider or facility." Fla. Stat. § 817.505(1)(a).  The Patient Brokering Statute also prohibits soliciting or receiving "a commission, benefit, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, . . . , in return for referring a patient or patronage to or from a health care provider or facility." Fla. Stat. § 817.505(1)(b).  Finally, the Patient Brokering Statute prohibits aiding, abetting, advising, or other participating in the conduct prohibited by the Statute.  *See* Fla. Stat. § 817.505(1)(d).

236.    Florida's Anti-Kickback Statute, § 456.054, also prohibits providers of health care services from "offer[ing], pay[ing], solicit[ing], or receiv[ing] a kickback, directly or indirectly,

overtly or covertly, in cash or in kind, for referring or soliciting patients." Fla. Stat. §
456.054(2). A kickback means "a remuneration or payment, by or on behalf of a provider of
health care services or items, to any person as an incentive or inducement to refer patients for
past or future services or items, when the payment is not tax deductible as an ordinary and
necessary expense." Fla. Stat. § 456.054(1). Paying or receiving a kickback is also considered
patient brokering. *See* Fla. Stat. § 456.054(3)

237. Counter-Defendants violated FDUTPA and their submission of claims to United
to collect charges that were not owed constituted insurance fraud under Florida Statutes
§ 817.234. In addition, their perpetration of a patient brokering and kickback scheme also
violates FDUTPA. Further, their conduct in violation of these statutes was unlawful, unfair, and
deceptive and forms the basis for United's claims for unjust enrichment, declaratory judgment,
overpayment and FDUTPA violations.

## IX.    CLAIMS FOR RELIEF

**A.    First Claim for Relief – Violation of Florida Deceptive and Unfair Trade Practices
Act, Fla. Stat.  § 502.201 *et seq.* ("FDUTPA") (As to All Counter-Defendants)**

238. United incorporates, adopts, and re-alleges the factual allegations set forth in
paragraphs 1 through 237 above as if fully set forth herein.

239. FDUTPA prohibits "unfair methods of competition, unconscionable acts or
practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."
Fla. Stat. §§ 501.202(2), 501.204(1).

240. National Labs, Lukens, Treasure Coast, and Wellness were, at all material times,
actively engaged in trade and commerce in the State of Florida.

241. United is a consumer as defined by Florida Statute § 501.203(7).

242.     As described in detail above and summarized below, National Labs, Lukens, Treasure Coast,  Wellness, Treatment Management, Aid in Recovery, and Sunshine Doctors, all with common ownership, engaged in a pattern of unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce by, among other things:

a.   Aid In Recovery, Treatment Management, Wellness, Lukens, and Treasure Coast engaged in unlawful patient brokering and kickback arrangements in violation of Florida Statutes §§ 817.505 and 456.054.  Violations of these statutes constitute *per se* deceptive and/or unfair conduct under FDUTPA.  In addition, patient brokering and kickback schemes constitute unfair, deceptive, and unconscionable acts and trade practices under a traditional FDUTPA analysis.

b.   Counter-Defendants, in concert with one another, instituted and executed a predetermined protocol pattern of ordering excessive, unnecessary, and exorbitantly expensive UDT for all patients multiple times per week, irrespective of a patient's individualized needs, risk factors, clinical indications, or health concerns, in order to maximize billing and enrich the Web.

c.   Wellness, Lukens, and Treasure Coast, through Sunshine Doctors and under Treatment Management's direction, performed UDT on-site and also ordered the UDT according to the rote 3/2 Protocol of testing patients several days per week and also upon "discharge" from one level of care and "admission" to a lower level, even if the "admission" and "discharge" occurred on the same day and the patient never went unsupervised.

d.   Wellness, Lukens, and Treasure Coast would perform additional UDT and order additional UDT before receiving results from previous testing. Likewise, National

Labs often performed UDT on urine specimens prior to reporting results of the previous specimens.

e.  National Labs knowingly accepted the urine specimens multiple times per week, often delayed performing UDT and reporting results, and submitted astronomical and unconscionable charges to United.

f.  Counter-Defendants made no effort to locate in-network labs from which Counter-Defendants could order UDT and reduce costs; rather, ordered UDT from National Labs to enrich the Web.

g.  Under Treatment Management's direction, Wellness, Lukens, Treasure Coast, and Sunshine Doctors routinely and intentionally performed and/or ordered "double presumptive" tests on the same date of service, and also ordered definitive UDT before receiving the results of presumptive UDT.

h.  Under Treatment Management's direction, Wellness, Lukens, Treasure Coast, and National Labs ordered and/or performed UDT for predetermined and extensive lists of numerous substances, regardless of patient-specific factors.

i.  National Labs, Lukens, Treasure Coast, and Wellness's failure to engage in a good faith effort to collect copayments, coinsurance, deductibles, and differentials between billed amounts and Eligible Expenses constitutes insurance fraud, which also serves as a *per se* basis for violation of FDUTPA pursuant to Florida Statutes §§ 501.203(3)(c) and 817.234(7).

243.    National Labs, Lukens, Treasure Coast, Wellness, Sunshine Doctors, Aid In Recovery, and Treatment Management's conduct is deceptive because it is based on

representations, omissions, and other acts and practices that are likely to mislead consumers, including United, who acted reasonably under the circumstances to its detriment.

244.    The above-described acts and omissions of all Counter-Defendants offend the established public policy of the State of Florida and are illegal, immoral, unethical, oppressive, unscrupulous, and substantially injurious to United and its insureds.

245.    As a direct and proximate result of the above-described deceptive and unfair trade practices of National Labs, Lukens, Treasure Coast, Wellness, Sunshine Doctors, Aid In Recovery, and Treatment Management, United was damaged. *See **Exhibits A, S, T, LL.*** These deceptive and unfair trade practices caused United to pay or authorize payment to National Labs, Lukens, Treasure Coast, and Wellness for millions of dollars for medical services that were unauthorized, medically unnecessary, and non-compensable. It also created tens or hundreds of thousands of dollars in personal financial liability to each patient pursuant to their copayment, coinsurance, and deductible obligations for out-of-network providers.

246.    Counter-Defendants' unlawful, deceptive, and unfair practices have harmed not only United, but also plan members and health care consumers generally by artificially inflating the cost of health care services for their own pecuniary gain.

247.    National Labs, Lukens, Treasure Coast, Wellness, Treatment Management, Sunshine Doctors, and Aid In Recovery are jointly and severally liable for the violations of FDUTPA, as each played an essential role as a perpetrator of the scheme and each participated in the unfair, deceptive, and unlawful conduct.

248.    United retained the services of the undersigned counsel to represent it in this matter and agreed to pay such firm a reasonable fee for their services for which National Labs, Lukens, Treasure Coast, and Wellness are liable pursuant to Florida Statutes § 501.2105.

WHEREFORE, United respectfully requests this Court to enter judgment in its favor, jointly and severally, against National Labs, Lukens, Treasure Coast, Wellness, Treatment Management, Sunshine Doctors and Aid in Recovery for actual damages, attorney's fees, and costs, and grant such other relief as the Court deems just and appropriate.

**B.      Second Claim for Relief – Unjust Enrichment (As to National Labs, Lukens, Treasure Coast, Sunshine Doctors, and Wellness)**

249.      United incorporates as though fully set forth herein the allegations in paragraphs 1 through 237 above.

250.      United conferred benefits on National Labs, Lukens, Treasure Coast, Sunshine Doctors, and Wellness by making or authorizing payments to them, directly or indirectly, in the amounts listed on *Exhibits A, S, T, and KK*, pursuant to false, illegal, and improper claims for health insurance benefits related to medical services that were not lawfully rendered.  The applicable policies and plans issued or administered by United are not required to cover unlawful, unauthorized, or medically unnecessary treatment and/or testing, and United is not obligated to pay or authorize payment of claims arising from such treatment and/or testing.

251.      As described above, National Labs, Lukens, Treasure Coast, Sunshine Doctors, and Wellness made false and fraudulent statements or omissions of fact to United, with respect to the medical necessity and authorization for the UDT it allegedly performed on substance abuse patients.

252.      In addition, as described above, Counter-Defendants engaged in an unlawful patient brokering and kickback scheme through which patients were referred to Web treatment facilities, rendering claims for treatment void and non-compensable.

253.      United processed benefits and paid or authorized payment of claims submitted for UDT services allegedly provided by National Labs, Lukens, Treasure Coast, and Wellness and,

as a result, National Labs, Lukens, Treasure Coast, and Wellness received payments amounting to $16,547,089.37 from United.  *See Exhibit A*.

254.    United processed benefits and paid or authorized payment of claims submitted for SUD treatment and related services allegedly provided by National Labs, Lukens, Treasure Coast, Sunshine Doctors and Wellness and, as a result, National Labs, Lukens, Treasure Coast, Sunshine Doctors, and Wellness received payments amounting to $6,123,141.72 from United. *See Exhibits S and T*.

255.    Thus, for the claims referenced on *Exhibits A, S, T*, and *LL*, National Labs, Lukens, Treasure Coast, Sunshine Doctors, and Wellness obtained a benefit from United through fraudulent conduct, receiving payment for claims that included charges for unreasonable, unauthorized, and unnecessary treatment, diagnostics, and related health care services based not on patient needs but an intentionally fraudulent protocol scheme designed to significantly inflate the value of the patients' insurance claims.

256.    National Labs, Lukens, Treasure Coast, Sunshine Doctors, and Wellness' conduct in developing, implementing, and concealing the scheme was designed to enrich National Labs, Lukens, Treasure Coast, Sunshine Doctors, and Wellness, and their owners, to the detriment of United and the health benefit plans it administers. These benefits were procured by National Labs, Lukens, Treasure Coast, Sunshine Doctors, and Wellness' fraud, and involved the violation of Florida criminal statutes that prohibit health care professionals from submitting to a patient or a third-party payor a bill for a treatment that the facility or professional knows was not provided or knows was improper, unreasonable, or medically or clinically unnecessary.  *See* Fla. Stat. § 817.234(1).

257.     Under these circumstances, National Labs, Lukens, Treasure Coast, Sunshine Doctors, and Wellness were not entitled to seek, receive, or retain payments from or authorized by United, and it would be unjust for National Labs, Lukens, Treasure Coast, Sunshine Doctors, and Wellness to be permitted to keep these payments. National Labs, Lukens, Treasure Coast, Sunshine Doctors, and Wellness have not returned the payments to United or to the health benefit plans United administers.

258.     The money National Labs, Lukens, Treasure Coast, Sunshine Doctors, and Wellness received from United belongs in good conscience to United, United's plans, and to the sponsors and administrators of those plans.

259.     By virtue of the foregoing, United and the health benefit plans it administers are entitled to disgorgement and/or restitution of the benefits National Labs, Lukens, Treasure Coast, Sunshine Doctors, and Wellness obtained from or through United by fraud, deception, unfair practices, and/or unlawful conduct.

260.     National Labs, Lukens, Treasure Coast, Sunshine Doctors, and Wellness are jointly and severally liable to United, as each played an essential role as a perpetrator of the scheme and each participated in the fraudulent and unlawful conduct underlying this claim.

WHEREFORE, United respectfully requests this Court to enter judgment in its favor, jointly and severally, against National Labs, Lukens, Treasure Coast, Sunshine Doctors, and Wellness, and require them to disgorge all monies paid by United to them, directly or indirectly, for the unlawful and non-compensable services described herein, and grant such other relief as the Court deems just and appropriate.

**C.   Third Claim for Relief – Claim for Overpayment Under ERISA § 502(a)(3) (National Labs)**

261.   United incorporates by reference every allegation set forth in paragraphs 1 through 237 above.

262.   With respect to the ERISA-governed plans United insures or administers, United acts as a claims fiduciary, either as a third-party administrator of employer-sponsored and employer-funded group health benefit plans, or as an insurer of employer-sponsored group health benefit plans.

263.   In addition, under the relevant plans, United is an ERISA fiduciary and has the authority to review and make decisions on claims for benefits under the applicable plans, and has standing to sue under Section 502(a)(3) of ERISA to obtain appropriate equitable relief and enforce the terms of the ERISA-governed plans.

264.   The payments identified in *Exhibit LL* provided to National Labs do not constitute covered services under the relevant health and welfare benefit plans, and violate United reimbursement policies applicable to these benefit claims, and in particular, the Laboratory Services Policy.

265.   National Labs was not entitled to seek, collect, or retain the payments it received from or through United's administration of the benefit claims at issue. National Labs has not returned the payments to United.

266.   The ERISA-governed plans grant United, as an ERISA fiduciary, the right to recover any overpayments or other payments made under the plans. Pursuant to ERISA and the express terms of the plans, United is entitled to recover the overpayments made to National Labs.

267.   United seeks to recover all overpayments that have been made to National Labs identified in *Exhibit LL*.

268.     These overpayments were made or authorized directly by United to National Labs.

269.     Without limitation, United seeks (i) a constructive trust over the payments that United made or authorized to the National Labs, (ii) an order requiring the return of such funds, and (iii) a constructive trust over any such funds in the possession or control of the National Labs as a result of the conduct specified herein.

WHEREFORE, United respectfully requests this Court to enter judgment in its favor against National Labs for the amount of United's overpayment, and grant such other relief as the Court deems just and appropriate.

**D.     Fourth Claim for Relief – Declaratory Relief Under 28 U.S.C. § 2201**
**(As to National Labs, Lukens, Treasure Coast, Sunshine Doctors, and Wellness)**

270.     United incorporates as though fully set forth herein the allegations in paragraphs 1 through 237 above.

271.     There is an actual case or controversy between United and National Labs, Lukens, Treasure Coast, and Wellness as to the demands and charges submitted to United by National Labs, Lukens, Treasure Coast, and Wellness, which have not been paid and which are set forth in *Exhibits A, S, T, and LL*.

272.     By submitting, or causing to be submitted, bills, claims, and supporting documentation that were actually the result of unauthorized and medically unnecessary urinalysis testing, National Labs, Lukens, Treasure Coast, Sunshine Doctors, and Wellness represented that these charges are legitimate, medically necessary and compensable.

273.     By submitting, or causing to be submitted, bills, claims, and supporting documentation that were actually the result of patient brokering and kickback arrangements,

National Labs, Lukens, Treasure Coast, Sunshine Doctors, and Wellness represented that these charges are legitimate, medically necessary and compensable

274.    Payment for National Labs, Lukens, Treasure Coast, Sunshine Doctors, and Wellness' pending and/or unpaid charges is not owed because these charges are the product of an unlawful testing scheme and an unlawful patient brokering and kickback scheme.

275.    There is a bona fide, present, and practical need for a declaration as to all such outstanding charges.

WHEREFORE, pursuant to 28 U.S.C. § 2201(a), United respectfully requests this Court to enter judgment in its favor declaring that: any of National Labs, Lukens, Treasure Coast, and Wellness' unpaid charges for POC, machine-analyzed presumptive, and definitive UDT are not owed because they are the product of an unlawful testing scheme to collect insurance benefits, and enforcement of those charges would contravene the strong public policy of Florida; and any of National Labs, Lukens, Treasure Coast, Sunshine Doctors, and Wellness' unpaid charges for any service that are the product of a patient brokering or kickback arrangement are not owed because they are deceptive, unfair, and unlawful, and enforcement of those charges would contravene the strong public policy of Florida.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, United demands a trial by jury on all issues so triable.

WHEREFORE, United respectfully requests this Court to enter judgment in its favor, jointly and severally against National Labs, Lukens, Treasure Coast, Wellness, Treatment Management, Sunshine Doctors, and Aid In Recovery, and grant such other relief as the Court deems just and appropriate.

45448753;3

Date: June 8, 2018                                   Respectfully submitted,

                                                     /s/ Sandra L. Heller
                                                     David I. Spector (FBN: 086540)
                                                     E-mail: david.spector@akerman.com
                                                     Sandra L. Heller (FBN: 037055)
                                                     E-mail: sandra.heller@akerman.com
                                                     Irene A. Bassel Frick (FBN: 158739)
                                                     E-mail: irene.basselfrick@akerman.com
                                                     Andrew M. Loewenstein  (FBN: 073096)
                                                     E-mail: andrew.loewenstein@akerman.com
                                                     Darcie A. Thompson (FBN: 124888)
                                                     E-mail: darcie.thompson@akerman.com
                                                     AKERMAN LLP
                                                     777 South Flagler Drive,
                                                     Suite 1100, West Tower
                                                     West Palm Beach, FL 33401
                                                     Telephone:  (561) 653-5000
                                                     Facsimile:   (561) 659-6313
                                                     Attorneys for Defendants


## CERTIFICATE OF SERVICE

I hereby certify that on June 8, 2018, I electronically filed this Motion with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on parties listed in the below Service List via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner.

                                         By: /s/ Sandra Heller

45448753;3

**SERVICE LIST**

*National Laboratories, LLC, The Lukens Institute, LLC, Treasure Coast Recovery, LLC v. Unitedhealth Group, Inc., United Healthcare Services, Inc.,  Unitedhealthcare Insurance Company,  United Healthcare Services LLC, Optum, Inc., and Golden Rule Insurance  Company. Case No.: 9:17-cv-81178-DMM United States District Court, Southern District of Florida, West Palm Beach Division*

| | |
|---|---|
| Jason S. Mazer, Esq.<br>CIMO MAZER MARK PLLC<br>100 SE 2nd Street, Ste. 3650<br>Miami, FL 33131<br>Telephone:  (305) 374-6481<br>jmazer@cmmlawgroup.com<br>kshaw@cmmlawgroup.com<br><br>Anthony S. Hearn, Esq.<br>VER PLOEG & LUMPKIN, P.A.<br>100 S.E. 2nd Street, 30th Floor<br>Miami, FL 33131<br>Telephone: (305) 577-3996<br>Facsimile:  (305) 577-3558<br>ahearn@vpl-law.com<br><br>Glenn E. Solomon, Esq. (*pro hac vice*)<br>Jonathan H. Shin, Esq. (*pro hac vice*)<br>HOOPER, LUNDY & BOOKMAN, PC<br>1875 Century Park East, Suite 1600<br>Los Angeles, CA 90067<br>Telephone: (310) 551-8179<br>gsolomon@health-law.com<br>jshin@health-law.com<br><br>David S. Schumacher, Esq. (*pro hac vice*)<br>HOOPER, LUNDY & BOOKMAN, PC<br>470 Atlantic Avenue, Suite 1201<br>Boston, MA  02210<br>Telephone:  (617) 532-2704<br>dschumacher@health-law.com<br><br><br>*Attorneys for Plaintiffs* | David I. Spector, Esq.<br>Sandra L. Heller, Esq.<br>Irene A. Bassel Frick, Esq.<br>Andrew M. Loewenstein, Esq.<br>Darcie A. Thompson, Esq.<br>AKERMAN LLP<br>777 South Flagler Drive<br>Suite 1100, West Tower<br>West Palm Beach, FL 33401<br>Telephone: (561) 653-5000<br>Facsimile:  (561) 659-6313<br>david.spector@akerman.com<br>sandra.heller@akerman.com<br>irene.bassel@akerman.com<br>andrew.loewenstein@akerman.com<br>darcie.thompson@akerman.com<br><br>*Attorneys for Defendants, Unitedhealth Group, Inc.;  United,  Healthcare  Services,  Inc.; Unitedhealthcare  Insurance  Company,  Inc.; United Healthcare Services, LLC; Optum, Inc.; and Golden Rule Insurance Company* |

45448753;3